RECEIPT # 54084
AMOUNT $ 150 —
SUMMONS ISSUED _____
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. Kim Abrad
DATE 2-25-04

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

------------------------------------------x

UNITED STATES OF AMERICA, *ex rel.*
CHERYL D. ECKARD,                                    CASE NO.:

                    Plaintiff,          **04 - 10375 JLT**

          v.
                                        COMPLAINT AND
                                        JURY DEMAND

GLAXOSMITHKLINE HOLDINGS (AMERICAS) INC.,      FILED IN CAMERA
SB PHARMCO PUERTO RICO, INC. and ROCHE         AND UNDER SEAL
HOLDING AG,

                    Defendants.         MAGISTRATE JUDGE _____

------------------------------------------x

**SEALED**

**DOCKETED**



## TABLE OF CONTENTS

| | |
|---|---|
| INTRODUCTION ................................... | 1 |
| JURISDICTION AND VENUE ......................... | 5 |
| PARTIES ........................................ | 5 |
| NON-PARTY PARTICIPANTS.......................... | 7 |
| GOVERNMENT PROGRAMS ............................ | 9 |
| RELEVANT LAWS, RULES AND REGULATIONS ........... | 12 |
| SUMMARY OF FALSE CLAIMS ACT LIABILITY ........... | 17 |
|     GSK ....................................... | 18 |
|     Roche ..................................... | 25 |
|     Damages ................................... | 26 |
| PARTICULARS OF FALSE CLAIMS ACT VIOLATIONS ...... | 27 |
|     Background ................................ | 27 |
|     GSK's Response to the FDA: Warning Letter "Recovery" ................................ | 30 |
|     Alleged Product Diversion ................. | 43 |
|     Eckard's Termination, Report to GSK's Compliance Department and Report to the FDA .. | 46 |
|     Details of cGMP and Related Violations ...... | 48 |
|         Product Comingling ..................... | 48 |
|         Laboratory Investigations ........... | 52 |
|         Process Validation .................... | 57 |
|         Equipment Calibration ................ | 59 |
|         Overdue Process Investigations ...... | 61 |

-i-

Understaffing in the Quality Assurance
Unit  ..............................  63

Poor Documentation Quality  ...........  64

Contamination in Products Manufactured
in the Sterile Facility  ...............  65

Substandard Quality and Control of
Water Systems  .........................  67

OOS Events for Environmental Monitoring
of Manufacturing Areas and
Clean Equipment  .....................  68

Destruction of Audit Reports  ...........  68

Microbiology Laboratory ("Micro Lab")  ...  70

Substandard Air Quality  ...............  71

Cytotoxic Research & Development ("R&D")
Manufacturing  .........................  71

Other cGMP Issues  ....................  72

CONCLUSION  ....................................  73

CAUSES OF ACTION  ..............................  75

DEMAND FOR RELIEF  .............................  109

DEMAND FOR JURY TRIAL  .........................  113

## GLOSSARY OF TERMS

cGMPs       current Good Manufacturing Practices

DQRS        The FDA's Drug Quality Reporting System

FCA         False Claims Act, 31 U.S.C. § 3729, *et. seq.*

FDA         Food and Drug Administration

FDA-483     FDA Form FD483, a list of "observations" representing
            violations the FDA believes a manufacturer has
            committed

FDC Act     Federal Food, Drug and Cosmetics Act, 21 U.S.C. §§ 301
            *et seq*

GQA         Global Quality Assurance, a division of GSK

NDA         New Drug Application

OOS         Out-of-specification

QA          Quality Assurance

R&D         Research & Development

RTP         GSK headquarters in Research Triangle Park, North
            Carolina

SMIRT       Senior Management Incident Reporting Team, a senior
            management team established at Cidra in 2002

SOPs        Standard Operating Procedures

Plaintiff/relator, Cheryl D. Eckard, in the name of and on behalf of the United States of America, the State of California, the State of Delaware, the State of Florida, the State of Hawaii, the State of Illinois, the State of Massachusetts, the State of Nevada, the State of Tennessee, the State of Texas, the State of Louisiana, the State of Virginia, and the District of Columbia, by her attorneys, Getnick & Getnick, as and for her complaint, alleges as follows:

## INTRODUCTION

1. As more fully alleged herein, this action arises out of a scheme or schemes to defraud the United States of America, the fifty states, and the District of Columbia perpetrated by the defendants, commencing in or before 2000 and continuing to the date hereof.  The Defendants made and caused to be made to the United States, the fifty state governments and the District of Columbia false claims for payment for prescription drugs covered by Medicare, State Medicaid programs, the Department of Veterans Affairs, the Public Health Service and other federal and state purchasers of prescription drugs.  The claims were false or fraudulent because the drugs, which were manufactured at Defendant GlaxoSmithKline's plant in Cidra, Puerto Rico, were not safe and/or effective within the meaning of 42 U.S.C. 1396r

-1-

(8)(k)(3) and hence were not covered by federal and state government health programs. The false claims arose as a result of chronic, serious deficiencies in the quality assurance function at the Cidra plant and the defendants' ongoing violations of the laws and regulations designed to ensure the safety and effectiveness of drug products released to the market, including the current Good Manufacturing Practices, the Federal Food, Drug and Cosmetics Act, 21 U.S.C. §§ 301 et seq., and the Code of Federal Regulations, Part 21.

2. Further, Defendants GlaxoSmithKline and SB Pharmco Puerto Rico, Inc., failed adequately to investigate allegations of product diversion from the Cidra plant. On information and belief, this resulted in the distribution of reject drug product to the United States market and the submission of false claims for drug product that was not safe and/or effective, as set forth above.

3. The drugs affected by the defendants' conduct include Paxil, Paxil CR, Avandia, Avandamet, Coreg, Bactroban, Abreva, Cimetidine, Compazine, Denavir, Dyazide, Thorazine, Stelazine, Ecotrin, Tagamet, Relafen, Kytril, Factive, Dyrenium and Albenza.

4. The allegations set forth herein apply to defendant Roche

-2-

Holding AG only in so far as they relate to the drug Kytril.

5. These acts constitute violations of the federal False Claims Act, 31 U.S.C. § 3729, *et. seq.* ("FCA"), and numerous state equivalent statutes.[1]  The FCA provides, *inter alia*, that any person who knowingly presents and/or causes to be presented to the United States a false or fraudulent claim for payment is liable for a civil penalty of up to $11,000 for each claim, plus three times the amount of the damages sustained by the Government.  The FCA allows any person discovering a fraud perpetrated against the Government to bring an action for himself and for the Government and to share in any recovery.  The complaint in an FCA action is filed under seal for 60 days (without service on the Defendant within such 60-day period) to enable the Government (1) to conduct its own investigation

---

[1] As set forth below, the defendants' acts constitute violations of the California False Claims Act, Cal. Gov't Code §§ 12650-12655; the Florida False Claims Act, Fla. Stat. Ann. §§ 68.081-092; the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §§ 175/1-8; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-182 et seq.; the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §§ 36.001 et seq.; and the District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. §§ 1-1188.13-19; the Delaware False Claims and Reporting Act, 6 Del. C. § 1201(a)(1); the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21(a)(1); the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. 46:438.3(A); the Massachusetts False Claims Act, Mass. Gen. L. Ch. 12, §§ 5B(1); the Nevada False Claims Act, Nev. Rev. Stat. § 357.040(1)(a); and the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3(A)(1)

-3-

without the defendant's knowledge and (2) to determine whether to join in the action.

6. Plaintiff/relator Cheryl D. Eckard ("Eckard") is a former Manager of Global Quality Assurance for defendant GlaxoSmithKline. Eckard is an expert in Code of Federal Regulations, Part 21, compliance and an experienced pharmaceutical professional. She has a B.A. in Chemistry. She worked for GlaxoSmithKline from 1992 through 2003. She is an expert on the technical, legal, regulatory and compliance aspects of the pharmaceutical Good Manufacturing Practices and quality systems regulations relating to the development, manufacture, packaging, testing, holding and distribution of drug products. She has performed compliance functions including quality management of multiple manufacturing sites and preparing manufacturing sites for FDA pre-approval and current Good Manufacturing Process profile inspections. She has managed international commercial investigation teams, technical working parties and Warning Letter Recovery teams, and worked closely with the FDA and other regulatory bodies in developing implementation plans to respond to regulatory sanctions.

7. Eckard seeks to recover damages and civil penalties in the name of the United States and the states for the violations

-4-

alleged herein. On information and belief, as set forth in paragraphs 56 and 57 below, the damages and civil penalties that may be assessed against the defendants under the facts alleged in this Complaint amount to hundreds of millions of dollars.

8. Eckard also seeks to recover damages on her own behalf for retaliatory discharge under 31 U.S.C. § 3730(h) for her lawful acts done in furtherance of this action.

## JURISDICTION AND VENUE

9. This court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732.

10. Personal jurisdiction and venue are proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), as at least one of the defendants is found, has or had an agent or agents, has or had contacts, and transacts or transacted business and their affairs in this judicial district.

## PARTIES

11. Plaintiff/relator Eckard is a citizen of the United States and a resident of North Carolina. Eckard is a self-employed

-5-

consultant. Prior to June 2003, when she was terminated for her lawful acts done in furtherance of this action, Eckard was a Manager of Global Quality Assurance for GlaxoSmithKline, located in Research Triangle Park, North Carolina.

12. Defendant GlaxoSmithKline Holdings (Americas), Inc. ("GSK") is headquartered at 5 Moore Drive, Research Triangle Park, North Carolina 27709, and at One Franklin Plaza, Philadelphia, Pennsylvania 19102. GSK's parent company, GlaxoSmithKline PLC, is located at Charges House, 6-12 Charges Street, London, England WIY8DH. GSK is engaged in the development, manufacture, promotion, sale, interstate and international distribution of, *inter alia*, prescription drugs. GSK holds the second highest market share in the world pharmaceutical market. GSK has 100,000 employees in 100 countries, with 50% of its sales of prescription drugs in the United States. GSK's global pharmaceutical sales in 2002 totaled 18 billion pounds sterling.

13. Defendant SB Pharmco Puerto Rico, Inc. is a wholly-owned subsidiary of GSK located at 1250 South Collegeville Rd., Collegeville PA 19426. SB Pharmco Puerto Rico operates GSK's manufacturing plant located at Rd. 172, Km 9.2, Bo. Certenejas Cidra, PR 00739 ("Cidra"). Unless otherwise indicated, references herein to GSK include SB Pharmco Puerto Rico, Inc.

14. Defendant Roche Holding AG ("Roche") is a leading research-based health care enterprise and manufacturer of pharmaceuticals and diagnostics. Roche's U.S. prescription drug unit is Hoffman-LaRoche, Inc., which has its U.S. headquarters at 340 Kingsland Street, Nutley, NJ 07110. The global headquarters of Roche are located at CH-4070 Basel, Switzerland. In or about January 2001, Roche acquired the global rights for the drug Kytril from GSK for $1.23 billion. Kytril is marketed and sold exclusively by Roche but continues to be manufactured at the Cidra plant under contract with GSK. Global sales for Kytril were approximately 437 million Swiss francs in 2003. The allegations set forth herein apply to Roche only to the extent that they relate to Kytril.

## NON-PARTY PARTICIPANTS

15. David Pulman was GSK's Vice President of Manufacturing and Supply for North America until December 2002, when he became President, Global Manufacturing and Supply.

16. Janice Whitaker is GSK's Senior Vice President for Global Quality.

17. Steve Plating is GSK's Vice President for Quality, North

-7-

America.

18. Peter Savin is GSK's Vice President of Global Quality Assurance.

19. Diane Sevigny was Director of Global Quality Assurance for North America Pharma until July 2003 when she was promoted to Director, Global Quality Assurance, Risk Management and Compliance.

20. Jonathon Box is the Vice President of Manufacturing and Supply for North America.

21. Jose Luis Rosado was the President of SB Pharmco Puerto Rico, Inc. and General Manager of the Cidra plant until his resignation in April 2003.

22. Edwin Lopez was the Director of Quality at Cidra until the first quarter of 2003 when he was replaced in that role by Adalberto Ramirez and became Director of Laboratories at Cidra.

23. Adalberto Ramirez was the Director of Solid Manufacturing and Packaging at Cidra until the first quarter of 2003 when he was promoted to Director of Quality at Cidra.  He left the company in

-8-

July 2003.

24. Gloria Martinez was the Quality Assurance and Regulatory
Manager at Cidra until 2003 when she replaced Adalberto Ramirez
as Director of Quality.

25. Marion Lon is the site director of Cidra who took over from
Rosado in or about April 2003.

26. Carmelo Rosa is the FDA's San Juan District Office Compliance
Officer.

## GOVERNMENT PROGRAMS

27. Medicaid is the nation's medical assistance program for the
needy, the medically-needy aged, blind, and disabled and families
with dependent children. 42 U.S.C. §§ 1396-1396v. Medicaid is
largely administered by the states and funded by a combination of
Federal and State funds. Approximately 57% of Medicaid funding
is provided by the Federal Government. Among other forms of
medical assistance, the Medicaid programs cover outpatient
prescription drugs. 42 U.S.C. §§ 1396a(10)(A) and 1396d(a)(12).

28. Under 42 U.S.C. 1396r-8(k), a "covered outpatient drug" is

-9-

defined, *inter alia*, as one that "is approved for safety and effectiveness as a prescription drug under section 505 or 507 of the Federal Food, Drug, and Cosmetic Act or which is approved under section 505(j) of such Act."

29. Medicare is the nation's health program for persons over 65 and the disabled. Medicare is funded by the federal government. Medicare covers outpatient prescription drugs that are provided to a patient "incident to" a physicians' services, including injectable medications, and drugs that are required for the effective use of durable medical equipment. 42 U.S.C. § 1395x(s)(2)(A).

30. The Department of Veterans Affairs ("VA") provides medical assistance, including prescription drug coverage, for persons who have been discharged from active duty service in the military, naval, or air service.

31. The Public Health Service ("PHS") provides funding, including outpatient drug coverage, for entities such as black lung clinics, AIDS drug purchasing assistance programs, hemophilia diagnostic treatment centers, urban Indian organizations, disproportionate share hospitals, and other entities listed in § 340B(a)(4) of the Public Health Service Act.

-10-

32. The Department of Defense ("DOD") administers the TRICARE health care program for active duty and retired members of the uniformed services, their families, and survivors. TRICARE benefits include comprehensive prescription drug coverage.

33. Drug manufacturers enter into a Master Agreements with the VA (executed by the VA on behalf of itself, the DOD, the PHS and the Coast Guard), under which manufacturers agree to enter into Pharmaceutical Pricing Agreements with the VA for its covered drugs.   In the Master Agreement, "covered drug" has the same meaning as "covered outpatient drug" in the Social Security Act § 1927(k)(42 U.S.C. 1396r-8(k); see paragraph 28 above).  See Master Agreement, paragraph I(d), defining "covered drug."

34. The Food and Drug Administration ("FDA") is responsible for protecting the public health by assuring the safety, efficacy, and security of human and veterinary drugs, biological products, medical devices, the nation's food supply, cosmetics, and products that emit radiation.  The FDA administers, *inter alia*, the Federal Food, Drug and Cosmetics Act, ("FDC Act"), 21 U.S.C. §§ 301 *et seq*.

-11-

## RELEVANT LAWS, RULES AND REGULATIONS

35. Prescription and over-the-counter drugs must be manufactured, processed, packed and held, *inter alia*, in accordance with the requirements of: 21 U.S.C. §351(a)(2)(A) and (B); the current Good Manufacturing Practice ("cGMP") regulations set forth in 21 C.F.R. Parts 210 and 211; and 21 U.S.C. § 355(b)(1)(B)-(D).

36. Title 21 U.S.C. §§ 351(a)(2)(A) and(B) provide that a drug or device shall be deemed to be adulterated "(A) if it has been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health; or (B) the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this Act as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess[.]" It is a violation of the FDC Act, 21 U.S.C. §§ 331(a) to directly or indirectly cause adulterated drugs to be introduced or delivered for introduction into interstate commerce.

-12-

37. Title 21 U.S.C. §§ 355(b)(1)(B)-(D) provides that
applications to the FDA for approval of new drugs ("NDAs") must
include: "(B) a full list of the articles used as components of
such drug; (C) a full statement of the composition of such drug;
(D) a full description of the methods used in, and the facilities
and controls used for, the manufacture, processing, and packing
of such drug[.]" Approval by the FDA of this drug formula and
method of manufacture is required for introduction of the drug in
interstate commerce and distribution for human use.

38. The cGMP regulations are codified in 21 C.F.R. Parts 210 and
211 and contain the minimum requirements to be used for the
manufacture, processing, packing, and holding of drugs to assure
that they meet the safety, identity, strength, quality, and
purity characteristics that they purport to possess.
Manufacturers demonstrate compliance with cGMPs through written
documentation of procedures and practices. The cGMPs dictate,
inter alia, standards for: personnel engaged in quality control;
the design, construction and maintenance of buildings and
facilities; the construction, cleaning and maintenance of
equipment; the storage, inspection and testing of drug components
and containers; the control of production and process, including
procedures for sampling and testing of in-process drug products
for conformity with specifications and prevention of

-13-

microbiological contamination; control of packaging, labeling, storage and distribution; laboratory controls including testing of drug product batches for conformity with final specifications; the maintenance of records and reports and conduct of investigations; and procedures for handling of returned and salvaged product.

39. The FDA operates a Drug Quality Reporting System ("DQRS"), which includes the MedWatch reporting program. The DQRS, which serves as a vital link in the FDA's regulatory scheme, is an important part of the postmarketing surveillance phase of regulating drugs. It is designed to rapidly identify significant health hazards associated with the manufacturing and packaging of drugs, and to establish a central reporting system for detecting problem areas or trends requiring regulatory action. Doctors and pharmacists can report drug quality problems, such as defective components, poor packaging or labeling, suspected contamination or questionable stability to the FDA, the manufacturer, or both, using a standard form.

40. Pursuant to 21 C.F.R. § 314.81 (b)(1)(i) and (ii), manufacturers are required to notify the FDA by filing a "Field Alert" within 3 working days of the receipt, via the Medwatch system or otherwise, of: (i) information concerning any incident

that causes the drug product or its labeling to be mistaken for, or applied to, another article; (ii) information concerning any bacteriological contamination, or any significant chemical, physical, or other change or deterioration in the distributed drug product, or any failure of one or more distributed batches of the drug product to meet the specifications established for it in the new drug application.

41. The FDA does not have authority to order the recall of defective products. The FDA expects manufacturers to take full responsibility for product recalls, including follow-up checks to assure that recalls are successful. Under 21 C.F.R. § 7.40, "[r]ecall is a voluntary action that takes place because manufacturers and distributors carry out their responsibility to protect the public health and well-being from products that present a risk of injury or gross deception or are otherwise defective." The FDA's guidelines "categorize all recalls into one of three classes according to the level of hazard involved: Class I recalls are for dangerous or defective products that predictably could cause serious health problems or death. Examples of products that could fall into this category [include] ... a label mix-up on a life saving drug ... Class II recalls are for products that might cause a temporary health problem, or pose only a slight threat of a serious nature. One example is a

-15-

drug that is under-strength but that is not used to treat life-threatening situations. Class III recalls are for products that are unlikely to cause any adverse health reaction, but that violate FDA labeling or manufacturing regulations." FDA Recall Policies, FDA Center for Food Safety and Applied Nutrition, Industry Affairs Staff Brochure, June 2002. See also FDA Investigations Operations Manual, Chapter 800 (801.1).

42. Under the FDC Act § 704, 21 U.S.C. § 374, the FDA is authorized to conduct inspections of drug manufacturing facilities, including inspections of records, files, papers, processes, controls, and facilities. At the conclusion of the inspection, the FDA provides the manufacturer with a Form FD483 ("FDA-483"), or a list of "observations" representing violations the FDA believes the manufacturer has committed. The manufacturer is expected to respond in writing to each observation stating its position and any corrective action it proposes to take. The FDA takes this response into account in deciding whether further enforcement action is warranted.

43. Following an inspection or discovery of a violation, the FDA may issue a Warning Letter to the manufacturer representing its official findings of violations. FDC Act § 309, 21 U.S.C. § 336. The Warning Letter is the FDA's primary means of notifying

-16-

manufacturers of serious violations and of achieving prompt corrective action. The manufacturer must respond in writing to the Warning Letter within 15 days stating what action is being taken to correct the violations, what action will be taken to prevent similar violations, and the time frame for such action.

44. The FDA, acting through the Department of Justice, is authorized to seek injunctions, known as consent decrees, when there is a likelihood that violative acts will continue. FDC Act § 302, 21 U.S.C. § 332. A consent decree may be obtained, *inter alia*, where there have been multiple and continuing cGMP violations that have not been voluntarily corrected by the manufacturer. In such cases, the facility will typically be shut down until the manufacturer has brought itself into compliance, for example, by destroying adulterated product and revising standard operating procedures. Certification of compliance by an independent expert is often required before the FDA will permit normal operations to resume.

## SUMMARY OF FALSE CLAIMS ACT LIABILITY

45. The federal government endeavors to ensure the safety and efficacy of drug products consumed daily by millions of Americans through a combination of approvals, inspections, enforcement, and

-17-

self-regulation. Drug manufacturers are expected to ensure that
the complex and exacting processes involved in drug production,
packaging and distribution are conducted strictly in accordance
with the requirements of the cGMPs, which were designed as a
quality control measure to prevent super- and sub-potency,
product mix-ups, contamination, and mislabeling. See U.S. v.
Barr Laboratories, Inc., et al., 812 F. Supp. 458, 465 (D.N.J.
1993).

GSK

46. During the relevant times, GSK routinely and egregiously
violated the cGMPs and related laws and regulations at its Cidra
plant, in disregard of its responsibility under those laws and
regulations to protect and preserve the integrity of drug
products released to the market. GSK lied to the FDA in order to
conceal those violations, including lies contained in documents
responding to consumer complaints. In response to a Warning
Letter citing violations of the cGMPS, GSK concealed systemic
quality assurance problems at Cidra that, if known to the FDA,
would have delayed or precluded the approval of new, profitable
drugs manufactured at the plant. In addition, GSK failed
adequately to investigate an allegation of product diversion at
the plant that, on information and belief, led to the

-18-

distribution of reject drug products to the United States market. As a result, unsafe and/or ineffective product was released to the United States market and dispensed to beneficiaries of the Medicaid, Medicare and other government health programs.

47. For example, GSK released to the United States market from its Cidra plant:

a. Drug product that was mixed up with drug product of a different type or strength, e.g., 30mg and 10 mg tablets of an anti-depressant mixed in the same bottle, and 12.5 and 6.25 mg tablets of a heart medication mixed in the same bottle;

b. A diabetes medication that was sub-potent and/or super-potent;

c. An antibiotic ointment used to treat a skin infection common in small children that was contaminated with a micro-organism associated with bacteranemia, urinary tract infections, meningitis, wound infection, and peritonitis;

d. An injectable drug used to treat nausea and vomiting in patients undergoing chemotherapy that was contaminated with micro-organisms.

48. GSK's violations of the cGMPs and chronic quality assurance problems went to the heart of Cidra's manufacturing systems. As further detailed in paragraphs 101 through 138 below, they

-19-

included:

a. Product mix-ups, i.e., a drug of a different type or strength found in the same bottle (see paragraphs 102 through 107 below);

b. Inadequate investigation of out-of-specification results detected during laboratory testing (see paragraphs 108 through 112 below);

c. Inadequate process validation and non-existent validation review processes for some products (see paragraphs 57 through 115 below);

d. Inadequate or non-existent calibration of equipment and instruments and incomplete investigations relating to equipment found to be out-of-calibration (see paragraphs 115 through 118 below);

e. Overdue process investigations, at times numbering in the hundreds (see paragraphs 119 through 122 below);

f. Understaffing in the Quality Assurance Unit (see paragraphs 123 through 124 below);

g. Poor documentation quality, including unsigned, undated and/or lost or missing validation, investigation and change control documents, and hundreds of standard operating procedures overdue for revision (see paragraphs 125 through 126 below);

h. Contamination in products manufactured in the sterile facility, including Kytril injection and Bactroban ointment (see

-20-

paragraphs 127 through 128 below);

i. Substandard quality and control of the plant's water systems, resulting in build up of stagnant water and microbial contamination (see paragraph 129 below);

j. Manufacturing areas and purportedly clean equipment that repeatedly failed routine environmental testing and exhibited microbial contamination (see paragraphs 130 through 131 below);

k. Destruction of internal audit reports immediately after discussion with the responsible personnel, contrary to GSK policy and industry practice requiring 3 year retention (see paragraphs 132 through 133 below);

l. Serious deficiencies in the functioning of the Microbiology Laboratory, where testing of products and equipment for contamination by objectionable organisms is conducted (see paragraphs 134 through 135 below);

m. Substandard air handling systems not meeting cGMP standards and creating the potential for cross contamination (see paragraph 136 below);

n. Inadequate monitoring to ensure containment of a cytotoxic product (Topotecan, a chemotherapy drug) manufactured in the facility (see paragraph 137 below);

o. Various other cGMP Issues, including inadequate identification, control and storage of drug materials, waste and cleaning agents, poor disinfection procedures, leaking equipment,

-21-

and inadequate verification of product labels (see paragraph 138 below).

49. GSK violated the False Claims Act, as set forth in the following paragraphs.

50. The defendants manufactured, processed, packed and/or held drugs at the Cidra plant that were adulterated within the meaning of 21 U.S.C. §§ 351(a)(2)(A) and(B), in that the drugs were prepared, packed, or held under insanitary conditions whereby they may have been contaminated with filth or rendered injurious to health, and/or the methods used in, and/or the facilities or controls used for, the manufacture, processing, packing, and/or holding did not conform to and/or were are not operated or administered in conformity with the cGMPs to assure that such drugs met the requirements of the FDC Act as to safety and had the identity and strength, and met the quality and purity characteristics, that they were represented to possess. As a result, the drugs did not meet the safety and effectiveness standards required for approval and distribution in interstate commerce under the FDC Act and for payment by Medicaid, the VA and other government health programs under the Social Security Act, including 42 U.S.C. 1396r-8(k). Therefore, claims for those drugs were false.

51. Additionally or alternatively, the defendants' violations of 21 U.S.C. §§ 351(a)(2)(A) and(B) were so egregious that the defendants should have: (a) activated voluntarily recalls under 21 C.F.R. § 7.40; (b) suspended or ceased the manufacture and/or distribution of the drugs; (c) notified the FDA by, amongst other things, issuing Field Alerts; and/or (d) taken urgent steps to correct the violations and to prevent future similar violations. Instead, defendants failed to recall product, failed to suspend manufacturing and distribution, failed to issue required Field Alerts, failed to take urgent action to correct violations, lied to the FDA in order to conceal these ongoing violations and chronic quality assurance problems, and continued to manufacture, process, pack and distribute adulterated drug products. As a result, the drugs did not meet the safety and effectiveness standards required for approval and distribution in interstate commerce under the FDC Act and for payment by Medicaid, the VA and other government health programs under the Social Security Act, including 42 U.S.C. 1396r-8(k). Therefore, claims for those drugs were false.

52. Additionally or alternatively, such drugs were not manufactured, processed, packed and/or held by the defendants in accordance with the representations made by the defendants to the FDA in the NDAs they filed with the FDA for each of the drugs

-23-

under 21 U.S.C. § 355(b)(1)(B)-(D), on the basis of which they obtained approval for those drugs for safety and effectiveness and coverage by Medicaid, the VA, and other government health programs.   As a result, the drugs did not meet the safety and effectiveness standards required for approval and distribution in interstate commerce under the FDC Act and for payment by Medicaid, the VA and other government health programs under the Social Security Act, including 42 U.S.C. 1396r-8(k).  Therefore, claims for those drugs were false.

53. Further, the defendants failed adequately to investigate allegations of product diversion from the Cidra plant that, on information and belief, resulted in the distribution of drug product to the United States market that had been rejected by Cidra personnel as unfit for such distribution.  Such product was adulterated within the meaning of 21 U.S.C. §§ 351(a)(2)(A) and/or(B) and was never intended for legitimate distribution in interstate commerce.  Such product did not meet the safety and effectiveness standards required for approval and distribution in interstate commerce under the FDC Act and for payment by Medicaid, the VA and other government health programs under the Social Security Act, including 42 U.S.C. 1396r-8(k).  Therefore, claims for those drugs were false.

-24-

Roche

54. 21 C.F.R. § 211.22(a) provides that a drug manufacturer's quality assurance unit "shall have the responsibility for approving or rejecting drug products manufactured, processed, packed and held under contract by another company." Therefore, after its purchase of the global rights to Kytril in or about January 2001, Roche was responsible for ensuring that Kytril was manufactured in accordance with the cGMPs and was safe and effective for release and distribution in interstate commerce and dispensing to beneficiaries of government health programs. Roche was required to, and did in fact, conduct periodic audits of the Cidra facility, commencing in or about late 2000. As a result, Roche knew that there were cGMP compliance problems relating to Kytril. Further, as set forth in more detail below, between July 2001 and July 2002 the FDA noticed cGMP violations at the Cidra plant in two FDA-483s and a Warning Letter.

55. For the reasons set forth in paragraphs 46, 47.d., and 48 through 52 above, certain batches of Kytril, the precise identity of which is not presently known to the relator, were not safe and/or effective and hence were ineligible for coverage by government health programs. On information and belief, based on the Roche's knowledge that there were cGMP compliance problems

-25-

relating to Kytril at Cidra and on the fact that, in a one year period, the FDA had issued to Cidra two FDA-483s and a Warning Letter, which were public documents, Roche, at the very least, was recklessly indifferent to whether Kytril was safe and effective and/or deliberately ignorant of same. As a result, claims filed and caused to be filed by Roche for Kytril to government health programs were knowingly false within the FCA.

#### Damages

56. Defendant's violations of the cGMPs and the laws and regulations administered by the FDA include those set forth herein. Those violations affected certain batches, the precise identity of which is not presently known to the relator, of all of the drug products manufactured at the Cidra plant during the times relevant to this action, including Paxil, Paxil CR, Avandia, Avandamet, Coreg, Bactroban, Abreva, Cimetidine, Compazine, Denavir, Dyazide, Thorazine, Stelazine, Ecotrin, Tagamet, Relafen, Kytril, Factive, Dyrenium and Albenza.

57. Eckard does not know the precise extent of the financial damage suffered by Medicaid, Medicare, the VA, and other government health programs arising from the knowing submission of false claims by the defendants for drugs that were not safe and

-26-

effective.  However, Eckard believes that the damages amount to hundreds of millions of dollars, based on the following: (a) the violations were significant and systemic, affecting key aspects of the plant's operations; (b) the Cidra plant is the most important of all GSK's plants worldwide and provides $5.5 billion of GSK's product; (c) almost 100% of Cidra's product is sold in the United States; and (d) amongst the drugs manufactured at the Cidra plant that were unsafe and/or ineffective were Paxil (a top selling antidepressant), Coreg (a widely-prescribed heart medication), and Avandia and Avandamet (popular diabetes medications), amongst other drugs.  Paxil and Avandia are in the 50 top selling drug products in the world.

## PARTICULARS OF FALSE CLAIMS ACT VIOLATIONS

### Background

58. Cidra has a history of significant cGMP violations. A report prepared by Eckard for GSK senior executives in April 2003 (referred to herein as "the April 2,2003, report") listed six areas in which Cidra had been repeatedly cited by the FDA for cGMP violations since 1991, namely documentation, process validation, laboratory investigations, other investigations, sterile facility and computer validation.

-27-

59. An FDA inspection conducted at Cidra from March 29, 2001, to July 6, 2001, found significant cGMP deficiencies such as process validation deficiencies in Paxil OS (Oral Suspension) batches, inadequate out-of-specification ("OOS") and complaint investigations, inadequate laboratory controls, inadequate media fills, non-stability indicating analytical methods (i.e., inadequate testing to ensure that drug products could meet their purported shelf life) and deficiencies related to the aseptic (i.e. sterile) filling operation (relating to the production of injectable drugs). The FDA investigator who conducted this inspection initially recommended issue of a Warning Letter; however, following a meeting with GSK the FDA judged GSK's response adequate and the inspection was classified VAI (Voluntary Action Indicated). An FDA-483 was issued to GSK on or about July 6, 2001.

60. Another FDA inspection was conducted from February 7, 2002 to April 10, 2002 and again the FDA found significant cGMP violations such as the release to market of Bactroban ointment not meeting specifications, inadequate process validation of Paxil OS and Thorazine tablets, inadequate microbiological controls in Bactroban ointment production areas, inadequate laboratory investigations, inadequate instrument calibrations, and inadequate water sampling techniques. On April 10, 2002,

-28-

another FDA-483 was issued to GSK. GSK submitted a written response to the FDA stating its position on each observation and describing corrective and preventive steps it proposed to take. The FDA was not satisfied with this response, and issued a Warning Letter to Cidra on or about July 1, 2002 ("Warning Letter").

.

61. The Warning Letter detailed a number of significant cGMP violations at Cidra, including:

a. Release to the market of Bactroban Ointment that was contaminated with microorganisms;

b. Failure to manufacture Paxil Oral Suspension in accordance with established specifications and to demonstrate a reproducible and reliable manufacturing process;

c. Failure to adequately validate the manufacturing process for Thorazine tablets, including failure to test Thorazine tablets for friability and content uniformity;

d. Failure to conduct statutorily-mandated investigations in a timely manner and to take corrective actions to prevent recurrence, including investigations of High Total Plate Count results in water samples that took more than five months to complete or that were not completed at all.

e. Media fill vials (used to test for sterility of injectable drug product) were not incubated for the required time

-29-

to assure bacterial growth for both slow and fast microorganisms.

### GSK's Response to the FDA: Warning Letter "Recovery"

62. On or about July 2, 2002, GSK met with the FDA to discuss issues arising from the FDA-483 and the Warning Letter.  GSK's representatives at that meeting included Janice Whitaker ("Whitaker"), Senior Vice President for Global Quality, Steve Plating ("Plating"), Vice President for Quality North America, Jose Luis Rosado ("Rosado"), the President and General Manager of Cidra, and Adalberto Ramirez ("Ramirez"), Director of Solid Manufacturing and Packaging at Cidra.  At that meeting, the FDA informed GSK that pending approvals for GSK's new diabetes drug, Avandamet, and a new antibiotic, Factive, would not proceed until GSK's response to the Warning Letter was deemed adequate by the FDA and the FDA had reinspected the Cidra plant.  Avandamet and Factive are manufactured at the Cidra plant.

63. In early July 2002, Eckard traveled to Cidra in order to assist in the preparation of Cidra's preliminary response to the Warning Letter, which was delivered to the FDA on or about July 17, 2002.  At approximately that time, GSK undertook to immediately notify the FDA if any problems were found that could present a public health risk.

-30-

64. On or about July 17, 2002, GSK made the following specific commitments to the FDA in response to the Warning Letter received on July 1, 2002, and the FDA-483 received on April 10, 2002:

a. Provide a progress report to the FDA on or before August 15, 2002;

b. Review laboratory investigations:

i. Review all investigation reports from 2000 to date and prepare a summary of findings, this review to be conducted by consultants;

ii. Define an action plan for corrective actions;

iii. Evaluate the adequacy of current Standard Operating Procedures ("SOP") for handling OOS investigation results;

iv. Determine the adequacy of corrective actions taken.

c. Activate functions of the Senior Management Incident Reporting Team ("SMIRT") (Quality Council), a team established in 2002 after the FDA observed that Cidra senior managers were insufficiently involved in quality control;

d. Prepare a Site Validation Master Plan;

e. Review all process validation reports to assure compliance with current guidelines;

f. Conduct training on handling of laboratory investigations;

g. Activate the Lab Calibration/Metrology Unit;

-31-

h. Discuss with the FDA's Compliance Division and Division
of Anti-Infectives the microbial specification requirements for
Bactroban;

i. Define the sampling and testing for Paxil OS batches;

j. Establish a plan to assure that all investigations are
completed within 30 days;

k. Review adequacy of media fills documentation from 2001 to
July 2002;

l. Assessment of all systems.

m. Hire additional Quality Assurance ("QA") Staff;

n. Ensure adequate validation of Thorazine tablets;

o. Perform additional validation of the tablet process
rejection system for Factive;

p. Ensure adequate validation of Paxil OS.


65. On or about August 7, 2002, Eckard was assigned by GSK
headquarters in Research Triangle Park, NC, ("RTP") to lead the
Warning Letter Recovery Team in Cidra.


66. Eckard's role was to coordinate and oversee the work of
Compliance Action Plan Team Leaders who were assigned to each
functional area, including Materials, Equipment,
Facilities/Utilities, Validation, Laboratory, Computer
Validation, Quality Assurance, Production, and Calibration.  The

-32-

Team Leaders were to work on their action plans on a fully dedicated basis for the seven weeks following August 7, 2002, and to communicate serious incidents to top management with the objective of resolving the Warning Letter issues and making the site ready for FDA reinspection, which was a precondition to obtaining FDA approval for Avandamet and Factive. The reinspection was scheduled to commence on or about October 9, 2002. There were over 100 people on the Warning Letter Recovery Team, approximately 75 of them from the Cidra Plant and 25 from GSK headquarters.

67. Shortly after her arrival at Cidra, Eckard asked Cidra's Quality Assurance and Regulatory Manager, Gloria Martinez ("Martinez") to report on any compliance issues that the FDA had not identified in its recent inspections.

68. Martinez presented an internal report during a SMIRT meeting on or about August 14, 2002, which was attended by Cidra senior managers including Rosado. Martinez outlined the following compliance issues:

a. Product mix-ups: Cidra had filed at least 7 Field Alert reports with the FDA during 2002 due to complaints of product comingling from patients, pharmacies or physicians, i.e., tablets

-33-

of a different type or strength were found in the same bottle. Martinez also stated that Cidra had internally identified nine similar (though distinct) product mix-ups at the plant. Eckard also learned that in the Field Alerts filed with the FDA arising from consumer complaints, Cidra had assured the FDA that, for a variety of reasons, the mix-ups could not have happened at the plant, despite the fact that nine separate and contemporaneous similar incidents had been identified inside the plant. Product mix-ups typically are treated in the industry as Class I or Class II recall events, and yet no recalls had been initiated. Cidra had made no attempt to correct the cause of the mix-ups and had lied to the FDA in its Field Alert filings by stating that the mix-ups must have occurred outside of Cidra's control. The product mix-ups are discussed in detail in paragraphs 102 through 107 below.

b. Overdue process investigations: As further described in paragraph 119 below, process investigations must be completed within 30 days. Process investigations are conducted when deviations in the manufacturing process give rise to concerns that product quality may be compromised. In August 2002, there were 283 overdue process investigations. Cidra continued to manufacture and release product notwithstanding the potential impact on the quality of released batches.

-34-

c. Equipment not calibrated: As further described in
paragraph 115 below, equipment calibration is a requirement of
the cGMPs. Cidra did not have a calibration program for the
laboratory, and over 20,000 pieces of equipment were in urgent
need of calibration in the manufacturing areas. As a result, the
validity of data gathered during manufacture and testing to
assure product quality could not be relied upon as accurate.

d. Standard Operating Procedures overdue: As further
described in paragraph 126 below, written procedures, commonly
referred to as Standard Operating Procedures ("SOPs"), are the
foundation of the manufacturing plant's documentation system.
These SOPs must be routinely reviewed and revised to take account
of changing conditions and circumstances. In August 2002, 366
SOPs were overdue for review and revision at Cidra.

e. Annual product reviews overdue: 21 C.F.R. § 211.180
requires that manufacturers conduct reviews of data, at least
annually, for the purpose of evaluating the quality standards of
each product. Martinez described numerous product reviews that
were more than a year out of date.

69. Immediately after the SMIRT meeting on or about August 14,

-35-

2002, Eckard phoned Plating at GSK's headquarters in RTP.   She
gave him the information that she had received at the meeting.
She recommended that GSK stop shipping all product from the Cidra
plant, stop manufacturing product for two weeks in order to
investigate and resolve the issues raised and the impact on
released batches, and notify the FDA about the product mix-ups.
Eckard faxed to Plating the overheads that Martinez had used in
her presentation, consisting of approximately 13 pages ("the
Martinez presentation").

70. On or about August 15, 2002, Eckard returned to GSK
headquarters in Research Triangle Park, NC, where she immediately
reported her concerns to Whitaker.   Eckard reached Whitaker, who
was out of the country, by phone.   Eckard gave Whitaker the
information that she had received at Cidra, including that Cidra
had lied to the FDA.   She recommended that GSK stop shipping all
product from the Cidra plant, stop manufacturing product for two
weeks in order to investigate and resolve the issues raised and
the impact on released batches and notify the FDA about the
product mix-ups.   Eckard reminded Whitaker of GSK's promise to
the FDA at the meeting on July 17, 2002, that GSK would
immediately notify the FDA if any problems were found that could
present a public health risk.   Eckard told Whitaker that she
believed the Cidra plant was headed for a Consent Decree if the

-36-

problems were not handled with speed and integrity.  Eckard left
a copy of the Martinez presentation on Whitaker's desk.

71. On or about August 18, 2002, Eckard met with Plating to
reiterate the concerns she had communicated to him by phone on
August 14, 2002.

72. In September 2002, Eckard spoke by phone with David Pulman
("Pulman"), who was then Vice President of Manufacturing and
Supply for North America.  Pulman was promoted to President,
Global Manufacturing and Supply in December 2002. Plating had
provided Pulman with a copy of the Martinez presentation on or
about August 15, 2002.  Pulman's overriding concern was to make
the Cidra plant ready for the FDA reinspection to commence on or
about October 9, 2002.  As stated above, passing this inspection
was a precondition to obtaining FDA approval for Avandamet and
Factive.  Pulman asked Eckard for specific examples of the
quality problems at the plant.  She gave him a few examples and
later sent him, via email, a report prepared by the Director of
Validation for the sterile facility at GSK's Barnard Castle plant
in the United Kingdom, who had been brought in to review
validation in the sterile suite in Cidra. His report was
scathing.  Eckard told Pulman that nothing had improved at the
Cidra plant since her report to Plating on or about August 24,

-37-

2002.

73. Eckard did not have the authority to order recalls or
suspension of manufacturing or shipment of product, or to report
regulatory concerns to the FDA.  Pulman and Whitaker had ultimate
authority to order action of this kind.  Throughout 2002 and into
April 2003, Eckard continued to urge GSK managers to take the
action that she had recommended and to correct the quality and
compliance problems at the Cidra plant.  They failed to do so.
Eckard now believes that Whitaker, Pulman and other GSK
executives were unwilling to acknowledge the gravity of the cGMP
violations at the Cidra plant and to take the action that Eckard
had recommended in part because the FDA had indicated that it
would not consider approvals for Avandamet and Factive until the
Warning Letter issues were resolved, and such approvals were
unlikely to be obtained if the FDA were aware of the gravity of
the quality assurance deficiencies at the Cidra plant.  Once the
objective of approval for Avandamet was achieved, GSK and Cidra
management alike lost interest in correcting the deficiencies at
the Cidra site and resumed their focus on maximizing productivity
at the plant.  As stated above, the Cidra plant manufactures $5.5
billion of GSK's product and is the most important of all GSK's
plants worldwide.

74. On or about August 20, 2002, Eckard returned to Cidra. The Compliance Action Teams continued to prepare for the Avandamet reinspection, which was held in October. The focus of the inspection was on the progress of the recovery effort. During the inspection, Cidra informed the FDA that it had begun to put together Corrective and Preventive Action Plans but had not yet fully implemented them. Avandamet was approved by the FDA on October 8. Factive was approved on April 4, 2003.

75. Eckard left Cidra and returned to North Carolina immediately after the inspection, having been at the plant for a period of ten weeks. After three weeks, she returned to Cidra to resume work on Warning Letter recovery and the longer-term correction of Cidra's systemic quality assurance and compliance problems. However, Rosado and Ramirez stated that they wanted to take over the leadership of that effort, including leadership of the Compliance Action Teams. Following a meeting with Plating, it was agreed that Ramirez would lead the effort and Eckard would play an "oversight" role and report to Plating.

76. Thereafter, Eckard visited Cidra periodically for 1-3 days at a time, on each occasion receiving a progress report from Ramirez and reporting to Plating almost on a daily basis.

-39-

77. On or about January 24, 2003, Rosado, Plating, Ramirez and Edwin Lopez, Cidra's Director of Quality ("Lopez") met with the FDA to discuss the FDA-483 and Warning Letter Commitments set forth above, paragraph 64. Eckard attended that meeting, but was not on the agenda and did not present any items.

78. In or about February 2003, Eckard learned that Ramirez had repeatedly lied to her about the status of work in the written and verbal progress reports he had provided to her since assuming control of Warning Letter recovery. She also learned that the Compliance Action Teams had been disbanded immediately after the FDA's October reinspection and the approval of Avandamet, and that Rosado, Ramirez and Lopez had misrepresented the true status of Warning Letter recovery to the FDA at the January 24, 2003 meeting (as further set forth in paragraphs 110, 111, 114, 117, 124, and 127 below). Eckard reported these concerns to Plating and to her immediate boss, Diane Sevigny ("Sevigny"), Director of Global Quality Assurance for North America Pharma.

79. From February 4 through 8, 2003, Eckard and two other RTP personnel, representing the Global Quality Assurance team, conducted an internal audit at Cidra ("the February 2003 RTP audit"). That audit found continuing serious quality control problems and cGMP violations. The findings were communicated to

-40-

Rosado, Ramirez, Lopez, and senior GSK managers Sevigny, Plating and Jonathon Box ("Box"), the Vice President of Manufacturing and Supply for North America who took Pulman's job when Pulman was promoted in December 2002. Aspects of the February 2003 RTP audit is discussed further below, paragraphs 114.b., 117 and 122.

80. Following her findings in the February 2003 RTP audit and her discovery that Ramirez had lied to her about the status of progress by the Compliance Action Teams, Eckard told Sevigny in substance that she would not participate in a cover-up of the quality assurance and compliance problems at Cidra and would not take part in any further meetings with the FDA about the Cidra plant. During this period and thereafter, Eckard and Sevigny were in frequent and increasing conflict about GSK's management of the quality and compliance problems at Cidra.

81. In or about March 2003, GSK made a general call to employees for volunteers to accept a redundancy package arising from the merger of Glaxo Welcome and SmithKlineBeecham, which took place in December 2000. Eckard was so demoralized that she initially expressed interest in this package. However, upon reflection and discussion with colleagues, she soon withdrew her expression of interest, believing that she should continue to seek to make things right from within GSK rather than simply resign.

-41-

82. Eckard continued to press GSK senior management for action. In or about March 2003 Eckard put together a binder of materials detailing the quality assurance and compliance problems at Cidra and presented it to Plating and Marion Lon ("Lon"), who was to become and became the site director of Cidra when Rosado retired on or about April 1, 2003. Eckard also asked to meet with Plating and Lon.

83. On or about April 2, 2003, Eckard delivered to GSK senior managers Box, Peter Savin (Vice President of Global Quality Assurance), Whitaker, Plating and Sevigny, and Cidra managers Lon and Ramirez, a non-routine detailed memorandum on Current Compliance Risks for Manufacturing and Supply of Drug Products at Cidra ("the April 2, 2003, report"). Eckard provided Ramirez with a copy. She detailed the following high risk compliance problems:

a. Product mix-ups: see further, paragraphs 102 through 107 below;

b. Documentation quality: see further, paragraphs 125 through 126 below;

c. Computer validation;

d. Sterile manufacturing facility activities and documentation, including Kytril injection: see further, paragraphs 127 through 128 below;

-42-

e. Quality and control of water systems: see further, paragraph 129 below; and

f. OOS events for environmental monitoring of manufacturing areas and clean equipment: see further, paragraph 130 through 131 below.

84. Eckard called for increased monitoring by GSK management of compliance improvement initiatives at Cidra. However, she did not receive any response to her memorandum from any of the seven managers to whom she sent the report.

## Alleged Product Diversion

85. In or about early April 2003 Eckard learned of internal allegations that persons at the Cidra plant were skimming product during manufacture, including reject product, and diverting the product to Latin America.

86. Corporate Security and GSK senior manager Box were notified of these allegations in February 2003. The allegations were made by a current and a former Cidra employee, both unidentified. Background checks conducted by an outside private investigation company identified connections between a senior manager at Cidra, and companies alleged to distribute the "black market" product.

-43-

One of these companies was identified as MOVA Pharmaceuticals, Inc., ("MOVA") a contract manufacturer located in Caguas, Puerto Rico.

87. In or about the week beginning April 7, 2003, Sevigny took a team to Cidra to investigate these allegations, bypassing Eckard who would normally have been assigned leadership of the investigation. Sevigny took Eckard's employee, Kristal Adams, as part of the team. Although she had been told by Sevigny, in substance, to "stay out of it," Eckard nonetheless provided informal advice to Kristal Adams and received information from her about the investigation.

88. On or about April 27, 2003, following a consumer complaint, Cidra filed a Field Alert reporting that Avandamet 40 mg tablets had been found in the United States mixed up with unidentified tablets stamped "MOVA" or "MBO."

89. GSK had no legitimate business with MOVA, so there was no legitimate reason for Avandamet tablets and MOVA products to be at the same site.

90. Further, a considerable quantity of Avandamet batches had been rejected because of manufacturing problems in late 2002

-44-

because of lack of content uniformity, so that some tablets were sub-potent and others were super-potent.

91. On information and belief, based on paragraphs 85, 86, and 88 through 90, rejected batches of drug product, including Avandamet, were sent from Cidra to MOVA, (which is located near Cidra) for "black market" packaging and distribution, resulting in the mix-up.

92. On information and belief, based on paragraphs 85, 86, and 88 through 91, rejected batches of drug product, including Avandamet, were distributed to the United States market.

93. Additionally, the FDA and other experts have identified the cross-border sale to the United States of drugs, some of which are diverted, counterfeit, stolen or fraudulent, as a growing threat to patient safety. There is growing evidence of efforts by increasingly well-organized groups in other countries, backed by increasingly sophisticated technologies and criminal operations, to profit from such drugs at the expense of American patients, who increasingly are purchasing drugs at lower prices over the Internet and via other means from foreign sources. Drugs from countries along the United States border have been identified as a particular threat.

-45-

94. On information and belief, based on paragraphs 85, 86 and 93, product diverted from the Cidra plant to the "black market" in Latin America was sold to such groups and channeled back into the United States as legitimate product.

95. In or about April or May of 2003, GSK closed its internal investigation for lack of sufficient evidence. On information and belief, based on paragraphs 85 through 90 and paragraph 93 above, GSK's investigation was inadequate.

## Eckard's Termination, Report to GSK's Compliance Department and Report to the FDA

96. In early May 2003 Eckard received a phone call from the GSK Human Resources Department advising her that she was being offered a redundancy package. Eckard stated that she was not interested in a package and was told that she had no choice. She was advised to take a couple of weeks off with pay. In late May the Human Resources Department asked her to attend a meeting at RTP, at which the Vice President of Human Resources for Global Operations formally presented the redundancy package to her, took her security badge, and escorted her from the premises.

97. Even after her termination, Eckard continued her efforts to

-46-

have GSK address Cidra's quality and compliance problems.  In or about July 2003, she called GSK's general counsel and Chief Executive Officer in the United Kingdom, who declined to speak with her.  She then called GSK's general counsel in the United States and explained the general nature of her concerns to his secretary.  She referred Eckard to the Vice President for Compliance, whom Eckard phoned on or about July 14, 2003.  She detailed the serious quality assurance and compliance problems at Cidra, including the product diversion allegations.

98. On or about August 27, 2003, she participated in a teleconference with other GSK compliance personnel, in which she again detailed her concerns.  As a result of this call, she formed the view that the Compliance Department lacked authority internally and that regardless of the outcome of their investigation, if any, GSK was unlikely to take any corrective action.  On the same day, she called the FDA's San Juan District Office, where she spoke with Compliance Officer Carmelo Rosa ("Rosa").  For two to three hours, she detailed all of the serious quality assurance and compliance problems at Cidra, including the alleged product diversion.

99.  On or about October 3, 2003, following a phone conversation with the Compliance Department, Eckard called Rosa at the San

Juan District Office of the FDA and informed him that GSK did not intend to take any corrective actions as a result of her report.

100. On or about October 22, 2003, GSK announced in an SEC filing that in October 2003 the FDA had begun an investigation of its manufacturing facility in Cidra, Puerto Rico.

## Details of cGMP and Related Violations

101. The defendants' violations of the laws and regulations designed to ensure the safety and effectiveness of drug products released to the market, including the current Good Manufacturing Practices, the Federal Food, Drug and Cosmetics Act, 21 U.S.C. §§ 301 et seq., and the Code of Federal Regulations, Part 21, include those set forth below. Some violations relate to specific drug products, as indicated below. Unless so indicated, the violations apply to certain batches of all of the drug products manufactured at the Cidra plant during the relevant times, the precise identity of which is not presently known to the relator.

## Product Comingling

102. As set forth in paragraph 68 above, Eckard learned on or

about August 14, 2003, that Cidra had received a number of complaints of product comingling from patients, pharmacies and hospitals in 2002. In other words, consumers found tablets of a different drug type or different strength in the same bottle. Additional complaints were received during 2003.  To March 2003, these complaints reported the following:

a. Avandia 8 mg mixed with Avandia 4 mg;

b. Paxil 30 mg mixed with Paxil 10 mg;

c. Coreg 12.5 mg mixed with Coreg 6.25 mg;

d. Coreg 6.25 mg mixed with Coreg 3.125 mg;

e. Paxil 40 mg mixed with Paxil 20 mg;

f. Avandia 4 mg mixed with Avandia 8 mg; and

g. Paxil 20 mg mixed with Benadryl 25 mg.

h. Paxil 10 mg bottle contained unidentified pink tablets (Paxil 10 mg is yellow);

i. Paxil 40 mg mixed with Paxil 30 mg;

j. Paxil 10 mg bottle contained unidentified peach/brownish tablets;

k. Avandamet 40 mg mixed with unidentified tablets stamped "MOVA" or "MBO."  (As to MOVA, see paragraphs 86, 88, 89 and 91, above.)

l. Three Paxil CR 12.5 mg bottles contained unidentified pink tablets (Paxil CR 12.5 is yellow);

m. Avandia 2 mg mixed with Avandia 4 mg; and

-49-

n. Paxil CR 25 mg pink mixed with Paxil CR 12.5 mg.

103. Cidra filed Field Alert reports with the FDA with respect to these consumer complaints. Cidra told the FDA in each case that, following an investigation, it had determined that the product mix-ups were very unlikely to have occurred at the Cidra plant, for example, because of "the extensive controls in our packaging areas."

104. Between approximately January 2002 and June 2003 Cidra generated the following internal investigation reports describing product comingling that it had identified at the plant:

a. Avandia 4 mg mixed with Tagamet OTC 200 mg;

b. Avandia 8 mg mixed with Avandia 4 mg;

c. Coreg 25 mg mixed with Coreg 6.25 mg;

d. Ecotrin 81 mg mixed with Stelazine 2 mg;

e. Paxil 30 mg mixed with Avandia 4 mg;

f. Paxil 30 mg mixed with Paxil CR 12.5 mg;

g. Paxil 20 mg mixed with Paxil 25 mg;

h. Tagamet HB mixed with Avandia 4 mg;

i. Tagamet OTC mixed with Avandia 8 mg;

j. Avandia 8 mg mixed with Paxil 10 mg;

k. Coreg 6.25 mg mixed with Paxil 20 mg;

l. Coreg 25mg mixed with overweight tablets found during

-50-

packaging;

     m. Paxil DC 10mg mixed with two defective tablets found during packaging;

     n. Tagamet OTC mixed with Coreg 6.25; and

     o. Paxil DC 10mg mixed with Coreg 3.125mg.

105.  Despite these contemporaneous mix-ups discovered at the site, Cidra repeatedly represented to the FDA in the consumer-generated Field Alert reports referred to in paragraphs 102 and 103 above that its manufacturing and packaging processes were beyond reproach, that it was extremely unlikely that the mix-ups occurred on site and that they must have occurred outside GSK's control.  For example, in January 2003 Cidra filed a Field Alert report with the FDA following a pharmacist's complaint of finding Paxil 30 mg tablets in a Paxil 40 mg bottle.  Cidra told the FDA that "given the current process controls in place, it was highly unlikely that this situation occurred on our premises."  The above-listed mix-ups identified at the site, however, show that the similar incidents reported by consumers were, in fact, highly likely to have occurred on Cidra's premises.

106. When Eckard learned of the mix-ups in or about August 2002, she pressed Cidra managers for additional information about the cause.  She was told that they likely arose from the re-use of

undedicated bulk fiber board drums in tablet suites.  In other words, drums used in the processing of one type or strength of tablet had been re-used for a different type or strength of tablet.  Eckard was also told that uncoated tablets of one type were being mixed with uncoated tablets of another type, so that a tablet of a different type in a final batch would only be recognizable by its size or shape, and not by its color.

107. In or about August 2002, Eckard asked Cidra management to conduct a full analysis of the problem as a matter of priority. A report was not issued until May 2003.  This report concluded that "most mix-ups occurred in the compression area in Cidra II Building and were found to be related to drum cleaning and preparation."  In other words, Cidra's internal investigation confirmed that the consumer-reported mix-ups likely did not occur outside the plant (as it had earlier informed the FDA) but were a result of failure to properly clean out drums that were used to prepare one type or strength of drug before the drum was reused for another type or strength of drug.  Still, Cidra did not inform the FDA of these findings or initiate any product recalls.

## Laboratory Investigations

108. Manufacturers are required to conduct laboratory testing of

each drug lot prior to release to determine conformance to the final specifications of the drug product, including the identity and strength of each active ingredient. 21 C.F.R. § 211.165(a). When OOS results are found, i.e., products fail to meet specifications or other quality control criteria, the batch must be rejected. 21 C.F.R. § 211.165(f).

109. OOS results may be due to either error made in the laboratory during testing or to a drug sample that indeed does not conform to the specifications. When the initial assessment cannot document laboratory error, a full-scale failure investigation must be conducted. 21 C.F.R. § 211.192. This is a crucial step in the quality assurance process: root cause must be identified so that appropriate preventive action can be taken. Examples of potential causes of OOS results not attributable to laboratory error are: an improperly validated process (see paragraph 113 below), production operator error, improperly functioning production equipment, use of OOS components, and improper environmental conditions.

110. As stated above, on or about January 24, 2003, Rosado, Plating, Ramirez and senior Cidra staff members met with the FDA to discuss Warning Letter Commitments ("the January 24, 2003 meeting"). One of the Corrective and Preventive Action items

that GSK represented to be complete was its Review of Laboratory

Investigations.  GSK represented that a review of all

investigation reports from 2000 to date had been conducted by

consultants and a summary of findings prepared; that an action

plan had been defined for corrective actions; that an evaluation

of the adequacy of current Standard Operating Procedures for

handling OOS investigations had been conducted; and that the

adequacy of corrective actions taken had been determined.

111. In fact, Cidra's laboratory investigation review was not

complete.  In or about August 2002, GSK had hired a consulting

firm, The Weinberg Group, Inc. ("Weinberg") to conduct a

retrospective OOS laboratory investigations audit for the period

from 2000 to August 2002, i.e., to review Cidra's findings

arising from investigations of OOS results for products that had

been released to the market still containing shelf life (i.e.,

unexpired batches) and to state whether they concurred or did not

concur with those findings and with Cidra's decision to release

the product.  This encompassed some 500 investigations.  At that

time, GSK told the FDA that in the event of any "do not concur"

findings by the consultants that could present a public health

risk, it would immediately advise the FDA.  At the time of the

January 24, 2003, meeting, Weinberg had conducted its review and

prepared a summary of findings, including that it did not concur

-54-

with at least 30 of Cidra's findings. Unbeknownst to the FDA, Cidra had agreed with Weinberg that any investigations resulting in a "do not concur" finding would be reinvestigated by Cidra and re-evaluated by Weinberg. Further, a March 2003 internal report prepared by Cidra personnel ("the March 2003 Cidra report") listed some four additional laboratory investigations during the 2000-2002 period that the relator believes had not been reviewed by Weinberg at all at the time of the January 24, 2003, meeting. Therefore, GSK's representation to the FDA that the laboratory investigations review was complete was not accurate, since more than 30 investigations were still outstanding.

112. In addition, in many cases Cidra did not conduct laboratory investigations with adequate skill and diligence and failed to conduct follow-up investigations required by the cGMPS. For example:

a. A great many of Cidra's investigations, both those that were covered by The Weinberg Group's review, and those that post-dated the period of that review (August 2002), incorrectly assigned a root cause of "determinate" laboratory error, when in fact the root cause was "indeterminate laboratory error."  In other words, the investigation purported to find the cause of the OOS result as an identified laboratory error, when such cause had

-55-

not been proved but was merely theoretical. As stated above, 21 C.F.R. § 211.192 requires that a full-scale failure investigation be conducted when the initial assessment cannot document laboratory error. As a result of Cidra's incorrect assignment of cause, the required follow-up investigations were never conducted and thus product released to the market was potentially suspect.

b. An unusually and unacceptably high number of laboratory investigations conducted by Cidra arose as a result of "unknown peaks" detected during routine laboratory testing. "Unknown peaks" appearing on a chromatograph during routine laboratory testing of drug samples indicate that the drug lots may be contaminated. These investigations frequently assigned the root cause of the "unknown peak" as contamination from glassware or other equipment used in the analytical process without adequate proof. As a result, Cidra limited the root cause to laboratory error and did not conduct any additional investigation. The number of reported cases of contamination from glassware was so high that any objective investigator would have considered and investigated cross-contamination in the production facility, including contamination arising from environmental conditions, manufacturing equipment, air handling systems, and water systems. All of these areas of the production facility were classified in a June 2003 audit of the Cidra facility conducted by Global

Quality Assurance ("GQA") personnel ("the June 2003 GQA audit")
as areas in which there were serious deficiencies that could
significantly impact product quality and required immediate
corrective action, and yet Cidra ignored cross-contamination and
corrective action arising from "unknown peaks" was focused on re-
evaluation of its procedures for laboratory glassware washing.

### Process Validation

113. Process validation is a quality control measure for
obtaining, recording and interpreting the results required to
establish that a process will consistently yield product
complying with predetermined specifications. Manufacturers are
required to establish written procedures for production and
process control designed to assure that drug products have the
identity, strength, quality, and purity they are represented to
possess. 21 C.F.R. § 211.100. The execution of the validation
protocol, the test results and approvals are documented in a
validation report. Changes in process may render the process no
longer valid, and manufacturers are expected to establish a
system that monitors processes, equipment and personnel so that
unintended changes are identified, as well as conducting periodic
process reviews. Process validation is key to assuring that
quality, safety and effectiveness are designed and built into the

-57-

product rather than relying on quality inspection of the finished product, and that each step in the manufacturing process is controlled to maximize the probability that the finished product meets all quality and design specifications.

114. Inadequate validation of Paxil OS and Thorazine were cited by the FDA in the April 2002 FDA-483 and Warning Letter to Cidra. In addition to correcting these specific problems, GSK promised the FDA in or about August 2002 that it would review process validation for all products, many of which had not been reviewed for periods of up to ten or more years. GSK told the FDA on January 24, 2003, that it had reviewed all process validation reports to assure compliance with current guidelines. In fact, many elements of this review were incomplete. For example:

a. In the March 2003 Cidra report, Cidra documented 29 laboratory investigations, dating from 1995 through 2002, that required review in order to determine the impact on validation certification for the drugs in question. Those drugs included Avandia, Paxil, Relafen, Ecotrin, Tagamet, Albenza, Compazine, Factive, Dyrenium, Batroban and Kytril injection. While the report marked this review as being complete on 12/30/02, the relator believes that the review was in fact still outstanding.

b. The February 2003 RTP audit identified the need for
specific compliance questions concerning the validation of Kytril
injection to be rectified before additional batches of the drug
could be manufactured. Cidra nonetheless proceeded with the
manufacture of Kytril injection. The March 2003 Cidra report
identified an action item described as: "Issue a document
addressing the concerns raised by Richard Kettlewell [the
Director of Validation for the sterile facility at GSK's Barnard
Castle plant in the United Kingdom] in the process validation
assessment of Kytril." See paragraph 72 above. While this item is
marked as complete at 12/30/02, it was not, in fact, complete, as
evidenced by the findings of the February 2003 RTP audit.

c. Further, the June 2003 GQA Audit noted that Cidra did not
have any validation review processes in place for non-sterile
products and that reviews must be conducted at no less than
three-yearly intervals. (Non-sterile refers to all drug products
other than injectable drugs.) The auditors classified this
deficiency as one that could significantly impact product quality
and required immediate corrective action.

## Equipment Calibration

115. 21 C.F.R. § 211.68(a) requires that automatic, mechanical and

electronic equipment be inspected or checked according to a written program to ensure proper performance, and that written records of calibration and inspection be maintained according to a written program. The FDA expects that calibration will be performed both before and after validation studies to ensure the validity of the data gathered. If equipment is found to be out of calibration, investigations should be conducted to determine whether there was any impact of product quality.

116. Inadequate instrument calibration was one of the areas of non-compliance cited by the FDA in the FDA-483 issued to Cidra in April 2002. When the Warning Letter was issued in August 2002, Cidra still had no calibration program at all for the laboratory. As part of the Warning Letter recovery process, Cidra established a calibration program for the laboratory and calibrated some 20,000 pieces of equipment in the manufacturing facility. However, Cidra did not coordinate this process with validation studies as required by the FDA, and thus the validity of data gathered could not be relied upon as accurate.

117. At the January 24, 2003, meeting, Cidra told the FDA that it had completed the task of activating the Laboratory Calibration/ Metrology Unit. However, at the time of the February 2003 RTP audit, the timeline for the calibration corrective action plan

was not on target. For example, the auditors cited one item for
which the completion date was unknown, and one item that had not
even been started by the stated completion date.

118. Further, the June 2003 GQA Audit found that investigations
of equipment found to be out of calibration were not being
conducted in a timely manner. The auditors noted that due to the
high number of incomplete investigations it was difficult to
assess the impact of out-of-calibration conditions on product
quality. The auditors classified this deficiency as one that
could significantly impact product quality and required immediate
corrective action.

### Overdue Process Investigations

119. Process investigations are conducted whenever a mistake or
irregularity is detected during the manufacturing process. These
may arise, for example, from an OOS result that is not proven to
be caused by laboratory error (see above, paragraph 108 and 109),
from the discovery of mixed up product, or from a finding that
purportedly cleaned equipment is dirty. Process investigations
must be completed within 30 days. See U.S. v. Barr Laboratories,
Inc., et al., 812 F. Supp. 458, 468 (D.N.J. 1993)

120. As stated in paragraphs 69, 70 and 71 above, when Eckard learned, in August 2002, that hundreds of process investigations were overdue, she urged GSK management to shut the plant down immediately while the matters identified therein were resolved. The March 2003 Cidra report confirmed that in August 2002, there were 283 overdue process investigations. Cidra continued to manufacture and release product notwithstanding the potential impact on the quality of released batches.

121. An example of Cidra's inability to complete investigations within 30 days is its process investigation relating to Avandamet commenced in or about April 2003.

a. As stated in paragraph 72 above, Avandamet was approved by the FDA in October 2002. The process investigation should have been initiated in or about December 2002 when a number of failures and problems were observed during manufacture. These failures resulted in the rejection of several batches of the product for lack of content uniformity, assays (tests for purity) that failed to meet specification, and granulation that did not flow appropriately, so that some tablets were sub-potent and others were super-potent.

b. Finally, a process investigation was undertaken in or about April 2003 to determine root cause and any impact on batches that had been released to the market. To Eckard's

-62-

knowledge, the investigation was still outstanding in May 2003, when she was terminated. No Field Alert was filed with the FDA as required when quality of batches or product released to the market are suspect. 21 C.F.R. § 314.81 (b)(1)(ii).

122. Further, in the February 2003 RTP audit, Eckard and the other auditors noted that while Cidra had provided computer printouts for process investigations conducted during 2002 and 2003, no clear data for process investigations conducted during 2000 and 2001 had been made available. The auditors noted that they had been provided with log books for the period 2000-2001, which appeared to show that numerous (perhaps several hundred) process investigations were still outstanding. Cidra denied that any investigations were overdue from that time period, but never provided the auditors with any definitive data.

## Understaffing in the Quality Assurance Unit

123. The cGMPs require drug manufacturers to have a distinct QA unit that is responsible for ensuring that drug products produced and released to the market meet all applicable standards. Personnel employed in the unit must be appropriately trained and must be of adequate numbers. 21 C.F.R. 211.25(c). The QA unit is responsible for ensuring that procedures are implemented during

-63-

the manufacturing process to ensure drug product quality and for
conducting investigations of apparent errors, including ensuring
that investigations of laboratory testing results that may impact
on the identity, strength, purity and/or safety of drug products
are completed in a timely manner and that corrective actions are
taken when necessary.  21 C.F.R. 211.22.

124. Cidra's QA unit was chronically understaffed.  In or about
August 2002, Cidra told the FDA that it would increase the QA
Staff by 17 additional resources.  At the January 24, 2003,
meeting, Cidra told the FDA that it had hired 23 people.
However, it did not tell the FDA that many experienced staff had
resigned from the QA unit.  Therefore, the actual increase in
staff fell short of the promised number.  This attrition rate
continued in 2003.

## Poor Documentation Quality

125. Documentation is crucial to the maintenance of drug quality.
Drug manufacturing operations and related quality control and
quality assurance systems are required by the cGMPs to be managed
and documented according to detailed written procedures covering
manufacturing, testing, packaging and storing.  See, e.g., 21
C.F.R. § 211.100(a); 21. C.F.R. § 211.180-198.  In the April 2,

-64-

2003, report, Eckard noted that Cidra had been cited for
regulatory violations related to poor documentation quality
during FDA inspections in 1991, 1992, 1993, 1994, 2001 and 2002.
In that report, Eckard noted that critical documents, including
validation, investigation and change control documents, were
often not signed and/or dated, or were lost or missing.   She
noted that Cidra had not responded to regulatory scrutiny by
establishing systems to correct the problems.

126. Written procedures, commonly referred to as Standard
Operating Procedures ("SOPs"), are the foundation of the
manufacturing plant's documentation system.   The cGMPs require
that there be written procedures for the preparation of master
records (21 C.F.R. § 211.186(a)), and the "current good" aspect
of the cGMPs requires that procedures be reviewed and updating
considered on a regular basis.  Most responsible manufacturers
review procedures on a one or two year cycle.  In August 2002, -
366 SOPs were overdue for review and revision at Cidra.

## Contamination in Products Manufactured in the Sterile
Facility

127. Injectable medications are manufactured in the sterile
facility.  In the April 2, 2003, report, Eckard cited the sterile

facility and Kytril injection as a high risk compliance area.
Further, the June 2003 GQA Audit called for the manufacture of
Kytril injection to be immediately suspended due to high levels
of contamination.  The report called for capital expenditure to
improve conditions of sterile operations or else close the
sterile facility with a sense of urgency.

128. Bactroban ointment, while not a sterile product, is also
manufactured in the sterile facility at Cidra.  Bactroban is an
antibiotic ointment that is used, amongst other things, to treat
impetigo, a contagious skin infection that is common in small
children.  Release to the market of Bactroban ointment that was
contaminated with microorganisms was cited by the FDA in both the
April 2002 FDA-483 and the July 2002 Warning Letter.  At the
January 24, 2003 meeting, GSK told the FDA that it had completed
a line item entitled: "Discuss with FDA (Compliance and Division
of Anti-Infective) the microbial specification requirements for
Bactroban."  Cidra, however, failed to correct the problem.  The
June 2003 GQA Audit documented the release to the market on March
4, 2003, of a further lot of Bactroban contaminated with the same
microorganism as the one that resulted in an FDA-mandated recall
of Bactroban in February/May 2002.  This microorganism, Ralstonia
paucula, is associated with human infection such as bacteranemia,
urinary tract infections, meningitis, wound infection, and

peritonitis.   The June 2003 GQA Audit also found that there was
no formal validation to support the microbial cleaning of the
holding tank for Bactroban ointment.   They classified Bactroban
production as a major problem area that could significantly
impact product quality requiring immediate corrective action.

## Substandard Quality and Control of Water Systems

129.   In the April 2, 2003 report, Eckard cited quality and
control of water systems as a high risk compliance area at Cidra
due to an increase in the number of investigations related to the
isolation of objectionable organisms in the water system.   Eckard
noted that there was a project underway to upgrade the water
system.   However, this project was not progressing.   The June
2003 GQA Audit identified water systems as a major problem that
could significantly impact product quality requiring immediate
corrective action.   The auditors noted that the system design
allowed for build up of stagnant water exhibiting microbial
contamination.   They called for the critical assessment and
redesign of the water systems with swift implementation.

## OOS Events for Environmental Monitoring of
## Manufacturing Areas and Clean Equipment

130. In the April 2, 2003 report to GSK management, Eckard noted that manufacturing areas and equipment that had purportedly been cleaned to eliminate chemical and microbial contamination failed routine environmental testing on more than a dozen occasions during 2002. She also noted that the microbiology laboratory investigated 8 events of contamination in negative controls (i.e., control swabs used in testing for microbial contamination of equipment and manufacturing areas) in 2002, as well as inadequate investigation of root cause.

131. The June 2003 GQA Audit cited continuing contamination of negative controls in 2003, and the recovery of objectionable organisms from sampling plates collected during manufacture. The auditors noted that production continued even though two separate investigations failed to determine root cause. The auditors classified this as a major problem that could significantly impact product quality requiring immediate corrective action.

## Destruction of Audit Reports

132. It is current good practice in the pharmacuetical industry

to routinely conduct internal audits. Further, the cGMPs require that the quality assurance unit review all production records to ensure errors are fully investigated (21 C.F.R. § 211.22(a)) and that written production and process control procedures be reviewed (21 C.F.R. § 211.100(a)). In order to promote self-auditing, it is FDA policy to obtain copies of internal audit reports only when investigating a serious health problem or upon order of the court.

133. GSK policy requires that internal audit reports be retained for 3 years after all actions have been completed to facilitate tracking for future observations and that a 7 year log/record be maintained including the date, scope, auditor and completion of identified actions. This is consistent with industry practice. The June 2003 GQA Audit found that Cidra's standard procedure was to destroy audit reports once the problems had been discussed with the responsible personnel and to keep no evidence of same. The auditors found that action plans were not documented. They also found that the audit program did not include the aseptic area or the air handling system. They classified auditing as a major problem that could significantly impact product quality requiring immediate corrective action.

## Microbiology Laboratory ("Micro Lab")

134. Testing of products and equipment for contamination by objectionable organisms is conducted in the Micro Lab. The June 2003 RTP found a number of serious deficiencies in the functioning of the Micro Lab, including:

a. Poor controls of materials used in testing functions, including lack of assurance that media (used to test for growth of microorganisms) meets quality standards;

b. Poor document control and lack of data integrity;

c. Poor controls of water samples prior to testing for presence of microorganisms;

d. Lack of assurance that test samples and materials are maintained at the required temperatures for the duration of incubation and storage periods and no alarms on equipment for notification of out-of-range conditions.

e. No procedures for identification of trends in water and environmental monitoring;

f. Lack of timeliness in the review and approval of test results.

135. Deficiencies in environmental monitoring (discussed in paragraphs 130 through 131 above) are further evidence of problems impacting the effective functioning of the Micro Lab.

The auditors classified the Micro Lab as a major problem area that could significantly impact product quality requiring immediate corrective action.

### Substandard Air Quality

136. The cGMPS provide that air handling systems must be balanced to ensure that they are functioning correctly. Equipment for controlling air pressure, microorganisms, dust, humidity and temperature must be provided. 21 C.F.R. § 211.46. The June 2003 GQA Audit found that the design of Cidra's air handling did not meet cGMP standards and created the potential for cross contamination. The auditors found that pressure differentials were misdirected allowing improper airflow in certain areas. They classified this as a major problem that could significantly impact product quality requiring immediate corrective action. As stated above, poor air quality likely contributed to the high incidence of "unknown peaks" observed during routine laboratory testing.

### Cytotoxic Research & Development ("R&D") Manufacturing

137.   Cytotoxic substances cause the destruction or inhibit the function of cells.  Manufacture of cytotoxic substances must, for

obvious reasons, be strictly quarantined from manufacture of

other products.   The June 2003 GQA Audit found that Cidra was

engaged in the R&D manufacture of Topotecan, a chemotherapy drug

that is associated with serious side-effects, in a contained area

in the midst of commercial manufacturing.   The auditors found

that air pressure differentials that are crucial to containment

of the cytotoxic substance were not properly monitored and

documented: the most recent data was dated April 2002.   Further,

they found that there was no baseline monitoring in surrounding

areas to ensure that toxic substances were contained to the R&D

area and had not been tracked into other areas where prescription

and over-the-counter drugs were made.   The auditors also found

that an area formerly used for Topotecan trials had not been

properly decontaminated and decommissioned.   They classified this

as a major problem that could significantly impact product

quality requiring immediate corrective action.


### Other cGMP Issues


138. The June 2003 GQA Audit identified the following

miscellaneous cGMP issues, and collectively classified this as a

major problem that could significantly impact product quality

requiring immediate corrective action:

    a. Raw materials with no identification or status control;

-72-

b. Product waste inappropriately stored;

c. Equipment allowing product leakage creating the potential for cross-contamination;

d. Containers of drug product open in unprotected areas;

e. Poor controls of lubricants and cleaning agents creating the potential for misuse leading to product contamination;

f. H&K encapsulator for Dyazide (a machine that fills and seals capsules) was not cleaned after use;

g. Poor controls of disinfectants to ensure that they are free of contamination and within expiry date;

h. No studies to demonstrate effectiveness of disinfection procedures on surfaces in controlled areas;

i. Improper storage and inventory tracking of materials used in process validation; and

j. 9 of 28 packaging lines not equipped to carry out the required 100% electronic verification of printed materials.

## CONCLUSION

139. During the times relevant to this Complaint, GSK routinely violated the laws and regulations designed to ensure the safety and effectiveness of drug products released to the market, including the current Good Manufacturing Practices, the Federal Food, Drug and Cosmetics Act, 21 U.S.C. §§ 301 et seq., and the

Code of Federal Regulations, Part 21.  GSK lied to the FDA in the process of Warning Letter recovery and beyond in order to conceal its ongoing violations of those laws and regulations.

140. Further, GSK failed adequately to investigate allegations of product diversion from the Cidra plant.  On information and belief, this resulted in the distribution of reject drug product, including Avandamet, to the United States market.

141. GSK caused the distribution in interstate commerce of drug products that were not safe and/or effective and the submission of false claims for those products to the Medicaid, Medicare, the VA and other government health programs.

142. On information and belief, as set forth in paragraphs 54 through 55 above, after its purchase of the global rights to Kytril in or about January 2001, Roche filed and caused to be filed false claims within the FCA by failing to discharge its responsibility under 21 C.F.R. § 211.22(a) to ensure that Kytril was manufactured in accordance with the cGMPs and was safe and effective for release to the United States market and dispensing to beneficiaries of government health programs.

-74-

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

(Federal False Claims Act
31 U.S.C. § 3729(a)(1))

143. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein again at length.

144. This is a claim for penalties and treble damages under the Federal False Claims Act.

145. By virtue of the acts described above, Defendants, for the purpose of defrauding the Government, knowingly presented and/or caused to be presented false or fraudulent claims for payment or approval under the Medicare, Medicaid and other Government health programs to officers, employees or agents of the United States Government, within the meaning of 31 U.S.C. § 3729(a)(1).

146. As a result, federal monies were lost through payments made in respect of the claims and other costs were sustained by the Government.

147. Therefore, the Federal Government has been damaged in an

-75-

amount to be proven at trial.

148. Additionally, the Federal Government is entitled to the maximum penalty of \$11,000 for each and every false and fraudulent claim made and caused to be made by Defendants and arising from their fraudulent conduct as described herein.

## SECOND CAUSE OF ACTION

(Federal False Claims Act
31 U.S.C. § 3729(a)(2))

149. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein again at length.

150. This is a claim for penalties and treble damages under the Federal False Claims Act.

151. By virtue of the acts described above, the Defendants, for the purpose of defrauding the Government, knowingly made, used and/or caused to be made or used, false or fraudulent records or statements to get false and fraudulent claims paid or approved under Medicare, Medicaid and other Government health programs, within the meaning of 31 U.S.C. § 3729(a)(2).

-76-

152. As a result, federal monies were lost through payments made in respect of the claims and other costs were sustained by the Government.

153. Therefore, the Federal Government has been damaged in an amount to be proven at trial.

154. Additionally, the Federal Government is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

THIRD CAUSE OF ACTION
(Federal False Claims Act
31 U.S.C. § 3730 (h))

155. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein again at length.

156. This is a claim for damages and other relief under the Federal False Claims Act.

157. By virtue of the acts described above, Defendant GSK discharged the plaintiff/relator and discriminated against her in the terms and conditions of her employment because of lawful acts

-77-

done by her in furtherance of this action, in violation of 31 U.S.C. § 3730 (h).

158. As a result, the plaintiff/relator been damaged in an amount to be proven at trial.

159. Additionally, the plaintiff/relator is entitled to reinstatement with the same seniority status that she would have had but for the discrimination.

### FOURTH CAUSE OF ACTION
(California False Claims Act
Cal. Gov't Code § 12651(a)(1))

160. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein.

161. This is a claim for penalties and treble damages under the California False Claims Act.

162. By virtue of the acts described above, Defendants, for the purpose of defrauding the California State Government, knowingly presented and/or caused to be presented false claims for payment or approval under Medicaid and other California State funded programs to officers or employees of the state within the meaning of Cal.

-78-

Gov't Code § 12651(a)(1).

163. As a result, California State monies were lost through payments made in respect of the claims and other costs were sustained by the California State Government.

164. Therefore, the California State Government has been damaged in an amount to be proven at trial.

165. Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

FIFTH CAUSE OF ACTION
(California False Claims Act
Cal. Gov't Code § 12651(a)(2))

166. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein.

167. This is a claim for penalties and treble damages under the California False Claims Act.

168. By virtue of the acts described above, Defendants, for the

-79-

purpose of defrauding the California State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other California State funded programs within the meaning of Cal. Gov't Code § 12651(a)(2).

169. As a result, California State monies were lost through payments made in respect of the claims and other costs were sustained by the California State Government.

170. Therefore, the California State Government has been damaged in an amount to be proven at trial.

171. Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

### SIXTH CAUSE OF ACTION
(Delaware False Claims and Reporting Act
6 Del. C. § 1201(a)(1))

172. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein.

173. This is a claim for penalties and treble damages under the Delaware False Claims and Reporting Act.

174. By virtue of the acts described above, Defendants, for the purpose of defrauding the Delaware State Government, knowingly presented and/or caused to be presented, directly or indirectly, false or fraudulent claims for payment or approval under Medicaid and other Delaware State funded programs to officers or employees of the state within the meaning of 6 Del. C. § 1201(a)(1).

175. As a result, Delaware State monies were lost through payments made in respect of the claims and other costs were sustained by the Delaware State Government.

176. Therefore, the Delaware State Government has been damaged in an amount to be proven at trial.

177. Additionally, the Delaware State Government is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

SEVENTH CAUSE OF ACTION
(Delaware False Claims and Reporting Act
6 Del. C. § 1201(a)(2))

178. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein.

179. This is a claim for penalties and treble damages under the Delaware False Claims and Reporting Act.

180. By virtue of the acts described above, Defendants, for the purpose of defrauding the Delaware State Government, knowingly made, used, and/or caused to be made or used, directly or indirectly, false records or statements to get false or fraudulent claims paid or approved under Medicaid and other Delaware State funded programs within the meaning of 6 Del. C. § 1201(a)(2).

181. As a result, Delaware State monies were lost through payments made in respect of the claims and other costs were sustained by the Delaware State Government.

182. Therefore, the Delaware State Government has been damaged in an amount to be proven at trial.

183. Additionally, the Delaware State Government is entitled to the

maximum penalty of $11,000 for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

EIGHTH CAUSE OF ACTION
(District of Columbia Procurement Reform Amendment Act
D.C. Code § 2-308.14(a)(1))

184. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein.

185. This is a claim for penalties and treble damages under the District of Columbia Procurement Reform Amendment Act.

186. By virtue of the acts described above, Defendants, for the purpose of defrauding the District of Columbia Government, knowingly presented and/or caused to be presented, false claims for payment or approval under Medicaid and other District of Columbia funded programs to officers or employees of the District within the meaning of D.C. Code § 2-308.14(a)(1).

187. As a result, District of Columbia monies were lost through payments made in respect of the claims and other costs were sustained by the District of Columbia Government.

-83-

188. Therefore, the District of Columbia Government has been damaged in an amount to be proven at trial.

189. Additionally, the District of Columbia Government is entitled to the maximum penalty of $10,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

### NINTH CAUSE OF ACTION
(District of Columbia Procurement Reform Amendment Act
D.C. Code § 2-308.14(a)(2))

190. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein.

191. This is a claim for penalties and treble damages under the District of Columbia Procurement Reform Amendment Act.

192. By virtue of the acts described above, Defendants, for the purpose of defrauding the District of Columbia Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other District of Columbia funded programs within the meaning of D.C. Code § 2-308.14(a)(2).

-84-

193. As a result, District of Columbia monies were lost through payments made in respect of the claims and other costs were sustained by the District of Columbia Government.

194. Therefore, the District of Columbia Government has been damaged in an amount to be proven at trial.

195. Additionally, the District of Columbia Government is entitled to the maximum penalty of $10,000 for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

TENTH CAUSE OF ACTION
(Florida False Claims Act
Fla. Stat. § 68.082(2)(a))

196. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein.

197. This is a claim for penalties and treble damages under the Florida False Claims Act.

198. By virtue of the acts described above, Defendants, for the purpose of defrauding the Florida State Government, knowingly presented and/or caused to be presented false claims for payment or

-85-

approval under Medicaid and other Florida State funded programs to officers or employees of the state within the meaning of Fla. Stat. § 68.082(2)(a).

199. As a result, Florida State monies were lost through payments made in respect of the claims and other costs were sustained by the Florida State Government.

200. Therefore, the Florida State Government has been damaged in an amount to be proven at trial.

201. Additionally, the Florida State Government is entitled to the maximum penalty of $10,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

ELEVENTH CAUSE OF ACTION
(Florida False Claims Act
Fla. Stat. § 68.082(2)(b))

202. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein.

203. This is a claim for penalties and treble damages under the Florida False Claims Act.

-86-

204. By virtue of the acts described above, Defendants, for the purpose of defrauding the Florida State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved under Medicaid and other Florida State funded programs within the meaning of Fla. Stat. § 68.082(2)(b).

205. As a result, Florida State monies were lost through payments made in respect of the claims and other costs were sustained by the Florida State Government.

206. Therefore, the Florida State Government has been damaged in an amount to be proven at trial.

207. Additionally, the Florida State Government is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

TWELFTH CAUSE OF ACTION
(Hawaii False Claims Act
Haw. Rev. Stat. § 661-21(a)(1))

208. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though

-87-

fully set forth herein.

209. This is a claim for penalties and treble damages under the Hawaii False Claims Act.

210. By virtue of the acts described above, Defendants, for the purpose of defrauding the Hawaii State Government, knowingly presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other Hawaii State funded programs to officers or employees of the state within the meaning of Haw. Rev. Stat. § 661-21)(a)(1).

211. As a result, Hawaii State monies were lost through payments made in respect of the claims and other costs were sustained by the Hawaii State Government.

212. Therefore, the Hawaii State Government has been damaged in an amount to be proven at trial.

213. Additionally, the Hawaii State Government is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

THIRTEENTH CAUSE OF ACTION
(Hawaii False Claims Act
Haw. Rev. Stat. § 661-21(a)(2))

214. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein.

215. This is a claim for penalties and treble damages under the Hawaii False Claims Act.

216. By virtue of the acts described above, Defendants, for the purpose of defrauding the Hawaii State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved under Medicaid and other Hawaii State funded programs within the meaning of Haw. Rev. Stat. § 661-21)(a)(2).

217. As a result, Hawaii State monies were lost through payments made in respect of the claims and other costs were sustained by the Hawaii State Government.

218. Therefore, the Hawaii State Government has been damaged in an amount to be proven at trial.

219. Additionally, the Hawaii State Government is entitled to the

-89-

maximum penalty of $10,000 for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

FOURTEENTH CAUSE OF ACTION
(Illinois Whistleblower Reward and Protection Act
740 Ill. Comp. Stat. 175/3(a)(1))

220. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein.

221. This is a claim for penalties and treble damages under the Illinois Whistleblower Reward and Protection Act.

222. By virtue of the acts described above, Defendants, for the purpose of defrauding the Illinois State Government, knowingly presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other Illinois State funded programs to officers or employees of the state within the meaning of 740 Ill. Comp. Stat. 175/3(a)(1).

223. As a result, Illinois State monies were lost through payments made in respect of the claims and other costs were sustained by the Illinois State Government.

-90-

224. Therefore, the Illinois State Government has been damaged in an amount to be proven at trial.

225. Additionally, the Illinois State Government is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

### FIFTEENTH CAUSE OF ACTION
(Illinois Whistleblower Reward and Protection Act
740 Ill. Comp. Stat. 175/3(a)(2))

226. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein.

227. This is a claim for penalties and treble damages under the Illinois Whistleblower Reward and Protection Act.

228. By virtue of the acts described above, Defendants, for the purpose of defrauding the Illinois State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved under Medicaid and other Illinois State funded programs within the meaning of 740 Ill. Comp. Stat. 175/3(a)(2).

-91-

229. As a result, Illinois State monies were lost through payments made in respect of the claims and other costs were sustained by the Illinois State Government.

230. Therefore, the Illinois State Government has been damaged in an amount to be proven at trial.

231. Additionally, the Illinois State Government is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

### SIXTEENTH CAUSE OF ACTION
(Louisiana Medical Assistance Programs Integrity Law
La. Rev. Stat. 46:438.3(A))

232. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein.

233. This is a claim for a fine and damages under the Louisiana Medical Assistance Programs Integrity Law.

234. By virtue of the acts described above, Defendants, for the purpose of defrauding the Louisiana State Government, knowingly presented and/or caused to be presented false or fraudulent claims

-92-

for payment or approval under Medicaid and other Louisiana State funded programs within the meaning of La. Rev. Stat. 46:438.3(A).

235. As a result, Louisiana State monies were lost through payments made in respect of the claims and other costs were sustained by the Louisiana State Government.

236. Therefore, the Louisiana State Government has been damaged in an amount to be proven at trial.

237. Additionally, the Louisiana State Government is entitled to the maximum civil fine in the amount of three times the amount of actual damages sustained by the medical assistance programs as a result of the violations described herein.   La. Rev. Stat. 46:438.6(B)(2).

## SEVENTEENTH CAUSE OF ACTION
(Louisiana Medical Assistance Programs Integrity Law
La. Rev. Stat. 46:438.3(B))

238. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein.

239. This is a claim for a fine and damages under the Louisiana Medical Assistance Programs Integrity Law.

-93-

240. By virtue of the acts described above, Defendants, for the purpose of defrauding the Louisiana State Government, knowingly engaged in misrepresentations to obtain, or attempt to obtain, payment from medical assistance program funds within the meaning of La. Rev. Stat. 46:483.3(B).

241. As a result, Louisiana State monies were lost through payments made in respect of the defendants' conduct and other costs were sustained by the Louisiana State Government.

242. Therefore, the Louisiana State Government has been damaged in an amount to be proven at trial.

243. Additionally, the Louisiana State Government is entitled to the maximum civil fine in the amount of three times the amount of actual damages sustained by the medical assistance programs as a result of the violations described herein.   La. Rev. Stat. 46:438.6(B)(2).

EIGHTEENTH CAUSE OF ACTION
(Massachusetts False Claims Act
Mass. Gen. L. Ch. 12, §§ 5B(1))

244. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though

-94-

fully set forth herein.

245. This is a claim for penalties and treble damages under the Massachusetts False Claims Act.

246. By virtue of the acts described above, Defendants, for the purpose of defrauding the Massachusetts Commonwealth Government, knowingly presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other Massachusetts Commonwealth funded programs within the meaning of Mass. Gen. L. Ch. 12, §§ 5B(1).

247. As a result, Massachusetts Commonwealth monies were lost through payments made in respect of the claims and other costs were sustained by the Massachusetts Commonwealth Government.

248. Therefore, the Massachusetts Commonwealth Government has been damaged in an amount to be proven at trial.

249. Additionally, the Massachusetts Commonwealth Government is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

-95-

NINETEENTH CAUSE OF ACTION
(Massachusetts False Claims Act
Mass. Gen. L. Ch. 12, §§ 5B(2))

250. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein.

251. This is a claim for penalties and treble damages under the Massachusetts False Claims Act.

252. By virtue of the acts described above, Defendants, for the purpose of defrauding the Massachusetts Commonwealth Government, knowingly made, used, and/or caused to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth within the meaning of Mass. Gen. L. Ch. 12, §§ 5B(2).

253. As a result, Massachusetts Commonwealth monies were lost through payments made in respect of the claims and other costs were sustained by the Massachusetts Commonwealth Government.

254. Therefore, the Massachusetts Commonwealth Government has been damaged in an amount to be proven at trial.

255. Additionally, the Massachusetts Commonwealth Government is

-96-

entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

TWENTIETH CAUSE OF ACTION
(Nevada False Claims Act
Nev. Rev. Stat. § 357.040(1)(a))

256. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein.

257. This is a claim for penalties and treble damages under the Nevada False Claims Act, entitled "Submission of False Claims to State or Local Government".

258. By virtue of the acts described above, Defendants, for the purpose of defrauding the Nevada State Government, knowingly presented and/or caused to be presented false claims for payment or approval under Medicaid and other Nevada State funded programs within the meaning of Nev. Rev. Stat. § 357.040(1)(a).

259. As a result, Nevada State monies were lost through payments made in respect of the claims and other costs were sustained by the Nevada State Government.

260. Therefore, the Nevada State Government has been damaged in an amount to be proven at trial.

261. Additionally, the Nevada State Government is entitled to the maximum penalty of $10,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

TWENTY-FIRST CAUSE OF ACTION
(Nevada False Claims Act
Nev. Rev. Stat. § 357.040(1)(b))

262. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein.

263. This is a claim for penalties and treble damages under the Nevada False Claims Act, entitled "Submission of False Claims to State or Local Government".

264. By virtue of the acts described above, Defendants, for the purpose of defrauding the Nevada State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other Nevada State funded programs within the meaning of Nev. Rev. Stat. § 357.040(1)(b).

-98-

265. As a result, Nevada State monies were lost through payments made in respect of the claims and other costs were sustained by the Nevada State Government.

266. Therefore, the Nevada State Government has been damaged in an amount to be proven at trial.

267. Additionally, the Nevada State Government is entitled to the maximum penalty of $10,000 for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

### TWENTY-SECOND CAUSE OF ACTION
(Tennessee False Claims Act
Tenn. Code Ann. § 4-18-103(a)(1))

268. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein.

269. This is a claim for penalties and treble damages under the Tennessee False Claims Act.

270. By virtue of the acts described above, Defendants, for the purpose of defrauding the Tennessee State Government, knowingly presented and/or caused to be presented false claims for payment or

-99-

approval under Medicaid and other Tennessee State funded programs to officers or employees of the state within the meaning of Tenn. Code Ann. § 4-18-103(a)(1).

271. As a result, Tennessee State monies were lost through payments made in respect of the claims and other costs were sustained by the Tennessee State Government.

272. Therefore, the Tennessee State Government has been damaged in an amount to be proven at trial.

273. Additionally, the Tennessee State Government is entitled to the maximum penalty of $10,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

TWENTY-THIRD CAUSE OF ACTION
(Tennessee False Claims Act
Tenn. Code Ann. § 4-18-103(a)(2))

274. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein.

275. This is a claim for penalties and treble damages under the Tennessee False Claims Act.

-100-

276. By virtue of the acts described above, Defendants, for the purpose of defrauding the Tennessee State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other Tennessee State funded programs within the meaning of Tenn. Code Ann. § 4-18-103(a)(2).

277. As a result, Tennessee State monies were lost through payments made in respect of the claims and other costs were sustained by the Tennessee State Government.

278. Therefore, the Tennessee State Government has been damaged in an amount to be proven at trial.

279. Additionally, the Tennessee State Government is entitled to the maximum penalty of $10,000 for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

TWENTY-FOURTH CAUSE OF ACTION
(Tennessee Medicaid False Claims Act
Tenn. Code Ann. § 71-5-182(a)(1)(A))

280. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though

fully set forth herein.

281. This is a claim for penalties and treble damages under the Tennessee Medicaid False Claims Act.

282. By virtue of the acts described above, Defendants, for the purpose of defrauding the Tennessee State Government, knowingly presented and/or caused to be presented to the state claims for payment under the Medicaid program knowing such claims were false or fraudulent within the meaning of Tenn. Code Ann. § 71-5-182(a)(1)(A).

283. As a result, Tennessee State monies were lost through payments made in respect of the claims and other costs were sustained by the Tennessee State Government.

284. Therefore, the Tennessee State Government has been damaged in an amount to be proven at trial.

285. Additionally, the Tennessee State Government is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

TWENTY-FIFTH CAUSE OF ACTION
(Tennessee Medicaid False Claims Act
Tenn. Code Ann. § 71-5-182(a)(1)(B))

286. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein.

287. This is a claim for penalties and treble damages under the Tennessee Medicaid False Claims Act.

288. By virtue of the acts described above, Defendants, for the purpose of defrauding the Tennessee State Government, knowingly made, used, and/or caused to be made or used, records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the state knowing such record or statement were false within the meaning of Tenn. Code Ann. § 71-5-182(a)(1)(B).

289. As a result, Tennessee State monies were lost through payments made in respect of the claims and other costs were sustained by the Tennessee State Government.

290. Therefore, the Tennessee State Government has been damaged in an amount to be proven at trial.

291. Additionally, the Tennessee State Government is entitled to

the maximum penalty of $10,000 for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

TWENTY-SIXTH CAUSE OF ACTION
(Texas Medicaid Fraud Prevention Law
Tex. Hum. Res. Code § 36.002(1)(A))

292. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein.

293. This is a claim for restitution, interest, penalties and double damages under the Medicaid Fraud Prevention Law.

294. By virtue of the acts described above, the Defendants, for the purpose of defrauding the Texas State Government, knowingly or intentionally made, and/or caused to be made, false statements or representations of material facts on applications for contracts, benefits, or payments under the Medicaid program, within the meaning of Tex. Hum. Res. Code § 36.002(1)(A).

295. As a result, Texas State monies were lost through payments made in respect of the false statements or representations and other costs were sustained by the Texas State Government.

-104-

296. Therefore, the Texas State Government has been damaged in an amount to be proven at trial.

297. Additionally, the Texas State Government is entitled to the maximum penalty of $10,000 for each and every unlawful act committed by the Defendants under this provision. Tex. Hum. Res. Code § 36.052(3)(B).

TWENTY-SEVENTH CAUSE OF ACTION
(Texas Medicaid Fraud Prevention Law
Tex. Hum. Res. Code § 36.002(4)(B))

298. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein.

299. This is a claim for restitution, interest, penalties and double damages under the Medicaid Fraud Prevention Law.

300. By virtue of the acts described above, the Defendants, for the purpose of defrauding the Texas State Government, knowingly or intentionally made, caused to be made, induced, and/or sought to induce, the making of false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement

pertaining to the Medicaid program, within the meaning of Tex. Hum. Res. Code § 36.002(4)(B).

301. As a result, Texas State monies were lost through payments made in respect of the false statements or representations and other costs were sustained by the Texas State Government.

302. Therefore, the Texas State Government has been damaged in an amount to be proven at trial.

303. Additionally, the Texas State Government is entitled to the maximum penalty of $10,000 for each and every unlawful act committed by the Defendants under this provision. Tex. Hum. Res. Code § 36.052(3)(B).

TWENTY-EIGHTH CAUSE OF ACTION
(Virginia Fraud Against Taxpayers Act
Va. Code Ann. § 8.01-216.3(A)(1))

304. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though fully set forth herein.

305. This is a claim for penalties and treble damages under the Virginia Fraud Against Taxpayers Act.

-106-

306. By virtue of the acts described above, Defendants, for the purpose of defrauding the Virginia Commonwealth Government, knowingly presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other Virginia Commonwealth funded programs to officers or employees of the Commonwealth within the meaning of Va. Code Ann. § 8.01-216.3(A)(1).

307. As a result, Virginia Commonwealth monies were lost through payments made in respect of the claims and other costs were sustained by the Virginia Commonwealth Government.

308. Therefore, the Virginia Commonwealth Government has been damaged in an amount to be proven at trial.

309. Additionally, the Virginia Commonwealth Government is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

TWENTY-NINTH CAUSE OF ACTION
(Virginia Fraud Against Taxpayers Act
Va. Code Ann. § 8.01-216.3(A)(2))

310. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 142 above as though

fully set forth herein.

311. This is a claim for penalties and treble damages under the Virginia Fraud Against Taxpayers Act.

312. By virtue of the acts described above, Defendants, for the purpose of defrauding the Virginia Commonwealth Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth under Medicaid and other Virginia Commonwealth funded programs within the meaning of Va. Code Ann. § 8.01-216.3(A)(2).

313. As a result, Virginia Commonwealth monies were lost through payments made in respect of the claims and other costs were sustained by the Virginia Commonwealth Government.

314. Therefore, the Virginia Commonwealth Government has been damaged in an amount to be proven at trial.

315. Additionally, the Virginia Commonwealth Government is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1.   Judgment in an amount equal to threefold the damages to be proven at trial against Defendants and in favor of the United States, plus a civil penalty of up to $11,000 for each violation of 31 U.S.C. § 3729 proven at trial;

2.   Judgment in an amount equal to threefold the damages to be proven at trial against Defendants and in favor of the State of California, plus a civil penalty of $10,000 for each violation of Cal. Gov't Code § 12651 proven at trial;

3.   Judgment in an amount equal to threefold the damages to be proven at trial against Defendants and in favor of the State of Delaware, plus a civil penalty of $11,000 for each violation of 6 Del. C. § 1201 proven at trial;

4.   Judgment in an amount equal to threefold the damages to be proven at trial against Defendants and in favor of the District of Columbia, plus a civil penalty of $10,000 for each violation of D.C. Code Ann. § 2-308.14 proven at trial;

5.   Judgment in an amount equal to threefold the damages to be proven at trial against Defendants and in favor of the State of Florida, plus a civil penalty of $10,000 for each violation of Fla. Stat. Ann. § 68.082 proven at trial;

6.   Judgment in an amount equal to threefold the damages to be proven at trial against Defendants and in favor of the State of Hawaii, plus a civil penalty of $10,000 for each violation of Haw. Rev. Stat. § 661-21 proven at trial;

7.   Judgment in an amount equal to threefold the damages to be proven at trial against Defendants and in favor of the State of Illinois, plus a civil penalty of $10,000 for each violation of 740 Ill. Comp. Stat. § 175/3 proven at trial;

8.   Judgment in an amount equal to the damages to be proven at trial against Defendants and in favor of the State of Louisiana, plus a civil fine in the amount of three times the amount of actual damages sustained for each violation of La. Rev. Stat. 46:438.3 proven at trial;

9.   Judgment in an amount equal to threefold the damages to be proven at trial against Defendants and in favor of the Commonwealth of Massachusetts, plus a civil penalty of $10,000

-110-

for each violation of Mass. Gen. L. Ch. 12, § 5B proven at trial;

10.  Judgment in an amount equal to threefold the damages to be proven at trial against Defendants and in favor of the State of Nevada, plus a civil penalty of $10,000 for each violation of Nev. Rev. Stat. Ann. §§ 357.040 proven at trial;

11.  Judgment in an amount equal to threefold the damages to be proven at trial against Defendants and in favor of the State of Tennessee, plus a civil penalty of $10,000 for each violation of Tenn. Code Ann. § Tenn. Code Ann. § 4-18-103 proven at trial;

12.  Judgment in an amount equal to threefold the damages to be proven at trial against Defendants and in favor of the State of Tennessee, plus a civil penalty of $10,000 for each violation of Tenn. Code Ann. § 71-5-182 proven at trial;

13.  Judgment in an amount equal to restitution, interest, and twofold the damages to be proven at trial against Defendants and in favor of the State of Texas, plus a civil penalty of $10,000 for each violation of Tex. Hum. Res. Code Ann. §§ 36.002 proven at trial;

-111-

14. Judgment in an amount equal to threefold the damages to be
    proven at trial against Defendants and in favor of the
    Commonwealth of Virginia, plus a civil penalty of $10,000 for
    each violation of Va. Code Ann. § 8.01-216.3 proven at trial;;

15. An award to Cheryl Eckard of the maximum amount allowed
    pursuant to 31 U.S.C. § 3730(d) and equivalent provisions in
    the state statutes set forth above, including the costs and
    expenses of this action and reasonable attorneys' fees;

16. An award to Cheryl Eckard of appropriate relief under 31
    U.S.C. § 3730 (h), including reinstatement with the same
    seniority status she would have had but for the discrimination
    alleged herein, two times the amount of back pay, interest on
    the back pay, and compensation for special damages sustained
    as a result of the discrimination, including litigation costs
    and reasonable attorneys' fees; and

17. Such other, further and different relief, whether preliminary
    or permanent, legal or equitable, as the Court deems just and
    proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands that his claims for relief against the Defendant be tried by a jury to the full extent permitted by law.

Dated: __2/ 24__ , 2004          By: _____

GETNICK & GETNICK

Neil V. Getnick (9864)
Lesley Ann Skillen (5156)
GETNICK & GETNICK
Rockefeller Center
620 Fifth Avenue
New York, New York  10020-2457
Telephone:  (212) 376-5666

LOCAL COUNSEL

Dated: __Feb 25__ , 2004          By: _____

Scott Tucker (BBO# 503940)
Tucker, Heifetz & Saltzman, LLP
Three School Street
Boston, Massachusetts 02108
Telephone:  (617) 557-9696

Attorneys for Qui Tam
Plaintiff, Cheryl D. Eckard

-113-