UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

----------------------------------------x

UNITED STATES OF AMERICA, STATES
OF CALIFORNIA, DELAWARE, FLORIDA,
HAWAII, ILLINOIS, INDIANA, LOUISIANA,
MASSACHUSETTS, MICHIGAN, NEVADA,
NEW HAMPSHIRE, NEW MEXICO, TENNESSEE,
TEXAS, and VIRGINIA, THE DISTRICT OF
COLUMBIA and THE CITIES OF
CHICAGO AND NEW YORK, *ex rel.*
CHERYL D. ECKARD,                                    CASE NO.:

               Plaintiff,                  C.A. No: 04 CV10375
                               (JLT)

           v.
                            FIRST AMENDED
                            COMPLAINT AND
                            JURY DEMAND

SMITHKLINEBEECHAM CORPORATION D/B/A/
GLAXOSMITHKLINE,                                     FILED IN CAMERA
SB PHARMCO PUERTO RICO, INC.,                        AND UNDER SEAL
GLAXOSMITHKLINE PUERTO RICO, INC., and
HOFFMAN LA-ROCHE, INC.,

               Defendants.

----------------------------------------x

## TABLE OF CONTENTS

INTRODUCTION...................................... 1

JURISDICTION AND VENUE............................ 7

PARTIES.......................................... 7

INDIVIDUAL PARTICIPANTS........................... 9

GOVERNMENT PROGRAMS.............................. 11

ASPECTS OF THE FDA REGULATORY SCHEME.............. 13

    The current Good Manufacturing Practices...... 14

    Establishment Inspections, 483s and Warning
    Letters....................................... 15

    Post-Marketing Surveillance................... 16

    Product Recalls............................... 18

    Consent Decrees............................... 19

OVERVIEW OF FACTUAL BASIS FOR FALSE CLAIMS........ 20

SUMMARY OF FALSE CLAIMS ACT LIABILITY............. 22

    FCA Liability of Roche........................ 26

DAMAGES TO THE GOVERNMENT......................... 27

PARTICULARS OF FALSE CLAIMS ACT VIOLATIONS........ 28

    Background.................................... 28

    GSK's Response to the FDA: Warning Letter
    "Recovery"................................... 31

    Alleged Product Diversion..................... 46

    Eckard's Termination, Report to GSK's
    Compliance Department and Report to the FDA .. 49

DETAILS OF QUALITY ASSURANCE FAILURES AND VIOLATIONS
OF THE FDC ACT AND THE CFRs......................... 51

    Product Comingling............................ 51

    Laboratory Investigations..................... 55

    Process Validation............................ 60

    Equipment Calibration......................... 63

    Overdue Process Investigations............... 65

    Understaffing in the Quality Assurance
    Unit......................................... 67

    Poor Documentation Quality.................... 68

    Contamination in Products Manufactured
    in the Sterile Facility...................... 69

    Substandard Quality and Control of
    Water Systems................................ 71

    OOS Events for Environmental Monitoring
    of Manufacturing Areas and
    Clean Equipment.............................. 72

    Destruction of Audit Reports.................. 73

    Microbiology Laboratory ("Micro Lab")......... 74

    Substandard Air Quality....................... 75

    Cytotoxic Research & Development ("R&D")
    Manufacturing................................ 76

    Other cGMP Issues............................. 77

CONCLUSION   .................................... 78

CAUSES OF ACTION   .............................. 79

DEMAND FOR RELIEF   ............................. 130

DEMAND FOR JURY TRIAL   ......................... 137

## GLOSSARY OF TERMS

CFRs        Code of Federal Regulations

cGMPs       current Good Manufacturing Practices

DQRS        The FDA's Drug Quality Reporting System

FCA         False Claims Act, 31 U.S.C. § 3729, *et. seq.*

FDA         Food and Drug Administration

FDA-483     FDA Form FD483, a list of "observations" representing
            violations the FDA believes a manufacturer has committed

FDC Act     Federal Food, Drug and Cosmetics Act, 21 U.S.C. §§ 301 *et
            seq*

GQA         Global Quality Assurance, a division of GSK

NDA         New Drug Application

OOS         Out-of-specification

QA          Quality Assurance

R&D         Research & Development

RTP         GSK headquarters in Research Triangle Park, North Carolina

SMIRT       Senior Management Incident Reporting Team, a senior
            management team established at Cidra in 2002

SOPs        Standard Operating Procedures

Plaintiff/relator, Cheryl D. Eckard, in the name of and
on behalf of the United States of America, the State of
California, the State of Delaware, the District of Columbia,
the State of Florida, the State of Hawaii, the State of
Illinois, the State of Indiana, the State of Louisiana, the
State of Massachusetts, the State of Michigan, the State of
Nevada, the State of New Hampshire, the State of New Mexico,
the State of Tennessee, the State of Texas, the State of
Virginia, the City of Chicago and the City of New York, by her
attorneys, Getnick & Getnick, as and for her complaint,
alleges as follows:

#### INTRODUCTION

1. As more fully alleged herein, this action arises out of a
scheme or schemes to defraud the United States of America, the
fifty states, and the District of Columbia perpetrated by the
defendants, commencing in or before 2000 and continuing to the
date hereof.  The Defendants made and caused to be made to the
United States, the fifty state governments and the District of
Columbia false claims for payment for prescription drugs
covered by Medicare, State Medicaid programs, the Department
of Veterans Affairs, the Public Health Service and other
federal, state and city purchasers of prescription drugs.  The

-1-

claims were false and fraudulent because the drugs, which were manufactured at Defendant GlaxoSmithKline's plant in Cidra, Puerto Rico, were defective, misidentified as a result of product mix-ups, not manufactured in accordance with FDA approved processes, and/or did not come with the assurance of identity, strength, quality and purity required for distribution to patients; and/or approvals for the drugs were obtained through false representations to the FDA.  The false claims arose out of chronic, serious deficiencies in the quality assurance function at the Cidra plant and the defendants' ongoing serious violations of the laws and regulations designed to ensure the fitness of drug products for use, including the Federal Food, Drug and Cosmetics Act, 21 U.S.C. §§ 301 et seq., and the Code of Federal Regulations, Title 21.

2. The drugs affected by the defendants' conduct include Paxil, Paxil CR, Avandia, Avandamet, Coreg, Bactroban, Abreva, Cimetidine, Compazine, Denavir, Dyazide, Thorazine, Stelazine, Ecotrin, Tagamet, Relafen, Kytril, Factive, Dyrenium and Albenza.

3. Examples of defective and/or misidentified products that

-2-

the defendants released to the United States market from the
Cidra plant are:

a. Drug product that was mixed up with drug product of a
different type or strength, e.g., 30mg and 10 mg tablets of an
anti-depressant mixed in the same bottle, and 12.5 and 6.25 mg
tablets of a heart medication mixed in the same bottle (see
paragraph 93 below);

b. A diabetes medication that was sub-potent and/or
super-potent (see paragraph 112 below);

c. An antibiotic ointment used to treat a skin infection
common in small children that was contaminated with a micro-
organism associated with bacteranemia, urinary tract
infections, meningitis, wound infection, and peritonitis (see
paragraph 119 below);

d. An injectable drug used to treat nausea and vomiting
in patients undergoing chemotherapy that was contaminated with
micro-organisms (see paragraph 118 below).

4. Further, on information and belief, during the times
relevant to this complaint employees of Defendant
SmithKlineBeecham Corporation d/b/a GlaxoSmithKline ("GSK")
diverted reject drug product from the Cidra plant to black
markets in Latin America.  GSK management failed adequately to

-3-

investigate these allegations. On information and belief,
this resulted in the distribution of reject drug product to
the United States market and the submission of false claims
for drug product that was defective.

5. The allegations set forth herein apply to defendant Hoffman
La-Roche, Inc., only in so far as they relate to the drug
Kytril.

6. These acts constitute violations of the federal False
Claims Act, 31 U.S.C. § 3729, *et. seq.* ("FCA"), and numerous
equivalent state and city statutes.[1] The FCA provides, *inter*

_____

[1] As set forth below, the defendants' acts constitute violations
of the California False Claims Act, Cal. Gov't Code §§ 12650-12655;
the Delaware False Claims and Reporting Act, 6 Del. C. §§ 1201 et
seq.; the District of Columbia Procurement Reform Amendment Act, D.C.
Code Ann. §§ 2-308.13-21; the Florida False Claims Act, Fla. Stat.
Ann. §§ 68.081-092; the Hawaii False Claims Act, Haw. Rev. Stat. §§
661-21-29; the Illinois Whistleblower Reward and Protection Act, 740
Ill. Comp. Stat. §§ 175/1-8; the Indiana False Claims and
Whistleblower Protection Act, IC 5-115.5 et seq.;  the Louisiana
Medical Assistance Programs Integrity Law, La. Rev. Stat. 46:437.1-
14; the Massachusetts False Claims Act, Mass. Gen. L. Ch. 12, §§ 5B
et seq.; the Michigan Medicaid False Claims Act, MCL §§400.601 et
seq.; the New Hampshire Medicaid Fraud and False Claims Act, RSA §
167.58 et seq.; the New Mexico Medicaid False Claims Act, N.M. Stat.
Ann. §§ 27-12-1 et seq.; the Nevada False Claims Act, Nev. Rev. Stat.
§§ 357.010 et seq.; the Tennessee Medicaid False Claims Act, Tenn.
Code Ann. §§ 71-5-182 et seq.; the Tennessee False Claims Act, Tenn.
Code Ann. §§ 4-18-101 et seq.; the Texas Medicaid Fraud Prevention
Law, Tex. Hum. Res. Code Ann. §§ 36.001 et seq.; the Virginia Fraud
Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.3 et seq.; the
Chicago False Claims Act, Chicago Municipal Code Ch. 1-21 et seq.;
and the New York City False Claims Act, Local Law 53 of 2005, Title

-4-

*alia*, that any person who knowingly presents and/or causes to be presented to the United States a false or fraudulent claim for payment is liable for a civil penalty of up to $11,000 for each claim, plus three times the amount of the damages sustained by the Government. The FCA allows any person discovering a fraud perpetrated against the Government to bring an action for himself and for the Government and to share in any recovery. The complaint in an FCA action is filed under seal for 60 days (without service on the Defendant within such 60-day period) to enable the Government (1) to conduct its own investigation without the defendant's knowledge and (2) to determine whether to join in the action.

7. Plaintiff/relator Cheryl D. Eckard ("Eckard") is a former Manager of Global Quality Assurance for defendant GSK. Eckard is an expert in Code of Federal Regulations, Title 21, compliance and an experienced pharmaceutical professional. She has a B.A. in Chemistry. She worked for GSK from 1992 through 2003. She is an expert on the technical, legal, regulatory and compliance aspects of the pharmaceutical Good Manufacturing Practices and quality systems regulations

Chicago False Claims Act, Chicago Municipal Code Ch. 1-21 et seq.; and the New York City False Claims Act, Local Law 53 of 2005, Title 7, New York City Admin. Code §§7-801 et seq.

relating to the development, manufacture, packaging, testing, holding and distribution of drug products. She has performed compliance functions including quality management of multiple manufacturing sites and preparing manufacturing sites for FDA pre-approval and current Good Manufacturing Process profile inspections.    She has managed international commercial investigation teams, technical working parties and Warning Letter Recovery teams, and worked closely with the FDA and other regulatory bodies in developing implementation plans to respond to regulatory sanctions.

8. Eckard seeks to recover damages and civil penalties in the name of the United States and the states for the violations alleged herein.  On information and belief, as set forth in paragraph 47 below, the damages and civil penalties that may be assessed against the defendants under the facts alleged in this Complaint amount to at least hundreds of millions of dollars.

9. Eckard also seeks to recover damages on her own behalf for retaliatory discharge under 31 U.S.C. § 3730(h) for her lawful acts done in furtherance of this action.

-6-

## JURISDICTION AND VENUE

10. This court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732.

11. Personal jurisdiction and venue are proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), as at least one of the defendants is found, has or had an agent or agents, has or had contacts, and transacts or transacted business and their affairs in this judicial district.

## PARTIES

12. Plaintiff/relator Eckard is a citizen of the United States and a resident of North Carolina. Eckard is a self-employed consultant. Prior to June 2003, when she was terminated for her lawful acts done in furtherance of this action, Eckard was a Manager of Global Quality Assurance for GSK, located in Research Triangle Park, North Carolina.

13. Defendant GSK is headquartered at 5 Moore Drive, Research Triangle Park, North Carolina 27709, and at One Franklin

Plaza, Philadelphia, Pennsylvania 19102. GSK's parent

company, GlaxoSmithKline PLC, is located at Charges House, 6-

12 Charges Street, London, England WIY8DH. GSK is engaged in

the development, manufacture, promotion, sale, interstate and

international distribution of, *inter alia*, prescription drugs.

GSK holds the second highest market share in the world

pharmaceutical market. GSK has 100,000 employees in 100

countries, with 50% of its sales of prescription drugs in the

United States.

14. Defendants SB Pharmco Puerto Rico, Inc. and

GlaxoSmithKline Puerto Rico, Inc. are wholly-owned

subsidiaries of GSK. Together with GSK, they operate and

manage a manufacturing plant located at Rd. 172, Km 9.2, Bo.

Certenejas, Cidra, PR 00739 ("Cidra"). Unless otherwise

indicated, references herein to GSK include SB Pharmco Puerto

Rico, Inc. and GlaxoSmithKline Puerto Rico, Inc.

15. Defendant Hoffman-La Roche, Inc., ("Roche") is the U.S.

prescription drug unit of Roche Holding Ltd., a leading

research-based health care enterprise and manufacturer of

pharmaceuticals and diagnostics located at CH-4070 Basel,

Switzerland. Roche is located at 340 Kingsland Street,

-8-

Nutley, NJ 07110. In or about January 2001, Roche acquired
the global rights for the drug Kytril from GSK for $1.23
billion. Kytril is marketed and sold exclusively by Roche
but after its acquisition by Roche continued to be
manufactured at the Cidra plant under contract with GSK.
Global sales for Kytril were approximately $400 million in
2005. The allegations set forth herein apply to Roche only to
the extent that they relate to Kytril.

## INDIVIDUAL PARTICIPANTS

16. David Pulman was GSK's Vice President of Manufacturing and
Supply for North America until December 2002, when he became
President, Global Manufacturing and Supply.

17. Janice Whitaker is GSK's Senior Vice President for Global
Quality.

18. Steve Plating was GSK's Vice President for Quality, North
America. He left GSK in early 2005.

19. Peter Savin is GSK's Vice President of Global Quality
Assurance.

-9-

20. Diane Sevigny was Director of Global Quality Assurance for North America Pharma until July 2003 when she was promoted to Director, Global Quality Assurance, Risk Management and Compliance.

21. Jonathon Box is the Vice President of Manufacturing and Supply for North America.

22. Jose Luis Rosado was the President of SB Pharmco Puerto Rico, Inc. and General Manager of the Cidra plant until April 2003, when he left the company.

23. Edwin Lopez was the Director of Quality at Cidra until the first quarter of 2003 when he was replaced in that role by Adalberto Ramirez and became Director of Laboratories at Cidra. He is no longer employed by GSK.

24. Adalberto Ramirez was the Director of Solid Manufacturing and Packaging at Cidra until the first quarter of 2003 when he was promoted to Director of Quality at Cidra. He left GSK in July 2003.

25. Gloria Martinez was the Quality Assurance and Regulatory

Manager at Cidra until 2003 when she replaced Adalberto
Ramirez as Director of Quality.  She left GSK in December
2004.

26. Marion Lon was the site director of Cidra who took over
from Rosado in or about April 2003.  She left GSK in October
2004.

### GOVERNMENT PROGRAMS

27. Medicaid is the nation's medical assistance program for
the needy, the medically-needy aged, blind, and disabled and
families with dependent children.  42 U.S.C. §§ 1396-1396v.
Medicaid is largely administered by the states and funded by a
combination of Federal and State funds.  Approximately 57% of
Medicaid funding is provided by the Federal Government.  Among
other forms of medical assistance, the Medicaid programs cover
outpatient prescription drugs. 42 U.S.C. §§ 1396a(10)(A) and
1396d(a)(12).

28. Medicare is the nation's health program for persons over
65 and the disabled.  Medicare is funded by the federal
government.  Medicare Part B has long covered outpatient
prescription drugs that are provided to a patient "incident

-11-

to" a physicians' services, including injectable medications,
and drugs that are required for the effective use of durable
medical equipment.  42 U.S.C. § 1395x(s)(2)(A).  Commencing on
January 1, 2006, Medicare Part D provides comprehensive
outpatient prescription drug coverage for brand name and
generic drugs according to National and Local Coverage
Determinations.  Medicare Prescription Drug Improvement and
Modernization Act 2003, Pub. L. 108-173.

29. The Department of Veterans Affairs ("VA") provides medical
assistance, including prescription drug coverage, for persons
who have been discharged from active duty service in the
military, naval, or air service.

30. The Public Health Service ("PHS") provides funding,
including outpatient drug coverage, for entities such as black
lung clinics, AIDS drug purchasing assistance programs,
hemophilia diagnostic treatment centers, urban Indian
organizations, disproportionate share hospitals, and other
entities listed in § 340B(a)(4) of the Public Health Service
Act.

31. The Department of Defense ("DOD") administers the TRICARE

-12-

health care program for active duty and retired members of the uniformed services, their families, and survivors. TRICARE benefits include comprehensive prescription drug coverage.

32. The Food and Drug Administration ("FDA") is responsible for protecting the public health by assuring the safety, efficacy, and security of human and veterinary drugs, biological products, medical devices, the nation's food supply, cosmetics, and products that emit radiation. The FDA administers, *inter alia*, the Federal Food, Drug and Cosmetics Act, ("FDC Act"), 21 U.S.C. §§ 301 *et seq.*

## ASPECTS OF THE FDA REGULATORY SCHEME

33. The federal government endeavors to ensure the safety and efficacy of drug products consumed daily by millions of Americans through a combination of approvals, inspections, enforcement, and self-regulation by drug manufacturers. As the FDA's Deputy Associate General Counsel, Eric M. Blumberg, Esq., wrote, drug manufacturers "occupy a virtual fiduciary relationship to the public ... FDA shares this trustee relationship to the consumer with industry leaders, but the initial and ultimate responsibility remains with those

-13-

leaders.  This is true not only because the law makes it so,
but also for the practical reason that the FDA cannot be in
every factory, much less monitor every decision that is made
every day that affects the quality of our food and drugs."
Abbott Laboratories Consent Decree and Individual
Responsibility Under the Federal Food, Drug and Cosmetic Act,
55 Food and Drug L.J., 145, 147.


## The current Good Manufacturing Practices


34. The current Good Manufacturing Practices ("cGMPs") contain
the minimum requirements that pharmaceutical companies must
meet in manufacturing, processing, packing, and holding drugs
to assure that they meet the safety, identity, strength,
quality, and purity characteristics that they purport to
possess. The cGMPS are codified in 21 C.F.R. Parts 210 and
211.  Manufacturers demonstrate compliance with cGMPs through
written documentation of procedures and practices.  The cGMPs
dictate, inter alia, standards for: personnel engaged in
quality control; the design, construction and maintenance of
buildings and facilities; the construction, cleaning and
maintenance of equipment; the storage, inspection and testing
of drug components and containers; the control of production

-14-

and process, including procedures for sampling and testing of
in-process drug products for conformity with specifications
and prevention of microbiological contamination; control of
packaging, labeling, storage and distribution; laboratory
controls including testing of drug product batches for
conformity with final specifications; the maintenance of
records and reports and conduct of investigations; and
procedures for handling of returned and salvaged product.

35. Drugs are deemed to be adulterated if they are not
manufactured in compliance with the cGMPs or if they are
contaminated. See 21 U.S.C. §§ 351(a)(2)(A) and(B). It is a
violation of the FDC Act, 21 U.S.C. §§ 331(a) to directly or
indirectly cause adulterated drugs to be introduced or
delivered for introduction into interstate commerce.

Establishment Inspections, 483s and Warning Letters

36. Under the FDC Act § 704, 21 U.S.C. § 374, the FDA is
authorized to conduct inspections of drug manufacturing
facilities, including inspections of records, files, papers,
processes, controls, and facilities. At the conclusion of the
inspection, the FDA provides the manufacturer with a Form

-15-

FD483 ("FDA-483"), or a list of "observations" representing violations the FDA believes the manufacturer has committed. The manufacturer is expected to respond in writing to each observation stating its position and any corrective action it proposes to take. The FDA takes this response into account in deciding whether further enforcement action is warranted.

37. Following an inspection or discovery of a violation, the FDA may issue a Warning Letter to the manufacturer representing its official findings of violations. FDC Act § 309, 21 U.S.C. § 336. The Warning Letter is the FDA's primary means of notifying manufacturers of serious violations and of achieving prompt corrective action. The manufacturer must respond in writing to the Warning Letter within 15 days stating what action is being taken to correct the violations, what action will be taken to prevent similar violations, and the time frame for such action.

## Post-marketing surveillance

38. The FDA operates a Drug Quality Reporting System, which includes the MedWatch reporting program. This is designed to rapidly identify significant health hazards associated with

-16-

the manufacturing and packaging of drugs, and to establish a
central reporting system for detecting problem areas or trends
requiring regulatory action. Doctors and pharmacists can
report drug quality problems, such as defective components,
poor packaging or labeling, suspected contamination or
questionable stability to the FDA, the manufacturer, or both,
using a standard form.

39. Pursuant to 21 C.F.R. § 314.81 (b)(1)(i) and (ii),
manufacturers are required to notify the FDA by filing a
"Field Alert" within 3 working days of the receipt, via the
Medwatch system or otherwise, of: (i) information concerning
any incident that causes the drug product or its labeling to
be mistaken for, or applied to, another article; (ii)
information concerning any bacteriological contamination, or
any significant chemical, physical, or other change or
deterioration in the distributed drug product, or any failure
of one or more distributed batches of the drug product to meet
the specifications established for it in the new drug
application.

## Product Recalls

40. The FDA expects manufacturers to take full responsibility
for recall of defective products, including follow-up checks
to assure that recalls are successful. The FDA does not have
authority to order the recall of drug products. Under 21
C.F.R. § 7.40, "[r]ecall is a voluntary action that takes
place because manufacturers and distributors carry out their
responsibility to protect the public health and well-being
from products that present a risk of injury or gross deception
or are otherwise defective." The FDA's guidelines "categorize
all recalls into one of three classes according to the level
of hazard involved: Class I recalls are for dangerous or
defective products that predictably could cause serious health
problems or death. Examples of products that could fall into
this category [include] ... a label mix-up on a life saving
drug ... Class II recalls are for products that might cause a
temporary health problem, or pose only a slight threat of a
serious nature. One example is a drug that is under-strength
but that is not used to treat life-threatening situations.
Class III recalls are for products that are unlikely to cause
any adverse health reaction, but that violate FDA labeling or
manufacturing regulations." FDA Recall Policies, FDA Center

-18-

for Food Safety and Applied Nutrition, Industry Affairs Staff Brochure, June 2002. *See also* FDA Investigations Operations Manual, Chapter 800 (801.1).

## Consent Decrees

41. The FDA, acting through the Department of Justice, is authorized to seek injunctions. FDC Act § 302; 21 U.S.C. § 332. Injunctions are sought when there is a likelihood that violative acts will continue or recur. A consent decree of permanent injunction may be obtained, *inter alia*, where there have been multiple and continuing cGMP violations that have not been voluntarily corrected by the manufacturer. In such cases, the facility will typically be placed under the monitorship of an independent expert or shut down until the manufacturer has brought itself into compliance, for example, by destroying adulterated product and revising Standard Operating Procedures ("SOPs"). Certification of compliance by an independent expert is often required before the FDA will permit normal operations to resume.

-19-

## OVERVIEW OF FACTUAL BASIS FOR FALSE CLAIMS

42. GSK's chronic quality assurance problems and ongoing, serious cGMP violations went to the heart of Cidra's manufacturing, processing and packaging systems. As further detailed in paragraphs 92 through 129 below, they included and/or resulted in:

a. Product mix-ups, i.e., a drug of a different type or strength found in the same bottle (see paragraphs 93 through 98 below);

b. Inadequate investigation of out-of-specification ("OOS") results detected during laboratory testing (see paragraphs 99 through 103 below);

c. Inadequate process validation and non-existent validation review processes for some products (see paragraphs 104 through 105 below);

d. Inadequate or non-existent calibration of equipment and instruments and incomplete investigations relating to equipment found to be out-of-calibration (see paragraphs 106 through 109 below);

e. Overdue process investigations, at times numbering in the hundreds (see paragraphs 110 through 113 below);

f. Understaffing in the Quality Assurance Unit (see

-20-

paragraphs 114 through 115 below);

g. Poor documentation quality, including unsigned, undated and/or lost or missing validation, investigation and change control documents, and hundreds of SOPs overdue for revision (see paragraphs 116 through 117 below);

h. Contamination in products manufactured in the sterile facility, including Kytril injection and Bactroban ointment (see paragraphs 118 through 119 below);

i. Substandard quality and control of the plant's water systems, resulting in build up of stagnant water and microbial contamination (see paragraph 120 below);

j. Manufacturing areas and purportedly clean equipment that repeatedly failed routine environmental testing and exhibited microbial contamination (see paragraphs 121 through 122 below);

k. Destruction of internal audit reports immediately after discussion with the responsible personnel, contrary to GSK policy and industry practice requiring 3 year retention (see paragraphs 123 through 124 below);

l. Serious deficiencies in the functioning of the Microbiology Laboratory, where testing of products and equipment for contamination by objectionable organisms is conducted (see paragraphs 125 through 126 below);

-21-

m. Substandard air handling systems not meeting cGMP standards and creating the potential for cross contamination (see paragraph 127 below);

n. Inadequate monitoring to ensure containment of a cytotoxic product (Topotecan, a chemotherapy drug) manufactured in the facility (see paragraph 128 below);

o. Various other cGMP violations and quality assurance failures, including inadequate identification, control and storage of drug materials, waste and cleaning agents, poor disinfection procedures, leaking equipment, and inadequate verification of product labels (see paragraph 129 below).

## SUMMARY OF FALSE CLAIMS ACT LIABILITY

43. Defendants violated the False Claims Act as follows:

### a. Defective products

Defendants submitted and caused to be submitted false claims to the federal, state and city governments for drug products manufactured at the Cidra plant that were defective.

-22-

b. Products not having the same identity as the product
paid for (product mix-ups)

Defendant GSK submitted and caused to be submitted
false claims to the federal, state and city governments for
drug products manufactured at Cidra that were not the drug
products that they purported to be. For example, GSK released
to the market packaged drug product that was mixed up with
drug product of a different type or strength.

c. Drug approvals obtained through false statements to
the FDA

Defendant GSK obtained FDA approval for drug
products by making false and fraudulent statements to the FDA.
In particular, defendants obtained approval for Avandamet and
Factive[2] in October 2002 and April 2003 respectively by:

(1) falsely representing to the FDA, in or about
October 2002, that Warning Letter commitments would be and/or
had been fulfilled;

(2) stating in Field Alert reports to the FDA
that product mix-ups reported by consumers could not have

---

[2] Factive, an antibiotic for treatment of chronic bronchitis,
was developed by GSK. The marketing and regulatory rights are now
owned by Oscient Pharmaceuticals, formerly Genesoft, Inc.

-23-

occurred on premises, when similar mix-ups had been identified on premises at the same time.

(3) concealing from the FDA systemic quality assurance failures and significant violations of the cGMPs, including violations that defendants were required by law to report to the FDA.

## d. Drug product not "covered" under laws governing government health plans

i. For purposes of Medicare, Medicaid and other government programs, a "covered outpatient drug" is defined, *inter alia*, as one that "is approved for safety and effectiveness as a prescription drug under section 505 or 507 of the Federal Food, Drug, and Cosmetic Act or which is approved under section 505(j) of such Act." See 42 U.S.C. 1396r-8(k).

ii. The intent and purpose of the FDC Act and the regulatory schemes administered by the FDA are to ensure that drugs are both approved for safety and effectiveness and reach the market in a condition that renders them fit for their intended use. Under 21 U.S.C. § 355(e)(5), approval of any drug may be suspended if "there is an imminent hazard to the public health," and approval may be withdrawn following notice

-24-

to the drug maker and an opportunity to be heard if "the methods used in, or the facilities and controls used for, the manufacture, processing, and packing of such drug are inadequate to assure and preserve its identity, strength, quality, and purity ..."

iii. GSK manufactured, processed, packed and/or held, and GSK and Roche distributed, drug product that did not come with the assurance of identity, strength, quality and purity required for approval and distribution under the FDC Act. Therefore, the drugs were not "covered" by Medicare, Medicaid and other government health programs under the Social Security Act and claims for those drugs were false.

### e. Drug product not manufactured in accordance with NDAs

i. 21 U.S.C. §§ 355(b)(1)(B)-(D) provides that applications to the FDA for approval of new drugs ("NDAs") must include: "(B) a full list of the articles used as components of such drug; (C) a full statement of the composition of such drug; (D) a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug[.]" Approval by the FDA of this drug formula and method of manufacture is required for introduction of the drug in

-25-

interstate commerce and distribution for human use. 21 C.F.R.
§ 314.70 requires manufacturers to obtain FDA approval for
changes in the conditions established in an approved
application.

ii. The defendants released to the market drugs from
the Cidra plant that were not manufactured in accordance with
the NDAs filed with the FDA in that their components,
composition and/or methods and controls used in manufacturing,
processing and/or packing had been changed without FDA
approval. These manufacturing changes could reasonably be
expected to cause changes in safety, therapeutic value and/or
equivalence of the released drug product with the drug product
that was approved by the FDA. Therefore, the drugs were not
what they purported to be but were some other drugs of unknown
safety and effectiveness and were not "covered" drugs for the
purpose of Medicaid and other government health plans.

## FCA Liability of Roche

44. 21 C.F.R. § 211.22(a) provides that a drug manufacturer's
quality assurance unit "shall have the responsibility for
approving or rejecting drug products manufactured, processed,
packed and held under contract by another company."

-26-

45. Therefore, after its purchase of the global rights to Kytril in or about January 2001, Roche was responsible for ensuring that Kytril was fit for its intended use. Roche was required to, and did in fact, conduct periodic audits of the Cidra facility, commencing in or about late 2000. As a result, Roche knew that there were serious cGMP compliance and quality assurance problems relating to Kytril.

46. On information and belief, based on this knowledge and on the fact that, in a one year period between 2001 and 2002, the FDA had issued to Cidra two FDA-483s and a Warning Letter indicating that there were serious cGMP compliance problems at Cidra more generally, Roche, at the very least, was recklessly indifferent to whether Kytril was fit for use and/or deliberately ignorant of same. As a result, claims filed and caused to be filed by Roche for Kytril to government health programs were false.

## DAMAGE TO THE GOVERNMENT

47. Eckard does not know the precise extent of the financial damage suffered by Medicaid, Medicare, the VA, and other government health programs arising from the knowing submission of false claims by the defendants in this action. However,

-27-

Eckard believes that the damages amount to at least hundreds
of millions of dollars, based on the following: (a) the
violations were significant and systemic, affecting key
aspects of the plant's operations including the quality
assurance unit, and defective products were released to the
market and paid for by the government as a result; (b) the
Cidra plant is the most important of all GSK's plants
worldwide and provides $5.5 billion of GSK's product; (c)
almost 100% of Cidra's product is sold in the United States;
and (d) amongst the drugs manufactured at the Cidra plant were
Paxil and Paxil CR(top selling antidepressants), Coreg (a
widely-prescribed heart medication), and Avandia and Avandamet
(popular diabetes medications), amongst other drugs.   Paxil
and Avandia are in the 50 top selling drug products in the
world.


## PARTICULARS OF FALSE CLAIMS ACT VIOLATIONS

### Background

48. Cidra has a history of significant cGMP violations. A
report prepared by Eckard for GSK senior executives in April
2003 (referred to herein as "the April 2, 2003, report")
listed six areas in which Cidra had been repeatedly cited by

-28-

the FDA for cGMP violations since 1991, namely documentation, process validation, laboratory investigations, other investigations, sterile facility and computer validation.

49. An FDA inspection conducted at Cidra from March 29, 2001, to July 6, 2001, found significant cGMP deficiencies such as process validation deficiencies in Paxil OS (Oral Suspension) batches, inadequate OOS and complaint investigations, inadequate laboratory controls, inadequate media fills, non-stability indicating analytical methods (i.e., inadequate testing to ensure that drug products could meet their purported shelf life) and deficiencies related to the aseptic (i.e. sterile) filling operation (relating to the production of injectable drugs). The FDA investigator who conducted this inspection initially recommended issue of a Warning Letter; however, following a meeting with GSK the FDA judged GSK's response adequate and the inspection was classified VAI (Voluntary Action Indicated). An FDA-483 was issued to GSK on or about July 6, 2001.

50. Another FDA inspection was conducted from February 7, 2002 to April 10, 2002 and again the FDA found significant cGMP violations such as the release to market of Bactroban ointment

-29-

not meeting specifications, inadequate process validation of
Paxil OS and Thorazine tablets, inadequate microbiological
controls in Bactroban ointment production areas, inadequate
laboratory investigations, inadequate instrument calibrations,
and inadequate water sampling techniques. On April 10, 2002,
another FDA-483 was issued to GSK. GSK submitted a written
response to the FDA stating its position on each observation
and describing corrective and preventive steps it proposed to
take. The FDA was not satisfied with this response, and
issued a Warning Letter to Cidra on or about July 1, 2002
("Warning Letter").

51. The Warning Letter detailed a number of significant cGMP
violations at Cidra, including:

a. Release to the market of Bactroban Ointment that was
contaminated with microorganisms;

b. Failure to manufacture Paxil OS in accordance with
established specifications and to demonstrate a reproducible
and reliable manufacturing process;

c. Failure to adequately validate the manufacturing
process for Thorazine tablets, including failure to test
Thorazine tablets for friability and content uniformity;

d. Failure to conduct statutorily-mandated investigations

-30-

in a timely manner and to take corrective actions to prevent
recurrence, including investigations of High Total Plate Count
results in water samples that took more than five months to
complete or that were not completed at all.

e. Media fill vials (used to test for sterility of
injectable drug product) were not incubated for the required
time to assure bacterial growth for both slow and fast
microorganisms.

## GSK's Response to the FDA: Warning Letter "Recovery"

52. On or about July 2, 2002, GSK met with the FDA to discuss
issues arising from the FDA-483 and the Warning Letter.
GSK's representatives at that meeting included Janice Whitaker
("Whitaker"), Senior Vice President for Global Quality, Steve
Plating ("Plating"), Vice President for Quality North America,
Jose Luis Rosado ("Rosado"), the President and General Manager
of Cidra, and Adalberto Ramirez ("Ramirez"), Director of Solid
Manufacturing and Packaging at Cidra. At that meeting, the
FDA informed GSK that pending approvals for GSK's new diabetes
drug, Avandamet, and a new antibiotic, Factive, would not
proceed until GSK's response to the Warning Letter was deemed
adequate by the FDA and the FDA had reinspected the Cidra
plant. Avandamet and Factive are manufactured at the Cidra

-31-

plant.

53. In early July 2002, Eckard traveled to Cidra in order to assist in the preparation of Cidra's preliminary response to the Warning Letter, which was delivered to the FDA on or about July 17, 2002. At approximately that time, GSK undertook to immediately notify the FDA if any problems were found that could present a public health risk.

54. On or about July 17, 2002, GSK made the following specific commitments to the FDA in response to the Warning Letter received on July 1, 2002, and the FDA-483 received on April 10, 2002:

   a. Provide a progress report to the FDA on or before August 15, 2002;

   b. Review laboratory investigations:

      i. Review all investigation reports from 2000 to date and prepare a summary of findings, this review to be conducted by consultants;

      ii. Define an action plan for corrective actions;

      iii. Evaluate the adequacy of current SOPs for handling OOS investigation results;

      iv. Determine the adequacy of corrective actions

-32-

taken.

c. Activate functions of the Senior Management Incident Reporting Team ("SMIRT") (Quality Council), a team established in 2002 after the FDA observed that Cidra senior managers were insufficiently involved in quality control;

d. Prepare a Site Validation Master Plan;

e. Review all process validation reports to assure compliance with current guidelines;

f. Conduct training on handling of laboratory investigations;

g. Activate the Lab Calibration/Metrology Unit;

h. Discuss with the FDA's Compliance Division and Division of Anti-Infectives the microbial specification requirements for Bactroban;

i. Define the sampling and testing for Paxil OS batches;

j. Establish a plan to assure that all investigations are completed within 30 days;

k. Review adequacy of media fills documentation from 2001 to July 2002;

l. Assessment of all systems;

m. Hire additional Quality Assurance ("QA") Staff;

n. Ensure adequate validation of Thorazine tablets;

o. Perform additional validation of the tablet process

-33-

rejection system for Factive;

  p. Ensure adequate validation of Paxil OS.

55. On or about August 7, 2002, Eckard was assigned by GSK
headquarters in Research Triangle Park, NC, ("RTP") to lead
the Warning Letter Recovery Team in Cidra.

56. Eckard's role was to coordinate and oversee the work of
Compliance Action Plan Team Leaders who were assigned to each
functional area, including Materials, Equipment,
Facilities/Utilities, Validation, Laboratory, Computer
Validation, Quality Assurance, Production, and Calibration.
The Team Leaders were to work on their action plans on a fully
dedicated basis for the seven weeks following August 7, 2002,
and to communicate serious incidents to top management with
the objective of resolving the Warning Letter issues and
making the site ready for FDA reinspection, which was a
precondition to obtaining FDA approval for Avandamet and
Factive. The reinspection was scheduled to commence on or
about October 9, 2002.  There were over 100 people on the
Warning Letter Recovery Team, approximately 75 of them from
the Cidra Plant and 25 from GSK headquarters.

57. Shortly after her arrival at Cidra, Eckard asked Cidra's
Quality Assurance and Regulatory Manager, Gloria Martinez
("Martinez") to report on any compliance issues that the FDA
had not identified in its recent inspections.

58. Martinez presented an internal report during a SMIRT
meeting on or about August 14, 2002, which was attended by
Cidra senior managers including Rosado.  Martinez outlined the
following compliance issues:

a. Product mix-ups: Cidra had filed at least 7 Field
Alert reports with the FDA during 2002 due to complaints of
product comingling from patients, pharmacies or physicians,
i.e., tablets of a different type or strength were found in
the same bottle.  Martinez also stated that Cidra had
internally identified nine similar (though distinct) product
mix-ups at the plant.  Eckard also learned that in the Field
Alerts filed with the FDA arising from consumer complaints,
Cidra had assured the FDA that, for a variety of reasons, the
mix-ups could not have happened at the plant, despite the fact
that nine separate and contemporaneous similar incidents had
been identified inside the plant.  Product mix-ups typically
are treated in the industry as Class I or Class II recall

-35-

events, and yet no recalls had been initiated.  Cidra had made

no attempt to correct the cause of the mix-ups and had lied to

the FDA in its Field Alert filings by stating that the mix-ups

must have occurred outside of Cidra's control.  The product

mix-ups are discussed in detail in paragraphs [93] through

[98] below.


b. Overdue process investigations: As further described

in paragraph 110 below, process investigations must be

completed within 30 days.  Process investigations are

conducted when deviations in the manufacturing process give

rise to concerns that product quality may be compromised.  In

August 2002, there were 283 overdue process investigations.

As further described in paragraph 111 below, Cidra continued

to manufacture and release product notwithstanding the

potential impact on the quality of released batches.


c. Equipment not calibrated: As further described in

paragraphs 106 through 109 below, equipment calibration is a

requirement of the cGMPs. Cidra did not have a calibration

program for the laboratory, and over 20,000 pieces of

equipment were in urgent need of calibration in the

manufacturing areas.  As a result, the validity of data

-36-

gathered during manufacture and testing to assure product
quality could not be relied upon as accurate.

d. Standard Operating Procedures overdue: As further
described in paragraph 117 below, written procedures, commonly
referred to as SOPs, are the foundation of the manufacturing
plant's documentation system. These SOPs must be routinely
reviewed and revised to take account of changing conditions
and circumstances. In August 2002, 366 SOPs were overdue for
review and revision at Cidra.

e. Annual product reviews overdue: 21 C.F.R. § 211.180
requires that manufacturers conduct reviews of data, at least
annually, for the purpose of evaluating the quality standards
of each product. Martinez described numerous product reviews
that were more than a year out of date.

59. Immediately after the SMIRT meeting on or about August 14,
2002, Eckard phoned Plating at GSK's headquarters in RTP. She
gave him the information that she had received at the meeting.
She recommended that GSK stop shipping all product from the
Cidra plant, stop manufacturing product for two weeks in order
to investigate and resolve the issues raised and the impact on

-37-

released batches, and notify the FDA about the product mix-ups. Eckard faxed to Plating the overheads that Martinez had used in her presentation, consisting of approximately 13 pages ("the Martinez presentation").

60. On or about August 15, 2002, Eckard returned to GSK headquarters in Research Triangle Park, NC, where she immediately reported her concerns to Whitaker. Eckard reached Whitaker, who was out of the country, by phone. Eckard gave Whitaker the information that she had received at Cidra, including that Cidra had lied to the FDA. She recommended that GSK stop shipping all product from the Cidra plant, stop manufacturing product for two weeks in order to investigate and resolve the issues raised and the impact on released batches and notify the FDA about the product mix-ups. Eckard reminded Whitaker of GSK's promise to the FDA at the meeting on July 17, 2002, that GSK would immediately notify the FDA if any problems were found that could present a public health risk. Eckard told Whitaker that she believed the Cidra plant was headed for a Consent Decree if the problems were not handled with speed and integrity. Eckard left a copy of the Martinez presentation on Whitaker's desk.

-38-

61. On or about August 18, 2002, Eckard met with Plating to reiterate the concerns she had communicated to him by phone on August 14, 2002.

62. In September 2002, Eckard spoke by phone with David Pulman ("Pulman"), who was then Vice President of Manufacturing and Supply for North America.  Pulman was promoted to President, Global Manufacturing and Supply in December 2002. Plating had provided Pulman with a copy of the Martinez presentation on or about August 15, 2002.  Pulman's overriding concern was to make the Cidra plant ready for the FDA reinspection to commence on or about October 9, 2002.  As stated above, passing this inspection was a precondition to obtaining FDA approval for Avandamet and Factive.  Pulman asked Eckard for specific examples of the quality problems at the plant.  She gave him a few examples and later sent him, via email, a report prepared by the Director of Validation for the sterile facility at GSK's Barnard Castle plant in the United Kingdom, who had been brought in to review validation in the sterile suite in Cidra. His report was scathing.  Eckard told Pulman that nothing had improved at the Cidra plant since her report to Plating on or about August 24, 2002.

63. Eckard did not have the authority to order recalls or suspension of manufacturing or shipment of product, or to report regulatory concerns to the FDA. Pulman and Whitaker had ultimate authority to order action of this kind. Throughout 2002 and into April 2003, Eckard continued to urge GSK managers to take the action that she had recommended and to correct the quality and compliance problems at the Cidra plant. They failed to do so.

64. Eckard now believes that Whitaker, Pulman and other GSK executives were unwilling to acknowledge the gravity of the cGMP violations at the Cidra plant and to take the action that Eckard had recommended in part because the FDA had indicated that it would not consider approvals for Avandamet and Factive until the Warning Letter issues were resolved. Such approvals were unlikely to be obtained if the FDA were aware of the gravity of the quality assurance deficiencies at the Cidra plant. Once the objective of approval for Avandamet was achieved, GSK and Cidra management alike lost interest in correcting the deficiencies at the Cidra site and resumed their focus on maximizing productivity at the plant. As stated above, the Cidra plant manufactures $5.5 billion of GSK's product and is the most important of all GSK's plants

-40-