worldwide.

65. On or about August 20, 2002, Eckard returned to Cidra. The
Compliance Action Teams continued to prepare for the Avandamet
reinspection, which was held in October. The focus of the
inspection was on the progress of the recovery effort.
During the inspection, Cidra informed the FDA that it had
begun to put together Corrective and Preventive Action Plans
but had not yet fully implemented them.  Avandamet was
approved by the FDA on October 8, 2002.  Factive was approved
on April 4, 2003.

66. Eckard left Cidra and returned to North Carolina
immediately after the inspection, having been at the plant for
a period of ten weeks.  After three weeks, she returned to
Cidra to resume work on Warning Letter recovery and the
longer-term correction of Cidra's systemic quality assurance
and compliance problems.  However, Rosado and Ramirez stated
that they wanted to take over the leadership of that effort,
including leadership of the Compliance Action Teams.
Following a meeting with Plating, it was agreed that Ramirez
would lead the effort and Eckard would play an "oversight"
role and report to Plating.

-41-

67. Thereafter, Eckard visited Cidra periodically for 1-3 days at a time, on each occasion receiving a progress report from Ramirez and reporting to Plating almost on a daily basis.

68. On or about January 24, 2003, Rosado, Plating, Ramirez and Edwin Lopez, Cidra's Director of Quality ("Lopez") met with the FDA to discuss the FDA-483 and Warning Letter Commitments set forth above, paragraph 54. Eckard attended that meeting, but was not on the agenda and did not present any items.

69. In or about February 2003, Eckard learned that Ramirez had repeatedly lied to her about the status of work in the written and verbal progress reports he had provided to her since assuming control of Warning Letter recovery. She also learned that the Compliance Action Teams had been disbanded immediately after the FDA's October reinspection and the approval of Avandamet, and that Rosado, Ramirez and Lopez had misrepresented the true status of Warning Letter recovery to the FDA at the January 24, 2003 meeting (as further set forth in paragraphs 101, 102, 105, 108, 115 and 119 below). Eckard reported these concerns to Plating and to her immediate boss, Diane Sevigny ("Sevigny"), Director of Global Quality Assurance for North America Pharma.

-42-

70. From February 4 through 8, 2003, Eckard and two other RTP personnel, representing the Global Quality Assurance team, conducted an internal audit at Cidra ("the February 2003 RTP audit"). That audit found continuing serious quality control problems and cGMP violations. The findings were communicated to Rosado, Ramirez, Lopez, and senior GSK managers Sevigny, Plating and Jonathon Box ("Box"), the Vice President of Manufacturing and Supply for North America who took Pulman's job when Pulman was promoted in December 2002. Aspects of the February 2003 RTP audit are discussed further below, paragraphs 105.b., 108 and 113.

71. Following her findings in the February 2003 RTP audit and her discovery that Ramirez had lied to her about the status of progress by the Compliance Action Teams, Eckard told Sevigny in substance that she would not participate in a cover-up of the quality assurance and compliance problems at Cidra and would not take part in any further meetings with the FDA about the Cidra plant. During this period and thereafter, Eckard and Sevigny were in frequent and increasing conflict about GSK's management of the quality and compliance problems at Cidra.

-43-

72. In or about March 2003, GSK made a general call to employees for volunteers to accept a redundancy package arising from the merger of Glaxo Welcome and SmithKlineBeecham, which took place in December 2000. Eckard was so demoralized that she initially expressed interest in this package. However, upon reflection and discussion with colleagues, she soon withdrew her expression of interest, believing that she should continue to seek to make things right from within GSK rather than simply resign.

73. Eckard continued to press GSK senior management for action. In or about March 2003 Eckard put together a binder of materials detailing the quality assurance and compliance problems at Cidra and presented it to Plating and Marion Lon ("Lon"), who was to become and became the site director of Cidra when Rosado retired on or about April 1, 2003. Eckard also asked to meet with Plating and Lon.

74. On or about April 2, 2003, Eckard delivered to GSK senior managers Box, Peter Savin (Vice President of Global Quality Assurance), Whitaker, Plating and Sevigny, and Cidra managers Lon and Ramirez, a non-routine detailed memorandum on Current Compliance Risks for Manufacturing and Supply of Drug Products

-44-

at Cidra ("the April 2, 2003, report"). Eckard provided
Ramirez with a copy. She detailed the following high risk
compliance problems:

a. Product mix-ups: see further, paragraphs 93 through 98
below;

b. Documentation quality: see further, paragraphs 116
through 117 below;

c. Computer validation;

d. Sterile manufacturing facility activities and
documentation, including Kytril injection: see further,
paragraphs 118 through 119 below;

e. Quality and control of water systems: see further,
paragraph 120 below; and

f. OOS events for environmental monitoring of
manufacturing areas and clean equipment: see further,
paragraph 121 through 122 below.


75. Eckard called for increased monitoring by GSK management
of compliance improvement initiatives at Cidra. However, she
did not receive any response to her memorandum from any of the
seven managers to whom she sent the report.

-45-

## Alleged Product Diversion

76. In or about early April 2003 Eckard learned of internal allegations that persons at the Cidra plant were skimming product during manufacture, including reject product, and diverting the product to Latin America.

77. Corporate Security and GSK senior manager Box were notified of these allegations in February 2003.  The allegations were made by a current and a former Cidra employee, both unidentified.  Background checks conducted by an outside private investigation company identified connections between a senior manager at Cidra, and companies alleged to distribute the "black market" product. One of these companies was identified as MOVA Pharmaceuticals, Inc., ("MOVA") a contract manufacturer located in Caguas, Puerto Rico.

78. In or about the week beginning April 7, 2003, Sevigny took a team to Cidra to investigate these allegations, bypassing Eckard who would normally have been assigned leadership of the investigation.  Sevigny took Eckard's employee, Kristal Adams, as part of the team.  Although she had been told by Sevigny, in substance, to "stay out of it," Eckard nonetheless provided

-46-

informal advice to Kristal Adams and received information from her about the investigation.

79. On or about April 27, 2003, following a consumer complaint, Cidra filed a Field Alert reporting that Avandamet 40 mg tablets had been found in the United States mixed up with unidentified tablets stamped "MOVA" or "MBO."

80. GSK had no legitimate business with MOVA, so there was no legitimate reason for Avandamet tablets and MOVA products to be at the same site.

81. Further, a considerable quantity of Avandamet batches had been rejected because of manufacturing problems in late 2002 because of lack of content uniformity, so that some tablets were sub-potent and others were super-potent.

82. On information and belief, based on paragraphs 76, 77, and 79 through 81, rejected batches of drug product, including Avandamet, were sent from Cidra to MOVA, (which is located near Cidra) for "black market" packaging and distribution, resulting in the mix-up.

-47-

83. On information and belief, based on paragraphs 76, 77, and 79 through 82, rejected batches of drug product, including Avandamet, were distributed to the United States market.

84. Additionally, the FDA and other experts have identified the cross-border sale to the United States of drugs, some of which are diverted, counterfeit, stolen or fraudulent, as a growing threat to patient safety.  There is growing evidence of efforts by increasingly well-organized groups in other countries, backed by increasingly sophisticated technologies and criminal operations, to profit from such drugs at the expense of American patients, who increasingly are purchasing drugs at lower prices over the Internet and via other means from foreign sources.  Drugs from countries along the United States border have been identified as a particular threat.

85. On information and belief, based on paragraphs 76, 77, and 84, product diverted from the Cidra plant to the "black market" in Latin America was sold to such groups and channeled back into the United States as legitimate product.

86. In or about April or May of 2003, GSK closed its internal investigation for lack of sufficient evidence.  On information

-48-

and belief, based on paragraphs 76 through 81 and paragraph 84 above, GSK's investigation was inadequate.

## Eckard's Termination, Report to GSK's Compliance Department and Report to the FDA

87. In early May 2003 Eckard received a phone call from the GSK Human Resources Department advising her that she was being offered a redundancy package. Eckard stated that she was not interested in a package and was told that she had no choice. She was advised to take a couple of weeks off with pay. In late May the Human Resources Department asked her to attend a meeting at RTP, at which the Vice President of Human Resources for Global Operations formally presented the redundancy package to her, took her security badge, and escorted her from the premises.

88. Even after her termination, Eckard continued her efforts to have GSK address Cidra's quality and compliance problems. In or about July 2003, she called GSK's general counsel and Chief Executive Officer in the United Kingdom, who declined to speak with her. She then called GSK's general counsel in the United States and explained the general nature of her concerns to his secretary. She referred Eckard to the Vice President

-49-

for Compliance, whom Eckard phoned on or about July 14, 2003.
She detailed the serious quality assurance and compliance
problems at Cidra, including the product diversion
allegations.

89. On or about August 27, 2003, she participated in a
teleconference with other GSK compliance personnel, in which
she again detailed her concerns. As a result of this call,
she formed the view that the Compliance Department lacked
authority internally and that regardless of the outcome of
their investigation, if any, GSK was unlikely to take any
corrective action. On the same day, she called the FDA's San
Juan District Office, where she spoke with Compliance Officer
Carmelo Rosa ("Rosa"). For two to three hours, she detailed
all of the serious quality assurance and compliance problems
at Cidra, including the alleged product diversion.

90. On or about October 3, 2003, following a phone
conversation with the Compliance Department, Eckard called
Rosa at the San Juan District Office of the FDA and informed
him that GSK did not intend to take any corrective actions as
a result of her report.

91. On or about October 22, 2003, GSK announced in an SEC filing that in October 2003 the FDA had begun an investigation of its manufacturing facility in Cidra, Puerto Rico.

## DETAILS OF QUALITY ASSURANCE FAILURES AND VIOLATIONS OF THE FDC ACT AND CFRs

92. The defendants' failure to assure quality of drug products manufactured at Cidra and violations of the FDC Act and the Code of Federal Regulations, Title 21, include those set forth below.

## Product Comingling

93. As set forth in paragraph 58 above, Eckard learned on or about August 14, 2002, that Cidra had received a number of complaints of product comingling from patients, pharmacies and hospitals in 2002. In other words, consumers found tablets of a different drug type or different strength in the same bottle.  Additional complaints were received during 2003.  To June 2003, these complaints reported the following:

   a. Avandia 8 mg mixed with Avandia 4 mg;

   b. Paxil 30 mg mixed with Paxil 10 mg;

   c. Coreg 12.5 mg mixed with Coreg 6.25 mg;

   d. Coreg 6.25 mg mixed with Coreg 3.125 mg;

-51-

e. Paxil 40 mg mixed with Paxil 20 mg;

f. Avandia 4 mg mixed with Avandia 8 mg; and

g. Paxil 20 mg mixed with Benadryl 25 mg;

h. Paxil 10 mg bottle contained unidentified pink tablets (Paxil 10 mg is yellow);

i. Paxil 40 mg mixed with Paxil 30 mg;

j. Paxil 10 mg bottle contained unidentified peach/brownish tablets;

k. Avandamet 40 mg mixed with unidentified tablets stamped "MOVA" or "MBO"  (As to MOVA, see paragraphs 77, 79, 80 and 82 above);

l. Three Paxil CR 12.5 mg bottles contained unidentified pink tablets (Paxil CR 12.5 is yellow);

m. Avandia 2 mg mixed with Avandia 4 mg;

n. Paxil CR 25 mg pink mixed with Paxil CR 12.5 mg; and

o. Paxil CR 37.5 mg mixed with Paxil CR 25 mg.


94. Cidra filed Field Alert reports with the FDA with respect to these consumer complaints.  Cidra told the FDA in each case that, following an investigation, it had determined that the product mix-ups were very unlikely to have occurred at the Cidra plant, for example, because of "the extensive controls in our packaging areas."

95. Between approximately January 2002 and June 2003 Cidra generated the following internal investigation reports describing product comingling that it had identified at the plant:

    a. Avandia 4 mg mixed with Tagamet OTC 200 mg;

    b. Avandia 8 mg mixed with Avandia 4 mg;

    c. Coreg 25 mg mixed with Coreg 6.25 mg;

    d. Ecotrin 81 mg mixed with Stelazine 2 mg;

    e. Paxil 30 mg mixed with Avandia 4 mg;

    f. Paxil 30 mg mixed with Paxil CR 12.5 mg;

    g. Paxil 20 mg mixed with Paxil 25 mg;

    h. Tagamet HB mixed with Avandia 4 mg;

    i. Tagamet OTC mixed with Avandia 8 mg;

    j. Avandia 8 mg mixed with Paxil 10 mg;

    k. Coreg 6.25 mg mixed with Paxil 20 mg;

    l. Coreg 25mg mixed with overweight tablets found during packaging;

    m. Paxil DC 10mg mixed with two defective tablets found during packaging;

    n. Tagamet OTC mixed with Coreg 6.25; and

    o. Paxil DC 10mg mixed with Coreg 3.125mg.

96. Despite these contemporaneous mix-ups discovered at the

-53-

site, Cidra repeatedly represented to the FDA in Field Alert
reports responding to consumer complaints referred to in
paragraphs 93 and 94 above that its manufacturing and
packaging processes were beyond reproach, that it was
extremely unlikely that the mix-ups occurred on site and that
they must have occurred outside GSK's control.  For example,
in January 2003 Cidra filed a Field Alert report with the FDA
following a pharmacist's complaint of finding Paxil 30 mg
tablets in a Paxil 40 mg bottle.  Cidra told the FDA that
"given the current process controls in place, it was highly
unlikely that this situation occurred on our premises."  The
above-listed mix-ups identified at the site, however, show
that the similar incidents reported by consumers were, in
fact, highly likely to have occurred on Cidra's premises.

97. When Eckard learned of the mix-ups in or about August
2002, she pressed Cidra managers for additional information
about the cause.  She was told that they likely arose from the
re-use of undedicated bulk fiber board drums in tablet suites.
In other words, drums used in the processing of one type or
strength of tablet had been re-used for a different type or
strength of tablet.  Eckard was also told that uncoated
tablets of one type were being mixed with uncoated tablets of

-54-

another type, so that a tablet of a different type in a final batch would only be recognizable by its size or shape, and not by its color.

98. In or about August 2002, Eckard asked Cidra management to conduct a full analysis of the problem as a matter of priority. A report was not issued until May 2003. This report concluded that "most mix-ups occurred in the compression area in Cidra II Building and were found to be related to drum cleaning and preparation." In other words, Cidra's internal investigation confirmed that the consumer-reported mix-ups likely did not occur outside the plant (as it had earlier informed the FDA) but were a result of failure to properly clean out drums that were used to prepare one type or strength of drug before the drum was reused for another type or strength of drug. Still, Cidra did not inform the FDA of these findings or initiate any product recalls.

## Laboratory Investigations

99. Manufacturers are required to conduct laboratory testing of each drug lot prior to release to determine conformance to the final specifications of the drug product, including the identity and strength of each active ingredient. 21 C.F.R. §

-55-

211.165(a).  When OOS results are found, i.e., products fail
to meet specifications or other quality control criteria, the
batch must be rejected.  21 C.F.R. § 211.165(f).

100. OOS results may be due to either error made in the
laboratory during testing or to a drug sample that indeed does
not conform to the specifications.  When the initial
assessment cannot document laboratory error, a full-scale
failure investigation must be conducted. 21 C.F.R. § 211.192.
This is a crucial step in the quality assurance process: root
cause must be identified so that appropriate preventive action
can be taken.  Examples of potential causes of OOS results not
attributable to laboratory error are: an improperly validated
process (see paragraph 104 below), production operator error,
improperly functioning production equipment, use of OOS
components, and improper environmental conditions.

101. As stated above, on or about January 24, 2003, Rosado,
Plating, Ramirez and senior Cidra staff members met with the
FDA to discuss Warning Letter Commitments ("the January 24,
2003 meeting").  One of the Corrective and Preventive Action
items that GSK represented to be complete was its Review of
Laboratory Investigations.  GSK represented that a review of

all investigation reports from 2000 to date had been conducted
by consultants and a summary of findings prepared; that an
action plan had been defined for corrective actions; that an
evaluation of the adequacy of current SOPs for handling OOS
investigations had been conducted; and that the adequacy of
corrective actions taken had been determined.

102. In fact, Cidra's laboratory investigation review was not
complete. In or about August 2002, GSK had hired a consulting
firm, The Weinberg Group, Inc. ("Weinberg") to conduct a
retrospective OOS laboratory investigations audit for the
period from 2000 to August 2002, i.e., to review Cidra's
findings arising from investigations of OOS results for
products that had been released to the market still containing
shelf life (i.e., unexpired batches) and to state whether they
concurred or did not concur with those findings and with
Cidra's decision to release the product. This encompassed
some 500 investigations. At that time, GSK told the FDA that
in the event of any "do not concur" findings by the
consultants that could present a public health risk, it would
immediately advise the FDA. At the time of the January 24,
2003, meeting, Weinberg had conducted its review and prepared
a summary of findings, including that it did not concur with

at least 30 of Cidra's findings. Unbeknownst to the FDA,
Cidra had agreed with Weinberg that any investigations
resulting in a "do not concur" finding would be reinvestigated
by Cidra and re-evaluated by Weinberg. Further, a March 2003
internal report prepared by Cidra personnel ("the March 2003
Cidra report") listed some four additional laboratory
investigations during the 2000-2002 period that the relator
believes had not been reviewed by Weinberg at all at the time
of the January 24, 2003, meeting. Therefore, GSK's
representation to the FDA that the laboratory investigations
review was complete was not accurate, since more than 30
investigations were still outstanding.

103. In addition, in many cases Cidra did not conduct
laboratory investigations with adequate skill and diligence
and failed to conduct follow-up investigations required by the
cGMPS. For example:

     a. A great many of Cidra's investigations, both those
that were covered by the Weinberg review, and those that post-
dated the period of that review (August 2002), incorrectly
assigned a root cause of "determinate" laboratory error, when
in fact the root cause was "indeterminate laboratory error."

In other words, the investigation purported to find the cause

of the OOS result as an identified laboratory error, when such

cause had not been proved but was merely theoretical. As

stated above, 21 C.F.R. § 211.192 requires that a full-scale

failure investigation be conducted when the initial assessment

cannot document laboratory error. As a result of Cidra's

incorrect assignment of cause, the required follow-up

investigations were never conducted and thus product released

to the market was potentially suspect.

b. An unusually and unacceptably high number of

laboratory investigations conducted by Cidra arose as a result

of "unknown peaks" detected during routine laboratory testing.

"Unknown peaks" appearing on a chromatograph during routine

laboratory testing of drug samples indicate that the drug lots

may be contaminated.  These investigations frequently assigned

the root cause of the "unknown peak" as contamination from

glassware or other equipment used in the analytical process

without adequate proof.  As a result, Cidra limited the root

cause to laboratory error and did not conduct any additional

investigation.  The number of reported cases of contamination

from glassware was so high that any objective investigator

would have considered and investigated cross-contamination in

the production facility, including contamination arising from
environmental conditions, manufacturing equipment, air
handling systems, and water systems.

All of these areas of the production facility were classified
in a June 2003 audit of the Cidra facility conducted by Global
Quality Assurance ("GQA") personnel ("the June 2003 GQA
audit") as areas in which there were serious deficiencies that
could significantly impact product quality and required
immediate corrective action, and yet Cidra ignored cross-
contamination and corrective action arising from "unknown
peaks" was focused on re-evaluation of its procedures for
laboratory glassware washing.

## Process Validation

104. Process validation is a quality control measure for
obtaining, recording and interpreting the results required to
establish that a process will consistently yield product
complying with predetermined specifications. Manufacturers
are required to establish written procedures for production
and process control designed to assure that drug products have
the identity, strength, quality, and purity they are
represented to possess. 21 C.F.R. § 211.100. The execution
of the validation protocol, the test results and approvals are

-60-

documented in a validation report. Changes in process may render the process no longer valid, and manufacturers are expected to establish a system that monitors processes, equipment and personnel so that unintended changes are identified, as well as conducting periodic process reviews. Process validation is key to assuring that quality, safety and effectiveness are designed and built into the product rather than relying on quality inspection of the finished product, and that each step in the manufacturing process is controlled to maximize the probability that the finished product meets all quality and design specifications.

105. Inadequate validation of Paxil OS and Thorazine were cited by the FDA in the April 2002 FDA-483 and Warning Letter to Cidra. In addition to correcting these specific problems, GSK promised the FDA in or about August 2002 that it would review process validation for all products, many of which had not been reviewed for periods of up to ten or more years. GSK told the FDA on January 24, 2003, that it had reviewed all process validation reports to assure compliance with current guidelines. In fact, many elements of this review were incomplete. For example:

a. In the March 2003 Cidra report, Cidra documented 29 laboratory investigations, dating from 1995 through 2002, that required review in order to determine the impact on validation certification for the drugs in question. Those drugs included Avandia, Paxil, Relafen, Ecotrin, Tagamet, Albenza, Compazine, Factive, Dyrenium, Batroban and Kytril injection. While the report marked this review as being complete on 12/30/02, the relator believes that the review was in fact still outstanding.

b. The February 2003 RTP audit identified the need for specific compliance questions concerning the validation of Kytril injection to be rectified before additional batches of the drug could be manufactured. Cidra nonetheless proceeded with the manufacture of Kytril injection. The March 2003 Cidra report identified an action item described as: "Issue a document addressing the concerns raised by Richard Kettlewell [the Director of Validation for the sterile facility at GSK's Barnard Castle plant in the United Kingdom] in the process validation assessment of Kytril." See paragraph 72 above. While this item is marked as complete at 12/30/02, it was not, in fact, complete, as evidenced by the findings of the February 2003 RTP audit.

-62-

c. Further, the June 2003 GQA Audit noted that Cidra did not have any validation review processes in place for non-sterile products and that reviews must be conducted at no less than three-yearly intervals. (Non-sterile refers to all drug products other than injectable drugs.) The auditors classified this deficiency as one that could significantly impact product quality and required immediate corrective action.

## Equipment Calibration

106. 21 C.F.R. § 211.68(a) requires that automatic, mechanical and electronic equipment be inspected or checked according to a written program to ensure proper performance, and that written records of calibration and inspection be maintained according to a written program. The FDA expects that calibration will be performed both before and after validation studies to ensure the validity of the data gathered. If equipment is found to be out of calibration, investigations should be conducted to determine whether there was any impact of product quality.

107. Inadequate instrument calibration was one of the areas of non-compliance cited by the FDA in the FDA-483 issued to Cidra

in April 2002. When the Warning Letter was issued in August 2002, Cidra still had no calibration program at all for the laboratory. As part of the Warning Letter recovery process, Cidra established a calibration program for the laboratory and calibrated some 20,000 pieces of equipment in the manufacturing facility. However, Cidra did not coordinate this process with validation studies as required by the FDA, and thus the validity of data gathered could not be relied upon as accurate.

108. At the January 24, 2003, meeting, Cidra told the FDA that it had completed the task of activating the Laboratory Calibration/ Metrology Unit. However, at the time of the February 2003 RTP audit, the timeline for the calibration corrective action plan was not on target. For example, the auditors cited one item for which the completion date was unknown, and one item that had not even been started by the stated completion date.

109. Further, the June 2003 GQA Audit found that investigations of equipment found to be out of calibration were not being conducted in a timely manner. The auditors noted that due to the high number of incomplete investigations

-64-

it was difficult to assess the impact of out-of-calibration

conditions on product quality.  The auditors classified this

deficiency as one that could significantly impact product

quality and required immediate corrective action.

## Overdue Process Investigations

110. Process investigations are conducted whenever a mistake

or irregularity is detected during the manufacturing process.

These may arise, for example, from an OOS result that is not

proven to be caused by laboratory error (see paragraph 100

above), from the discovery of mixed up product, or from a

finding that purportedly cleaned equipment is dirty.  Process

investigations must be completed within 30 days. See U.S. v.

Barr Laboratories, Inc., et al., 812 F. Supp. 458, 468 (D.N.J.

1993)

111. As stated in paragraphs 59, 60 and 61, when Eckard

learned, in August 2002, that hundreds of process

investigations were overdue, she urged GSK management to shut

the plant down immediately while the matters identified

therein were resolved.  The March 2003 Cidra report confirmed

that in August 2002, there were 283 overdue process

investigations.  Cidra continued to manufacture and release

-65-

product notwithstanding the potential impact on the quality of
released batches.

112. An example of Cidra's inability to complete
investigations within 30 days is its process investigation
relating to Avandamet commenced in or about April 2003.

a. As stated in paragraph 65 above, Avandamet was
approved by the FDA in October 2002.  The process
investigation should have been initiated in or about December
2002 when a number of failures and problems were observed
during manufacture. These failures resulted in the rejection
of several batches of the product for lack of content
uniformity, assays (tests for purity) that failed to meet
specification, and granulation that did not flow
appropriately, so that some tablets were sub-potent and others
were super-potent.

b. Finally, a process investigation was undertaken in or
about April 2003 to determine root cause and any impact on
batches that had been released to the market.  To Eckard's
knowledge, the investigation was still outstanding in May
2003, when she was terminated.  No Field Alert was filed with
the FDA as required when the quality of batches or product
released to the market are suspect. 21 C.F.R. § 314.81

-66-

(b)(1)(ii).

113. Further, in the February 2003 RTP audit, Eckard and the
other auditors noted that while Cidra had provided computer
printouts for process investigations conducted during 2002 and
2003, no clear data for process investigations conducted
during 2000 and 2001 had been made available. The auditors
noted that they had been provided with log books for the
period 2000-2001, which appeared to show that numerous
(perhaps several hundred) process investigations were still
outstanding. Cidra denied that any investigations were
overdue from that time period, but never provided the auditors
with any definitive data.

## Understaffing in the Quality Assurance Unit

114. The cGMPs require drug manufacturers to have a distinct
QA unit that is responsible for ensuring that drug products
produced and released to the market meet all applicable
standards. Personnel employed in the unit must be
appropriately trained and must be of adequate numbers. 21
C.F.R. 211.25(c). The QA unit is responsible for ensuring
that procedures are implemented during the manufacturing
process to ensure drug product quality and for conducting

-67-

investigations of apparent errors, including ensuring that
investigations of laboratory testing results that may impact
the identity, strength, purity and/or safety of drug products
are completed in a timely manner and that corrective actions
are taken when necessary. 21 C.F.R. 211.22.

115. Cidra's QA unit was chronically understaffed. In or
about August 2002, Cidra told the FDA that it would increase
the QA Staff by 17 additional resources. At the January 24,
2003, meeting, Cidra told the FDA that it had hired 23 people.
However, it did not tell the FDA that many experienced staff
had resigned from the QA unit. Therefore, the actual increase
in staff fell short of the promised number. This attrition
rate continued in 2003.

## Poor Documentation Quality

116. Documentation is crucial to the maintenance of drug
quality. Drug manufacturing operations and related quality
control and quality assurance systems are required by the
cGMPs to be managed and documented according to detailed
written procedures covering manufacturing, testing, packaging
and storing. See, e.g., 21 C.F.R. § 211.100(a); 21. C.F.R. §
211.180-198. In the April 2, 2003, report, Eckard noted that

-68-

Cidra had been cited for regulatory violations related to poor documentation quality during FDA inspections in 1991, 1992, 1993, 1994, 2001 and 2002. In that report, Eckard noted that critical documents, including validation, investigation and change control documents, were often not signed and/or dated, or were lost or missing. She noted that Cidra had not responded to regulatory scrutiny by establishing systems to correct the problems.

117. Written procedures, commonly referred to as SOPs, are the foundation of the manufacturing plant's documentation system. The cGMPs require that there be written procedures for the preparation of master records (21 C.F.R. § 211.186(a)), and the "current good" aspect of the cGMPs requires that procedures be reviewed and updating considered on a regular basis. Most responsible manufacturers review procedures on a one or two year cycle. In August 2002, 366 SOPs were overdue for review and revision at Cidra.

Contamination in Products Manufactured in the Sterile Facility

118. Injectable medications are manufactured in the sterile facility. In the April 2, 2003, report, Eckard cited the sterile facility and Kytril injection as a high risk

-69-

compliance area. Further, the June 2003 GQA Audit called for the manufacture of Kytril injection to be immediately suspended due to high levels of contamination. The report called for capital expenditure to improve conditions of sterile operations or else close the sterile facility with a sense of urgency.

119. Bactroban ointment, while not a sterile product, is also manufactured in the sterile facility at Cidra. Bactroban is an antibiotic ointment that is used, amongst other things, to treat impetigo, a contagious skin infection that is common in small children. Release to the market of Bactroban ointment that was contaminated with microorganisms was cited by the FDA in both the April 2002 FDA-483 and the July 2002 Warning Letter. At the January 24, 2003 meeting, GSK told the FDA that it had completed a line item entitled: "Discuss with FDA (Compliance and Division of Anti-Infective) the microbial specification requirements for Bactroban." Cidra, however, failed to correct the problem. The June 2003 GQA Audit documented the release to the market on March 4, 2003, of a further lot of Bactroban contaminated with the same microorganism as the one that resulted in an FDA-mandated recall of Bactroban in February/May 2002. This microorganism,

*Ralstonia paucula*, is associated with human infection such as
bacteranemia, urinary tract infections, meningitis, wound
infection, and peritonitis. The June 2003 GQA Audit also
found that there was no formal validation to support the
microbial cleaning of the holding tank for Bactroban ointment.
They classified Bactroban production as a major problem area
that could significantly impact product quality requiring
immediate corrective action.

## Substandard Quality and Control of Water Systems

120. In the April 2, 2003 report, Eckard cited quality and
control of water systems as a high risk compliance area at
Cidra due to an increase in the number of investigations
related to the isolation of objectionable organisms in the
water system. Eckard noted that there was a project underway
to upgrade the water system. However, this project was not
progressing. The June 2003 GQA Audit identified water systems
as a major problem that could significantly impact product
quality requiring immediate corrective action. The auditors
noted that the system design allowed for build up of stagnant
water exhibiting microbial contamination. They called for the
critical assessment and redesign of the water systems with

-71-

swift implementation.

## OOS Events for Environmental Monitoring of Manufacturing Areas and Clean Equipment

121. In the April 2, 2003 report to GSK management, Eckard noted that manufacturing areas and equipment that had purportedly been cleaned to eliminate chemical and microbial contamination failed routine environmental testing on more than a dozen occasions during 2002. She also noted that the microbiology laboratory investigated 8 events of contamination in negative controls (i.e., control swabs used in testing for microbial contamination of equipment and manufacturing areas) in 2002, as well as inadequate investigation of root cause.

122. The June 2003 GQA Audit cited continuing contamination of negative controls in 2003, and the recovery of objectionable organisms from sampling plates collected during manufacture. The auditors noted that production continued even though two separate investigations failed to determine root cause.  The auditors classified this as a major problem that could significantly impact product quality requiring immediate corrective action.

## Destruction of Audit Reports

123. It is current good practice in the pharmacuetical industry to routinely conduct internal audits. Further, the cGMPs require that the quality assurance unit review all production records to ensure errors are fully investigated (21 C.F.R. § 211.22(a)) and that written production and process control procedures be reviewed (21 C.F.R. § 211.100(a)). In order to promote self-auditing, it is FDA policy to obtain copies of internal audit reports only when investigating a serious health problem or upon order of the court.

124. GSK policy requires that internal audit reports be retained for 3 years after all actions have been completed to facilitate tracking for future observations and that a 7 year log/record be maintained including the date, scope, auditor and completion of identified actions. This is consistent with industry practice. The June 2003 GQA Audit found that Cidra's standard procedure was to destroy audit reports once the problems had been discussed with the responsible personnel and to keep no evidence of same. The auditors found that action plans were not documented. They also found that the audit program did not include the aseptic area or the air handling system. They classified auditing as a major problem that

-73-

could significantly impact product quality requiring immediate corrective action.

## Microbiology Laboratory ("Micro Lab")

125. Testing of products and equipment for contamination by objectionable organisms is conducted in the Micro Lab. The June 2003 RTP found a number of serious deficiencies in the functioning of the Micro Lab, including:

a. Poor controls of materials used in testing functions, including lack of assurance that media (used to test for growth of microorganisms) meets quality standards;

b. Poor document control and lack of data integrity;

c. Poor controls of water samples prior to testing for presence of microorganisms;

d. Lack of assurance that test samples and materials are maintained at the required temperatures for the duration of incubation and storage periods and no alarms on equipment for notification of out-of-range conditions;

e. No procedures for identification of trends in water and environmental monitoring; and

f. Lack of timeliness in the review and approval of test results.

126. Deficiencies in environmental monitoring (discussed in paragraphs 121 through 122 above) are further evidence of problems impacting the effective functioning of the Micro Lab. The auditors classified the Micro Lab as a major problem area that could significantly impact product quality requiring immediate corrective action.

## Substandard Air Quality

127. The cGMPS provide that air handling systems must be balanced to ensure that they are functioning correctly. Equipment for controlling air pressure, microorganisms, dust, humidity and temperature must be provided. 21 C.F.R. § 211.46. The June 2003 GQA Audit found that the design of Cidra's air handling did not meet cGMP standards and created the potential for cross contamination. The auditors found that pressure differentials were misdirected allowing improper airflow in certain areas. They classified this as a major problem that could significantly impact product quality requiring immediate corrective action. As stated above, poor air quality likely contributed to the high incidence of "unknown peaks" observed during routine laboratory testing.

Cytotoxic Research & Development ("R&D") Manufacturing

128.  Cytotoxic substances cause the destruction or inhibit the function of cells.  Manufacture of cytotoxic substances must, for obvious reasons, be strictly quarantined from manufacture of other products.  The June 2003 GQA Audit found that Cidra was engaged in the R&D manufacture of Topotecan, a chemotherapy drug that is associated with serious side-effects, in a contained area in the midst of commercial manufacturing.  The auditors found that air pressure differentials that are crucial to containment of the cytotoxic substance were not properly monitored and documented: the most recent data was dated April 2002.  Further, they found that there was no baseline monitoring in surrounding areas to ensure that toxic substances were contained to the R&D area and had not been tracked into other areas where prescription and over-the-counter drugs were made.  The auditors also found that an area formerly used for Topotecan trials had not been properly decontaminated and decommissioned.  They classified this as a major problem that could significantly impact product quality requiring immediate corrective action.

-76-

## Other cGMP Issues

129. The June 2003 GQA Audit identified the following miscellaneous cGMP issues, and collectively classified this as a major problem that could significantly impact product quality requiring immediate corrective action:

    a. Raw materials with no identification or status control;

    b. Product waste inappropriately stored;

    c. Equipment allowing product leakage creating the potential for cross-contamination;

    d. Containers of drug product open in unprotected areas;

    e. Poor controls of lubricants and cleaning agents creating the potential for misuse leading to product contamination;

    f. H&K encapsulator for Dyazide (a machine that fills and seals capsules) was not cleaned after use;

    g. Poor controls of disinfectants to ensure that they are free of contamination and within expiry date;

    h. No studies to demonstrate effectiveness of disinfection procedures on surfaces in controlled areas;

    i. Improper storage and inventory tracking of materials used in process validation; and

    j. 9 of 28 packaging lines not equipped to carry out the

-77-

required 100% electronic verification of printed materials.

## CONCLUSION

130. During the times relevant to this Complaint, the
defendants released to the market and made claims to
government health programs for drugs manufactured at Cidra
that were defective, misidentified as a result of product mix-
ups, not manufactured in accordance with FDA approved
processes, and/or did not come with the assurance of identity,
strength, quality and purity required for distribution to
patients; and/or the approvals for which were obtained through
false representations to the FDA.

131. These false claims arose out of chronic, serious
deficiencies in the quality assurance function at the Cidra
plant and the defendants' ongoing serious violations of the
laws and regulations designed to ensure the fitness of drug
products for use, including the Federal Food, Drug and
Cosmetics Act, 21 U.S.C. §§ 301 et seq., and the Code of
Federal Regulations, Title 21.  GSK lied to the FDA in the
process of Warning Letter recovery and beyond in order to
conceal its inability and/or unwillingness to correct these

quality failures and legal and regulatory violations.

132. Further, on information and belief, GSK employees diverted reject drug product from the Cidra plant to black markets in Latin America. On information and belief, this resulted in the distribution of reject drug product to the United States market and the submission of false claims for drug product that was defective.

133. On information and belief, as set forth in paragraphs 45 through 46 above, after its purchase of the global rights to Kytril in or about January 2001, Roche filed and caused to be filed false claims under the FCA and state and city equivalents by failing to discharge its responsibility under 21 C.F.R. § 211.22(a) to ensure that Kytril was fit for use.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
(Federal False Claims Act
31 U.S.C. § 3729(a)(1))

134. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 133 above as though fully set forth herein again at length.

135. This is a claim for penalties and treble damages under the Federal False Claims Act.

136. By virtue of the acts described above, Defendants, for the purpose of defrauding the Government, knowingly presented and/or caused to be presented false or fraudulent claims for payment or approval under the Medicare, Medicaid and other Government health programs to officers, employees or agents of the United States Government, within the meaning of 31 U.S.C. § 3729(a)(1).

137. As a result, federal monies were lost through payments made in respect of the claims and other costs were sustained by the Government.

138. Therefore, the Federal Government has been damaged in an amount to be proven at trial.

139. Additionally, the Federal Government is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendants and arising from their fraudulent conduct as described herein.