UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS


-------------------------------------------x
UNITED STATES OF AMERICA, STATES
OF CALIFORNIA, DELAWARE, FLORIDA, GEORGIA,
HAWAII, ILLINOIS, INDIANA, LOUISIANA,
MASSACHUSETTS, MICHIGAN, NEVADA,
NEW HAMPSHIRE, NEW MEXICO, NEW YORK,
TENNESSEE, TEXAS, and VIRGINIA, THE
DISTRICT OF COLUMBIA and THE CITIES OF
CHICAGO AND NEW YORK, *ex rel.*
CHERYL D. ECKARD,                          CASE NO.:

                    Plaintiff,             C.A. No: 04 CV10375
                                           (JLT)

          v.
                                           SECOND AMENDED
                                           COMPLAINT AND
                                           JURY DEMAND


SMITHKLINEBEECHAM CORPORATION D/B/A/
GLAXOSMITHKLINE,                           LEAVE TO FILE GRANTED
SB PHARMCO PUERTO RICO, INC.,              ON 7/17/07
GLAXOSMITHKLINE PUERTO RICO, INC., and
HOFFMAN LA-ROCHE, INC.,


                    Defendants.


-------------------------------------------x

## TABLE OF CONTENTS

INTRODUCTION...................................... 1

JURISDICTION AND VENUE............................ 6

PARTIES........................................... 6

INDIVIDUAL PARTICIPANTS........................... 8

GOVERNMENT PROGRAMS.............................. 10

ASPECTS OF THE FDA REGULATORY SCHEME............. 12

    The current Good Manufacturing Practices...... 13

    Establishment Inspections, 483s and Warning
    Letters...................................... 14

    Post-Marketing Surveillance.................. 15

    Product Recalls.............................. 16

    Consent Decrees.............................. 17

OVERVIEW OF FACTUAL BASIS FOR FALSE CLAIMS........ 18

SUMMARY OF FALSE CLAIMS ACT LIABILITY............. 20

    FCA Liability of Roche....................... 24

DAMAGE TO THE GOVERNMENT......................... 25

PARTICULARS OF FALSE CLAIMS ACT VIOLATIONS........ 26

    Background................................... 26

    GSK's Response to the FDA: Warning Letter
    "Recovery"................................... 28

    Alleged Product Diversion.................... 42

    Eckard's Termination, Report to GSK's
    Compliance Department and Report to the FDA .. 45

DETAILS OF QUALITY ASSURANCE FAILURES AND VIOLATIONS
OF THE FDC ACT AND THE CFRs......................... 46

    Product Comingling............................ 47

    Laboratory Investigations..................... 51

    Process Validation............................ 55

    Equipment Calibration......................... 58

    Overdue Process Investigations................ 59

    Understaffing in the Quality Assurance
    Unit.......................................... 61

    Poor Documentation Quality.................... 62

    Contamination in Products Manufactured
    in the Sterile Facility....................... 63

    Substandard Quality and Control of
    Water Systems................................. 65

    OOS Events for Environmental Monitoring
    of Manufacturing Areas and
    Clean Equipment............................... 65

    Destruction of Audit Reports.................. 66

    Microbiology Laboratory ("Micro Lab")......... 67

    Substandard Air Quality....................... 68

    Cytotoxic Research & Development ("R&D")
    Manufacturing................................. 69

    Other cGMP Issues............................. 70

CONCLUSION    .................................... 71

CAUSES OF ACTION   .............................. 72

DEMAND FOR RELIEF   ............................. 124

DEMAND FOR JURY TRIAL   ......................... 130

Plaintiff/relator, Cheryl D. Eckard, in the name of and on behalf of the United States of America, the State of California, the State of Delaware, the District of Columbia, the State of Florida, the State of Georgia, the State of Hawaii, the State of Illinois, the State of Indiana, the State of Louisiana, the State of Massachusetts, the State of Michigan, the State of Nevada, the State of New Hampshire, the State of New Mexico, the State of New York, the State of Tennessee, the State of Texas, the State of Virginia, the City of Chicago and the City of New York, by her attorneys, Getnick & Getnick, as and for her complaint, alleges as follows:

### INTRODUCTION

1. As more fully alleged herein, this action arises out of a scheme or schemes to defraud the United States of America, the fifty states, and the District of Columbia perpetrated by the defendants, commencing in or before 2000 and continuing to the date hereof.  The Defendants made and caused to be made to the United States, the fifty state governments and the District of Columbia false claims for payment for prescription drugs covered by Medicare, State Medicaid programs, the Department of Veterans Affairs, the Public Health Service and other federal, state and city purchasers of prescription drugs.  The claims were false and fraudulent because the drugs, which were manufactured at

-1-

Defendant GlaxoSmithKline's plant in Cidra, Puerto Rico, were defective, misidentified as a result of product mix-ups, not manufactured in accordance with FDA approved processes, and/or did not come with the assurance of identity, strength, quality and purity required for distribution to patients; and/or approvals for the drugs were obtained through false representations to the FDA.  The false claims arose out of chronic, serious deficiencies in the quality assurance function at the Cidra plant and the defendants' ongoing serious violations of the laws and regulations designed to ensure the fitness of drug products for use, including the Federal Food, Drug and Cosmetics Act, 21 U.S.C. §§ 301 *et seq.*, and the Code of Federal Regulations, Title 21.

2. The drugs affected by the defendants' conduct include Paxil, Paxil CR, Avandia, Avandamet, Coreg, Bactroban, Abreva, Cimetidine, Compazine, Denavir, Dyazide, Thorazine, Stelazine, Ecotrin, Tagamet, Relafen, Kytril, Factive, Dyrenium and Albenza.

3. Examples of defective and/or misidentified products that the defendants released to the United States market from the Cidra plant are:

    a. Drug product that was mixed up with drug product of a different type or strength, e.g., 30mg and 10 mg tablets of an

-2-

anti-depressant mixed in the same bottle, and 12.5 and 6.25 mg tablets of a heart medication mixed in the same bottle (see paragraph 93 below);

b. A diabetes medication that was sub-potent and/or super-potent (see paragraph 112 below);

c. An antibiotic ointment used to treat a skin infection common in small children that was contaminated with a micro-organism associated with bacteranemia, urinary tract infections, meningitis, wound infection, and peritonitis (see paragraph 119 below);

d. An injectable drug used to treat nausea and vomiting in patients undergoing chemotherapy that was contaminated with micro-organisms (see paragraph 118 below).

4. Further, on information and belief, during the times relevant to this complaint employees of Defendant SmithKlineBeecham Corporation d/b/a GlaxoSmithKline ("GSK") diverted reject drug product from the Cidra plant to black markets in Latin America. GSK management failed adequately to investigate these allegations. On information and belief, this resulted in the distribution of reject drug product to the United States market and the submission of false claims for drug product that was defective.

-3-

5. The allegations set forth herein apply to defendant Hoffman
La-Roche, Inc., only in so far as they relate to the drug Kytril.

6. These acts constitute violations of the federal False Claims
Act, 31 U.S.C. § 3729, *et. seq.* ("FCA"), and numerous equivalent
state and city statutes.[1]  The FCA provides, *inter alia*, that any
person who knowingly presents and/or causes to be presented to
the United States a false or fraudulent claim for payment is
liable for a civil penalty of up to $11,000 for each claim, plus
three times the amount of the damages sustained by the
Government.  The FCA allows any person discovering a fraud
perpetrated against the Government to bring an action for himself

---

[1] As set forth below, the defendants' acts constitute violations
of the California False Claims Act, Cal. Gov't Code §§ 12650-12655;
the Delaware False Claims and Reporting Act, 6 Del. C. §§ 1201 et
seq.; the District of Columbia Procurement Reform Amendment Act, D.C.
Code Ann. §§ 2-308.13-21; the Florida False Claims Act, Fla. Stat.
Ann. §§ 68.081-092; the Georgia State False Medicaid Claims Act, Ga.
Code Ann. §§ 49-4-168 et seq.; the Hawaii False Claims Act, Haw. Rev.
Stat. §§ 661-21-29; the Illinois Whistleblower Reward and Protection
Act, 740 Ill. Comp. Stat. §§ 175/1-8; the Indiana False Claims and
Whistleblower Protection Act, IC 5-115.5 et seq.;  the Louisiana
Medical Assistance Programs Integrity Law, La. Rev. Stat. 46:437.1-14;
the Massachusetts False Claims Act, Mass. Gen. L. Ch. 12, §§ 5B et
seq.; the Michigan Medicaid False Claims Act, MCL §§ 400.601 et seq.;
the Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 et seq.; the
New Hampshire Medicaid Fraud and False Claims Act, RSA §§ 167.58 et
seq.; the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-
12-1 et seq.; the New York False Claims Act, N.Y. State Fin. Law §§
187-194; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§
71-5-182 et seq.; the Tennessee False Claims Act, Tenn. Code Ann. §§
4-18-101 et seq.; the Texas Medicaid Fraud Prevention Law, Tex. Hum.
Res. Code Ann. §§ 36.001 et seq.; the Virginia Fraud Against Taxpayers
Act, Va. Code Ann. §§ 8.01-216.3 et seq.; the Chicago False Claims
Act, Chicago Municipal Code Ch. 1-21 et seq.; and the New York City
False Claims Act, Local Law 53 of 2005, Title 7, New York City Admin.
Code §§ 7-801 et seq.

-4-

and for the Government and to share in any recovery.   The

complaint in an FCA action is filed under seal for 60 days

(without service on the Defendant within such 60-day period) to

enable the Government (1) to conduct its own investigation

without the defendant's knowledge and (2) to determine whether to

join in the action.


7. Plaintiff/relator Cheryl D. Eckard ("Eckard")is a former

Manager of Global Quality Assurance for defendant GSK.   Eckard is

an expert in Code of Federal Regulations, Title 21, compliance

and an experienced pharmaceutical professional.   She has a B.A.

in Chemistry.   She worked for GSK from 1992 through 2003.   She is

an expert on the technical, legal, regulatory and compliance

aspects of the pharmaceutical Good Manufacturing Practices and

quality systems regulations relating to the development,

manufacture, packaging, testing, holding and distribution of drug

products. She has performed compliance functions including

quality management of multiple manufacturing sites and preparing

manufacturing sites for FDA pre-approval and current Good

Manufacturing Process profile inspections.   She has managed

international commercial investigation teams, technical working

parties and Warning Letter Recovery teams, and worked closely

with the FDA and other regulatory bodies in developing

implementation plans to respond to regulatory sanctions.

-5-

8. Eckard seeks to recover damages and civil penalties in the name of the United States and the states for the violations alleged herein.  On information and belief, as set forth in paragraph 47 below, the damages and civil penalties that may be assessed against the defendants under the facts alleged in this Complaint amount to at least hundreds of millions of dollars.

9. Eckard also seeks to recover damages on her own behalf for retaliatory discharge under 31 U.S.C. § 3730(h) for her lawful acts done in furtherance of this action.

## JURISDICTION AND VENUE

10. This court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732.

11. Personal jurisdiction and venue are proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), as at least one of the defendants is found, has or had an agent or agents, has or had contacts, and transacts or transacted business and their affairs in this judicial district.

## PARTIES

12. Plaintiff/relator Eckard is a citizen of the United States

-6-

and a resident of North Carolina. Eckard is a self-employed
consultant. Prior to June 2003, when she was terminated for her
lawful acts done in furtherance of this action, Eckard was a
Manager of Global Quality Assurance for GSK, located in Research
Triangle Park, North Carolina.

13. Defendant GSK is headquartered at 5 Moore Drive, Research
Triangle Park, North Carolina 27709, and at One Franklin Plaza,
Philadelphia, Pennsylvania 19102. GSK's parent company,
GlaxoSmithKline PLC, is located at Charges House, 6-12 Charges
Street, London, England WIY8DH. GSK is engaged in the
development, manufacture, promotion, sale, interstate and
international distribution of, *inter alia*, prescription drugs.
GSK holds the second highest market share in the world
pharmaceutical market. GSK has 100,000 employees in 100
countries, with 50% of its sales of prescription drugs in the
United States.

14. Defendants SB Pharmco Puerto Rico, Inc. and GlaxoSmithKline
Puerto Rico, Inc. are wholly-owned subsidiaries of GSK. Together
with GSK, they operate and manage a manufacturing plant located
at Rd. 172, Km 9.2, Bo. Certenejas, Cidra, PR 00739 ("Cidra").
Unless otherwise indicated, references herein to GSK include SB
Pharmco Puerto Rico, Inc. and GlaxoSmithKline Puerto Rico, Inc.

-7-

15. Defendant Hoffman-La Roche, Inc., ("Roche") is the U.S. prescription drug unit of Roche Holding Ltd., a leading research-based health care enterprise and manufacturer of pharmaceuticals and diagnostics located at CH-4070 Basel, Switzerland.  Roche is located at 340 Kingsland Street, Nutley, NJ 07110.  In or about January 2001, Roche acquired the global rights for the drug Kytril from GSK for $1.23 billion.  Kytril is marketed and sold exclusively by Roche but after its acquisition by Roche continued to be manufactured at the Cidra plant under contract with GSK. Global sales for Kytril were approximately $400 million in 2005. The allegations set forth herein apply to Roche only to the extent that they relate to Kytril.

## INDIVIDUAL PARTICIPANTS

16. David Pulman was GSK's Vice President of Manufacturing and Supply for North America until December 2002, when he became President, Global Manufacturing and Supply.

17. Janice Whitaker is GSK's Senior Vice President for Global Quality.

18. Steve Plating was GSK's Vice President for Quality, North America.  He left GSK in early 2005.

-8-

19. Peter Savin is GSK's Vice President of Global Quality
Assurance.

20. Diane Sevigny was Director of Global Quality Assurance for
North America Pharma until July 2003 when she was promoted to
Director, Global Quality Assurance, Risk Management and
Compliance.

21. Jonathon Box is the Vice President of Manufacturing and
Supply for North America.

22. Jose Luis Rosado was the President of SB Pharmco Puerto Rico,
Inc. and General Manager of the Cidra plant until April 2003,
when he left the company.

23. Edwin Lopez was the Director of Quality at Cidra until the
first quarter of 2003 when he was replaced in that role by
Adalberto Ramirez and became Director of Laboratories at Cidra.
He is no longer employed by GSK.

24. Adalberto Ramirez was the Director of Solid Manufacturing and
Packaging at Cidra until the first quarter of 2003 when he was
promoted to Director of Quality at Cidra.  He left GSK in July

-9-

2003.

25. Gloria Martinez was the Quality Assurance and Regulatory
Manager at Cidra until 2003 when she replaced Adalberto Ramirez
as Director of Quality.  She left GSK in December 2004.

26. Marion Lon was the site director of Cidra who took over from
Rosado in or about April 2003.  She left GSK in October 2004.

## GOVERNMENT PROGRAMS

27. Medicaid is the nation's medical assistance program for the
needy, the medically-needy aged, blind, and disabled and families
with dependent children.  42 U.S.C. §§ 1396-1396v.  Medicaid is
largely administered by the states and funded by a combination of
Federal and State funds.  Approximately 57% of Medicaid funding
is provided by the Federal Government.  Among other forms of
medical assistance, the Medicaid programs cover outpatient
prescription drugs. 42 U.S.C. §§ 1396a(10)(A) and 1396d(a)(12).

28. Medicare is the nation's health program for persons over 65
and the disabled.  Medicare is funded by the federal government.
Medicare Part B has long covered outpatient prescription drugs
that are provided to a patient "incident to" a physicians'
services, including injectable medications, and drugs that are

-10-

required for the effective use of durable medical equipment.    42
U.S.C. § 1395x(s)(2)(A).  Commencing on January 1, 2006, Medicare
Part D provides comprehensive outpatient prescription drug
coverage for brand name and generic drugs according to National
and Local Coverage Determinations.  Medicare Prescription Drug
Improvement and Modernization Act 2003, Pub. L. 108-173.

29. The Department of Veterans Affairs ("VA") provides medical
assistance, including prescription drug coverage, for persons who
have been discharged from active duty service in the military,
naval, or air service.

30. The Public Health Service ("PHS") provides funding, including
outpatient drug coverage, for entities such as black lung
clinics, AIDS drug purchasing assistance programs, hemophilia
diagnostic treatment centers, urban Indian organizations,
disproportionate share hospitals, and other entities listed in §
340B(a)(4) of the Public Health Service Act.

31. The Department of Defense ("DOD") administers the TRICARE
health care program for active duty and retired members of the
uniformed services, their families, and survivors.  TRICARE
benefits include comprehensive prescription drug coverage.

-11-

32. The Food and Drug Administration ("FDA") is responsible for protecting the public health by assuring the safety, efficacy, and security of human and veterinary drugs, biological products, medical devices, the nation's food supply, cosmetics, and products that emit radiation.  The FDA administers, *inter alia*, the Federal Food, Drug and Cosmetics Act, ("FDC Act"), 21 U.S.C. §§ 301 *et seq*.

## ASPECTS OF THE FDA REGULATORY SCHEME

33. The federal government endeavors to ensure the safety and efficacy of drug products consumed daily by millions of Americans through a combination of approvals, inspections, enforcement, and self-regulation by drug manufacturers.  As the FDA's Deputy Associate General Counsel, Eric M. Blumberg, Esq., wrote, drug manufacturers "occupy a virtual fiduciary relationship to the public ...  FDA shares this trustee relationship to the consumer with industry leaders, but the initial and ultimate responsibility remains with those leaders.  This is true not only because the law makes it so, but also for the practical reason that the FDA cannot be in every factory, much less monitor every decision that is made every day that affects the quality of our food and drugs."  Abbott Laboratories Consent Decree and Individual Responsibility Under the Federal Food, Drug and Cosmetic Act, 55 Food and Drug L.J., 145, 147.

-12-

## The current Good Manufacturing Practices

34. The current Good Manufacturing Practices ("cGMPs") contain the minimum requirements that pharmaceutical companies must meet in manufacturing, processing, packing, and holding drugs to assure that they meet the safety, identity, strength, quality, and purity characteristics that they purport to possess. The cGMPS are codified in 21 C.F.R. Parts 210 and 211. Manufacturers demonstrate compliance with cGMPs through written documentation of procedures and practices. The cGMPs dictate, *inter alia*, standards for: personnel engaged in quality control; the design, construction and maintenance of buildings and facilities; the construction, cleaning and maintenance of equipment; the storage, inspection and testing of drug components and containers; the control of production and process, including procedures for sampling and testing of in-process drug products for conformity with specifications and prevention of microbiological contamination; control of packaging, labeling, storage and distribution; laboratory controls including testing of drug product batches for conformity with final specifications; the maintenance of records and reports and conduct of investigations; and procedures for handling of returned and salvaged product.

-13-

35. Drugs are deemed to be adulterated if they are not manufactured in compliance with the cGMPs or if they are contaminated. See 21 U.S.C. §§ 351(a)(2)(A) and(B). It is a violation of the FDC Act, 21 U.S.C. §§ 331(a) to directly or indirectly cause adulterated drugs to be introduced or delivered for introduction into interstate commerce.

### Establishment Inspections, 483s and Warning Letters

36. Under the FDC Act § 704, 21 U.S.C. § 374, the FDA is authorized to conduct inspections of drug manufacturing facilities, including inspections of records, files, papers, processes, controls, and facilities. At the conclusion of the inspection, the FDA provides the manufacturer with a Form FD483 ("FDA-483"), or a list of "observations" representing violations the FDA believes the manufacturer has committed. The manufacturer is expected to respond in writing to each observation stating its position and any corrective action it proposes to take. The FDA takes this response into account in deciding whether further enforcement action is warranted.

37. Following an inspection or discovery of a violation, the FDA may issue a Warning Letter to the manufacturer representing its official findings of violations. FDC Act § 309, 21 U.S.C. § 336.

-14-

The Warning Letter is the FDA's primary means of notifying manufacturers of serious violations and of achieving prompt corrective action. The manufacturer must respond in writing to the Warning Letter within 15 days stating what action is being taken to correct the violations, what action will be taken to prevent similar violations, and the time frame for such action.

## Post-marketing surveillance

38. The FDA operates a Drug Quality Reporting System, which includes the MedWatch reporting program. This is designed to rapidly identify significant health hazards associated with the manufacturing and packaging of drugs, and to establish a central reporting system for detecting problem areas or trends requiring regulatory action. Doctors and pharmacists can report drug quality problems, such as defective components, poor packaging or labeling, suspected contamination or questionable stability to the FDA, the manufacturer, or both, using a standard form.

39. Pursuant to 21 C.F.R. § 314.81 (b)(1)(i) and (ii), manufacturers are required to notify the FDA by filing a "Field Alert" within 3 working days of the receipt, via the Medwatch system or otherwise, of: (i) information concerning any incident that causes the drug product or its labeling to be mistaken for,

-15-

or applied to, another article; (ii) information concerning any

bacteriological contamination, or any significant chemical,

physical, or other change or deterioration in the distributed

drug product, or any failure of one or more distributed batches

of the drug product to meet the specifications established for it

in the new drug application.

## Product Recalls

40. The FDA expects manufacturers to take full responsibility for

recall of defective products, including follow-up checks to

assure that recalls are successful.  The FDA does not have

authority to order the recall of drug products.  Under 21 C.F.R.

§ 7.40, "[r]ecall is a voluntary action that takes place because

manufacturers and distributors carry out their responsibility to

protect the public health and well-being from products that

present a risk of injury or gross deception or are otherwise

defective."  The FDA's guidelines "categorize all recalls into

one of three classes according to the level of hazard involved:

Class I recalls are for dangerous or defective products that

predictably could cause serious health problems or death.

Examples of products that could fall into this category [include]

... a label mix-up on a life saving drug ...  Class II recalls

are for products that might cause a temporary health problem, or

pose only a slight threat of a serious nature. One example is a drug that is under-strength but that is not used to treat life-threatening situations. Class III recalls are for products that are unlikely to cause any adverse health reaction, but that violate FDA labeling or manufacturing regulations." FDA Recall Policies, FDA Center for Food Safety and Applied Nutrition, Industry Affairs Staff Brochure, June 2002. *See also* FDA Investigations Operations Manual, Chapter 800 (801.1).

## Consent Decrees

41. The FDA, acting through the Department of Justice, is authorized to seek injunctions. FDC Act § 302; 21 U.S.C. § 332. Injunctions are sought when there is a likelihood that violative acts will continue or recur.  A consent decree of permanent injunction may be obtained, *inter alia*, where there have been multiple and continuing cGMP violations that have not been voluntarily corrected by the manufacturer.  In such cases, the facility will typically be placed under the monitorship of an independent expert or shut down until the manufacturer has brought itself into compliance, for example, by destroying adulterated product and revising Standard Operating Procedures ("SOPs").  Certification of compliance by an independent expert is often required before the FDA will permit normal operations to

-17-

resume.

## OVERVIEW OF FACTUAL BASIS FOR FALSE CLAIMS

42. GSK's chronic quality assurance problems and ongoing, serious cGMP violations went to the heart of Cidra's manufacturing, processing and packaging systems.  As further detailed in paragraphs 92 through 129 below, they included and/or resulted in:

a. Product mix-ups, i.e., a drug of a different type or strength found in the same bottle (see paragraphs 93 through 98 below);

b. Inadequate investigation of out-of-specification ("OOS") results detected during laboratory testing (see paragraphs 99 through 103 below);

c. Inadequate process validation and non-existent validation review processes for some products (see paragraphs 104 through 105 below);

d. Inadequate or non-existent calibration of equipment and instruments and incomplete investigations relating to equipment found to be out-of-calibration (see paragraphs 106 through 109 below);

e. Overdue process investigations, at times numbering in the hundreds (see paragraphs 110 through 113 below);

f. Understaffing in the Quality Assurance Unit (see

-18-

paragraphs 114 through 115 below);

g. Poor documentation quality, including unsigned, undated and/or lost or missing validation, investigation and change control documents, and hundreds of SOPs overdue for revision (see paragraphs 116 through 117 below);

h. Contamination in products manufactured in the sterile facility, including Kytril injection and Bactroban ointment (see paragraphs 118 through 119 below);

i. Substandard quality and control of the plant's water systems, resulting in build up of stagnant water and microbial contamination (see paragraph 120 below);

j. Manufacturing areas and purportedly clean equipment that repeatedly failed routine environmental testing and exhibited microbial contamination (see paragraphs 121 through 122 below);

k. Destruction of internal audit reports immediately after discussion with the responsible personnel, contrary to GSK policy and industry practice requiring 3 year retention (see paragraphs 123 through 124 below);

l. Serious deficiencies in the functioning of the Microbiology Laboratory, where testing of products and equipment for contamination by objectionable organisms is conducted (see paragraphs 125 through 126 below);

m. Substandard air handling systems not meeting cGMP standards and creating the potential for cross contamination (see

-19-

paragraph 127 below);

n. Inadequate monitoring to ensure containment of a cytotoxic product (Topotecan, a chemotherapy drug) manufactured in the facility (see paragraph 128 below);

o. Various other cGMP violations and quality assurance failures, including inadequate identification, control and storage of drug materials, waste and cleaning agents, poor disinfection procedures, leaking equipment, and inadequate verification of product labels (see paragraph 129 below).

### SUMMARY OF FALSE CLAIMS ACT LIABILITY

43. Defendants violated the False Claims Act as follows:

#### a. Defective products

Defendants submitted and caused to be submitted false claims to the federal, state and city governments for drug products manufactured at the Cidra plant that were defective.

#### b. Products not having the same identity as the product paid for (product mix-ups)

Defendant GSK submitted and caused to be submitted false claims to the federal, state and city governments for drug products manufactured at Cidra that were not the drug products

-20-

that they purported to be.  For example, GSK released to the
market packaged drug product that was mixed up with drug product
of a different type or strength.

c. Drug approvals obtained through false statements to the
FDA

Defendant GSK obtained FDA approval for drug products
by making false and fraudulent statements to the FDA.  In
particular, defendants obtained approval for Avandamet and
Factive[2] in October 2002 and April 2003 respectively by:

(1) falsely representing to the FDA, in or about
October 2002, that Warning Letter commitments would be and/or had
been fulfilled;

(2) stating in Field Alert reports to the FDA that
product mix-ups reported by consumers could not have occurred on
premises, when similar mix-ups had been identified on premises at
the same time.

(3) concealing from the FDA systemic quality
assurance failures and significant violations of the cGMPs,
including violations that defendants were required by law to
report to the FDA.

_____

[2] Factive, an antibiotic for treatment of chronic
bronchitis, was developed by GSK.  The marketing and regulatory
rights are now owned by Oscient Pharmaceuticals, formerly
Genesoft, Inc.

-21-

d. Drug product not "covered" under laws governing government health plans

i. For purposes of Medicare, Medicaid and other government programs, a "covered outpatient drug" is defined, *inter alia*, as one that "is approved for safety and effectiveness as a prescription drug under section 505 or 507 of the Federal Food, Drug, and Cosmetic Act or which is approved under section 505(j) of such Act."  See 42 U.S.C. 1396r-8(k).

ii. The intent and purpose of the FDC Act and the regulatory schemes administered by the FDA are to ensure that drugs are both approved for safety and effectiveness and reach the market in a condition that renders them fit for their intended use.  Under 21 U.S.C. § 355(e)(5), approval of any drug may be suspended if "there is an imminent hazard to the public health," and approval may be withdrawn following notice to the drug maker and an opportunity to be heard if "the methods used in, or the facilities and controls used for, the manufacture, processing, and packing of such drug are inadequate to assure and preserve its identity, strength, quality, and purity ..."

iii. GSK manufactured, processed, packed and/or held, and GSK and Roche distributed, drug product that did not come with the assurance of identity, strength, quality and purity required for approval and distribution under the FDC Act. Therefore, the drugs were not "covered" by Medicare, Medicaid and

-22-

other government health programs under the Social Security Act
and claims for those drugs were false.

### e. Drug product not manufactured in accordance with NDAs

i. 21 U.S.C. §§ 355(b)(1)(B)-(D) provides that
applications to the FDA for approval of new drugs ("NDAs") must
include: "(B) a full list of the articles used as components of
such drug; (C) a full statement of the composition of such drug;
(D) a full description of the methods used in, and the facilities
and controls used for, the manufacture, processing, and packing
of such drug[.]" Approval by the FDA of this drug formula and
method of manufacture is required for introduction of the drug in
interstate commerce and distribution for human use. 21 C.F.R. §
314.70 requires manufacturers to obtain FDA approval for changes
in the conditions established in an approved application.

ii. The defendants released to the market drugs from
the Cidra plant that were not manufactured in accordance with the
NDAs filed with the FDA in that their components, composition
and/or methods and controls used in manufacturing, processing
and/or packing had been changed without FDA approval. These
manufacturing changes could reasonably be expected to cause
changes in safety, therapeutic value and/or equivalence of the
released drug product with the drug product that was approved by
the FDA. Therefore, the drugs were not what they purported to be

-23-

but were some other drugs of unknown safety and effectiveness and were not "covered" drugs for the purpose of Medicaid and other government health plans.

## FCA Liability of Roche

44. 21 C.F.R. § 211.22(a) provides that a drug manufacturer's quality assurance unit "shall have the responsibility for approving or rejecting drug products manufactured, processed, packed and held under contract by another company."

45. Therefore, after its purchase of the global rights to Kytril in or about January 2001, Roche was responsible for ensuring that Kytril was fit for its intended use.  Roche was required to, and did in fact, conduct periodic audits of the Cidra facility, commencing in or about late 2000.  As a result, Roche knew that there were serious cGMP compliance and quality assurance problems relating to Kytril.

46. On information and belief, based on this knowledge and on the fact that, in a one year period between 2001 and 2002, the FDA had issued to Cidra two FDA-483s and a Warning Letter indicating that there were serious cGMP compliance problems at Cidra more generally, Roche, at the very least, was recklessly indifferent to whether Kytril was fit for use and/or deliberately ignorant of

-24-

same.  As a result, claims filed and caused to be filed by Roche
for Kytril to government health programs were false.

### DAMAGE TO THE GOVERNMENT

47. Eckard does not know the precise extent of the financial
damage suffered by Medicaid, Medicare, the VA, and other
government health programs arising from the knowing submission of
false claims by the defendants in this action.  However, Eckard
believes that the damages amount to at least hundreds of millions
of dollars, based on the following: (a) the violations were
significant and systemic, affecting key aspects of the plant's
operations including the quality assurance unit, and defective
products were released to the market and paid for by the
government as a result; (b) the Cidra plant is the most important
of all GSK's plants worldwide and provides $5.5 billion of GSK's
product; (c) almost 100% of Cidra's product is sold in the United
States; and (d) amongst the drugs manufactured at the Cidra plant
were Paxil and Paxil CR(top selling antidepressants), Coreg (a
widely-prescribed heart medication), and Avandia and Avandamet
(popular diabetes medications), amongst other drugs.   Paxil and
Avandia are in the 50 top selling drug products in the world.

## PARTICULARS OF FALSE CLAIMS ACT VIOLATIONS

### Background

48. Cidra has a history of significant cGMP violations. A report prepared by Eckard for GSK senior executives in April 2003 (referred to herein as "the April 2, 2003, report") listed six areas in which Cidra had been repeatedly cited by the FDA for cGMP violations since 1991, namely documentation, process validation, laboratory investigations, other investigations, sterile facility and computer validation.

49. An FDA inspection conducted at Cidra from March 29, 2001, to July 6, 2001, found significant cGMP deficiencies such as process validation deficiencies in Paxil OS (Oral Suspension) batches, inadequate OOS and complaint investigations, inadequate laboratory controls, inadequate media fills, non-stability indicating analytical methods (i.e., inadequate testing to ensure that drug products could meet their purported shelf life) and deficiencies related to the aseptic (i.e. sterile) filling operation (relating to the production of injectable drugs).  The FDA investigator who conducted this inspection initially recommended issue of a Warning Letter; however, following a meeting with GSK the FDA judged GSK's response adequate and the inspection was classified VAI (Voluntary Action Indicated).  An

-26-

FDA-483 was issued to GSK on or about July 6, 2001.

50. Another FDA inspection was conducted from February 7, 2002 to April 10, 2002 and again the FDA found significant cGMP violations such as the release to market of Bactroban ointment not meeting specifications, inadequate process validation of Paxil OS and Thorazine tablets, inadequate microbiological controls in Bactroban ointment production areas, inadequate laboratory investigations, inadequate instrument calibrations, and inadequate water sampling techniques. On April 10, 2002, another FDA-483 was issued to GSK. GSK submitted a written response to the FDA stating its position on each observation and describing corrective and preventive steps it proposed to take. The FDA was not satisfied with this response, and issued a Warning Letter to Cidra on or about July 1, 2002 ("Warning Letter").

51. The Warning Letter detailed a number of significant cGMP violations at Cidra, including:

    a. Release to the market of Bactroban Ointment that was contaminated with microorganisms;

    b. Failure to manufacture Paxil OS in accordance with established specifications and to demonstrate a reproducible and reliable manufacturing process;