c. Failure to adequately validate the manufacturing process for Thorazine tablets, including failure to test Thorazine tablets for friability and content uniformity;

d. Failure to conduct statutorily-mandated investigations in a timely manner and to take corrective actions to prevent recurrence, including investigations of High Total Plate Count results in water samples that took more than five months to complete or that were not completed at all.

e. Media fill vials (used to test for sterility of injectable drug product) were not incubated for the required time to assure bacterial growth for both slow and fast microorganisms.

## GSK's Response to the FDA: Warning Letter "Recovery"

52. On or about July 2, 2002, GSK met with the FDA to discuss issues arising from the FDA-483 and the Warning Letter.   GSK's representatives at that meeting included Janice Whitaker ("Whitaker"), Senior Vice President for Global Quality, Steve Plating ("Plating"), Vice President for Quality North America, Jose Luis Rosado ("Rosado"), the President and General Manager of Cidra, and Adalberto Ramirez ("Ramirez"), Director of Solid Manufacturing and Packaging at Cidra.   At that meeting, the FDA informed GSK that pending approvals for GSK's new diabetes drug, Avandamet, and a new antibiotic, Factive, would not proceed until GSK's response to the Warning Letter was deemed adequate by the

-28-

FDA and the FDA had reinspected the Cidra plant.  Avandamet and Factive are manufactured at the Cidra plant.

53. In early July 2002, Eckard traveled to Cidra in order to assist in the preparation of Cidra's preliminary response to the Warning Letter, which was delivered to the FDA on or about July 17, 2002.  At approximately that time, GSK undertook to immediately notify the FDA if any problems were found that could present a public health risk.

54. On or about July 17, 2002, GSK made the following specific commitments to the FDA in response to the Warning Letter received on July 1, 2002, and the FDA-483 received on April 10, 2002:

    a. Provide a progress report to the FDA on or before August 15, 2002;

    b. Review laboratory investigations:

        i. Review all investigation reports from 2000 to date and prepare a summary of findings, this review to be conducted by consultants;

        ii.  Define an action plan for corrective actions;

        iii. Evaluate the adequacy of current SOPs for handling OOS investigation results;

        iv. Determine the adequacy of corrective actions taken.

-29-

c. Activate functions of the Senior Management Incident Reporting Team ("SMIRT") (Quality Council), a team established in 2002 after the FDA observed that Cidra senior managers were insufficiently involved in quality control;

d. Prepare a Site Validation Master Plan;

e. Review all process validation reports to assure compliance with current guidelines;

f. Conduct training on handling of laboratory investigations;

g. Activate the Lab Calibration/Metrology Unit;

h. Discuss with the FDA's Compliance Division and Division of Anti-Infectives the microbial specification requirements for Bactroban;

i. Define the sampling and testing for Paxil OS batches;

j. Establish a plan to assure that all investigations are completed within 30 days;

k. Review adequacy of media fills documentation from 2001 to July 2002;

l. Assessment of all systems;

m. Hire additional Quality Assurance ("QA") Staff;

n. Ensure adequate validation of Thorazine tablets;

o. Perform additional validation of the tablet process rejection system for Factive;

p. Ensure adequate validation of Paxil OS.

-30-

55. On or about August 7, 2002, Eckard was assigned by GSK
headquarters in Research Triangle Park, NC, ("RTP") to lead the
Warning Letter Recovery Team in Cidra.

56. Eckard's role was to coordinate and oversee the work of
Compliance Action Plan Team Leaders who were assigned to each
functional area, including Materials, Equipment,
Facilities/Utilities, Validation, Laboratory, Computer
Validation, Quality Assurance, Production, and Calibration.  The
Team Leaders were to work on their action plans on a fully
dedicated basis for the seven weeks following August 7, 2002, and
to communicate serious incidents to top management with the
objective of resolving the Warning Letter issues and making the
site ready for FDA reinspection, which was a precondition to
obtaining FDA approval for Avandamet and Factive. The
reinspection was scheduled to commence on or about October 9,
2002.  There were over 100 people on the Warning Letter Recovery
Team, approximately 75 of them from the Cidra Plant and 25 from
GSK headquarters.

57. Shortly after her arrival at Cidra, Eckard asked Cidra's
Quality Assurance and Regulatory Manager, Gloria Martinez
("Martinez") to report on any compliance issues that the FDA had
not identified in its recent inspections.

58. Martinez presented an internal report during a SMIRT meeting
on or about August 14, 2002, which was attended by Cidra senior
managers including Rosado.  Martinez outlined the following
compliance issues:

a. Product mix-ups: Cidra had filed at least 7 Field Alert
reports with the FDA during 2002 due to complaints of product
comingling from patients, pharmacies or physicians, i.e., tablets
of a different type or strength were found in the same bottle.
Martinez also stated that Cidra had internally identified nine
similar (though distinct) product mix-ups at the plant.  Eckard
also learned that in the Field Alerts filed with the FDA arising
from consumer complaints, Cidra had assured the FDA that, for a
variety of reasons, the mix-ups could not have happened at the
plant, despite the fact that nine separate and contemporaneous
similar incidents had been identified inside the plant.  Product
mix-ups typically are treated in the industry as Class I or Class
II recall events, and yet no recalls had been initiated.  Cidra
had made no attempt to correct the cause of the mix-ups and had
lied to the FDA in its Field Alert filings by stating that the
mix-ups must have occurred outside of Cidra's control.  The
product mix-ups are discussed in detail in paragraphs [93]
through [98] below.

b. Overdue process investigations: As further described in paragraph 110 below, process investigations must be completed within 30 days.  Process investigations are conducted when deviations in the manufacturing process give rise to concerns that product quality may be compromised.  In August 2002, there were 283 overdue process investigations.   As further described in paragraph 111 below, Cidra continued to manufacture and release product notwithstanding the potential impact on the quality of released batches.

c. Equipment not calibrated: As further described in paragraphs 106 through 109 below, equipment calibration is a requirement of the cGMPs. Cidra did not have a calibration program for the laboratory, and over 20,000 pieces of equipment were in urgent need of calibration in the manufacturing areas. As a result, the validity of data gathered during manufacture and testing to assure product quality could not be relied upon as accurate.

d. Standard Operating Procedures overdue: As further described in paragraph 117 below, written procedures, commonly referred to as SOPs, are the foundation of the manufacturing plant's documentation system.  These SOPs must be routinely reviewed and revised to take account of changing conditions and

-33-

circumstances.   In August 2002, 366 SOPs were overdue for review
and revision at Cidra.

     e. Annual product reviews overdue: 21 C.F.R. § 211.180
requires that manufacturers conduct reviews of data, at least
annually, for the purpose of evaluating the quality standards of
each product.   Martinez described numerous product reviews that
were more than a year out of date.

59. Immediately after the SMIRT meeting on or about August 14,
2002, Eckard phoned Plating at GSK's headquarters in RTP.   She
gave him the information that she had received at the meeting.
She recommended that GSK stop shipping all product from the Cidra
plant, stop manufacturing product for two weeks in order to
investigate and resolve the issues raised and the impact on
released batches, and notify the FDA about the product mix-ups.
Eckard faxed to Plating the overheads that Martinez had used in
her presentation, consisting of approximately 13 pages ("the
Martinez presentation").

60. On or about August 15, 2002, Eckard returned to GSK
headquarters in Research Triangle Park, NC, where she immediately
reported her concerns to Whitaker.   Eckard reached Whitaker, who
was out of the country, by phone.   Eckard gave Whitaker the

-34-

information that she had received at Cidra, including that Cidra had lied to the FDA. She recommended that GSK stop shipping all product from the Cidra plant, stop manufacturing product for two weeks in order to investigate and resolve the issues raised and the impact on released batches and notify the FDA about the product mix-ups. Eckard reminded Whitaker of GSK's promise to the FDA at the meeting on July 17, 2002, that GSK would immediately notify the FDA if any problems were found that could present a public health risk. Eckard told Whitaker that she believed the Cidra plant was headed for a Consent Decree if the problems were not handled with speed and integrity. Eckard left a copy of the Martinez presentation on Whitaker's desk.

61. On or about August 18, 2002, Eckard met with Plating to reiterate the concerns she had communicated to him by phone on August 14, 2002.

62. In September 2002, Eckard spoke by phone with David Pulman ("Pulman"), who was then Vice President of Manufacturing and Supply for North America. Pulman was promoted to President, Global Manufacturing and Supply in December 2002. Plating had provided Pulman with a copy of the Martinez presentation on or about August 15, 2002. Pulman's overriding concern was to make the Cidra plant ready for the FDA reinspection to commence on or

-35-

about October 9, 2002. As stated above, passing this inspection
was a precondition to obtaining FDA approval for Avandamet and
Factive. Pulman asked Eckard for specific examples of the
quality problems at the plant. She gave him a few examples and
later sent him, via email, a report prepared by the Director of
Validation for the sterile facility at GSK's Barnard Castle plant
in the United Kingdom, who had been brought in to review
validation in the sterile suite in Cidra. His report was
scathing. Eckard told Pulman that nothing had improved at the
Cidra plant since her report to Plating on or about August 24,
2002.

63. Eckard did not have the authority to order recalls or
suspension of manufacturing or shipment of product, or to report
regulatory concerns to the FDA. Pulman and Whitaker had ultimate
authority to order action of this kind. Throughout 2002 and into
April 2003, Eckard continued to urge GSK managers to take the
action that she had recommended and to correct the quality and
compliance problems at the Cidra plant. They failed to do so.

64. Eckard now believes that Whitaker, Pulman and other GSK
executives were unwilling to acknowledge the gravity of the cGMP
violations at the Cidra plant and to take the action that Eckard
had recommended in part because the FDA had indicated that it

-36-

would not consider approvals for Avandamet and Factive until the
Warning Letter issues were resolved. Such approvals were
unlikely to be obtained if the FDA were aware of the gravity of
the quality assurance deficiencies at the Cidra plant. Once the
objective of approval for Avandamet was achieved, GSK and Cidra
management alike lost interest in correcting the deficiencies at
the Cidra site and resumed their focus on maximizing productivity
at the plant. As stated above, the Cidra plant manufactures $5.5
billion of GSK's product and is the most important of all GSK's
plants worldwide.

65. On or about August 20, 2002, Eckard returned to Cidra. The
Compliance Action Teams continued to prepare for the Avandamet
reinspection, which was held in October. The focus of the
inspection was on the progress of the recovery effort. During
the inspection, Cidra informed the FDA that it had begun to put
together Corrective and Preventive Action Plans but had not yet
fully implemented them. Avandamet was approved by the FDA on
October 8, 2002. Factive was approved on April 4, 2003.

66. Eckard left Cidra and returned to North Carolina immediately
after the inspection, having been at the plant for a period of
ten weeks. After three weeks, she returned to Cidra to resume
work on Warning Letter recovery and the longer-term correction of

-37-

Cidra's systemic quality assurance and compliance problems. However, Rosado and Ramirez stated that they wanted to take over the leadership of that effort, including leadership of the Compliance Action Teams.  Following a meeting with Plating, it was agreed that Ramirez would lead the effort and Eckard would play an "oversight" role and report to Plating.

67. Thereafter, Eckard visited Cidra periodically for 1-3 days at a time, on each occasion receiving a progress report from Ramirez and reporting to Plating almost on a daily basis.

68. On or about January 24, 2003, Rosado, Plating, Ramirez and Edwin Lopez, Cidra's Director of Quality ("Lopez") met with the FDA to discuss the FDA-483 and Warning Letter Commitments set forth above, paragraph 54.  Eckard attended that meeting, but was not on the agenda and did not present any items.

69. In or about February 2003, Eckard learned that Ramirez had repeatedly lied to her about the status of work in the written and verbal progress reports he had provided to her since assuming control of Warning Letter recovery.  She also learned that the Compliance Action Teams had been disbanded immediately after the FDA's October reinspection and the approval of Avandamet, and that Rosado, Ramirez and Lopez had misrepresented the true status

-38-

of Warning Letter recovery to the FDA at the January 24, 2003 meeting (as further set forth in paragraphs 101, 102, 105, 108, 115 and 119 below). Eckard reported these concerns to Plating and to her immediate boss, Diane Sevigny ("Sevigny"), Director of Global Quality Assurance for North America Pharma.

70. From February 4 through 8, 2003, Eckard and two other RTP personnel, representing the Global Quality Assurance team, conducted an internal audit at Cidra ("the February 2003 RTP audit"). That audit found continuing serious quality control problems and cGMP violations. The findings were communicated to Rosado, Ramirez, Lopez, and senior GSK managers Sevigny, Plating and Jonathon Box ("Box"), the Vice President of Manufacturing and Supply for North America who took Pulman's job when Pulman was promoted in December 2002. Aspects of the February 2003 RTP audit are discussed further below, paragraphs 105.b., 108 and 113.

71. Following her findings in the February 2003 RTP audit and her discovery that Ramirez had lied to her about the status of progress by the Compliance Action Teams, Eckard told Sevigny in substance that she would not participate in a cover-up of the quality assurance and compliance problems at Cidra and would not take part in any further meetings with the FDA about the Cidra plant. During this period and thereafter, Eckard and Sevigny

-39-

were in frequent and increasing conflict about GSK's management
of the quality and compliance problems at Cidra.

72. In or about March 2003, GSK made a general call to employees
for volunteers to accept a redundancy package arising from the
merger of Glaxo Welcome and SmithKlineBeecham, which took place
in December 2000.  Eckard was so demoralized that she initially
expressed interest in this package.  However, upon reflection and
discussion with colleagues, she soon withdrew her expression of
interest, believing that she should continue to seek to make
things right from within GSK rather than simply resign.

73. Eckard continued to press GSK senior management for action.
In or about March 2003 Eckard put together a binder of materials
detailing the quality assurance and compliance problems at Cidra
and presented it to Plating and Marion Lon ("Lon"), who was to
become and became the site director of Cidra when Rosado retired
on or about April 1, 2003.  Eckard also asked to meet with
Plating and Lon.

74. On or about April 2, 2003, Eckard delivered to GSK senior
managers Box, Peter Savin (Vice President of Global Quality
Assurance), Whitaker, Plating and Sevigny, and Cidra managers Lon
and Ramirez, a non-routine detailed memorandum on Current

-40-

Compliance Risks for Manufacturing and Supply of Drug Products at Cidra ("the April 2, 2003, report"). Eckard provided Ramirez with a copy. She detailed the following high risk compliance problems:

a. Product mix-ups: see further, paragraphs 93 through 98 below;

b. Documentation quality: see further, paragraphs 116 through 117 below;

c. Computer validation;

d. Sterile manufacturing facility activities and documentation, including Kytril injection: see further, paragraphs 118 through 119 below;

e. Quality and control of water systems: see further, paragraph 120 below; and

f. OOS events for environmental monitoring of manufacturing areas and clean equipment: see further, paragraph 121 through 122 below.

75. Eckard called for increased monitoring by GSK management of compliance improvement initiatives at Cidra. However, she did not receive any response to her memorandum from any of the seven managers to whom she sent the report.

## Alleged Product Diversion

76. In or about early April 2003 Eckard learned of internal allegations that persons at the Cidra plant were skimming product during manufacture, including reject product, and diverting the product to Latin America.

77. Corporate Security and GSK senior manager Box were notified of these allegations in February 2003.  The allegations were made by a current and a former Cidra employee, both unidentified. Background checks conducted by an outside private investigation company identified connections between a senior manager at Cidra, and companies alleged to distribute the "black market" product. One of these companies was identified as MOVA Pharmaceuticals, Inc., ("MOVA") a contract manufacturer located in Caguas, Puerto Rico.

78. In or about the week beginning April 7, 2003, Sevigny took a team to Cidra to investigate these allegations, bypassing Eckard who would normally have been assigned leadership of the investigation.  Sevigny took Eckard's employee, Kristal Adams, as part of the team.  Although she had been told by Sevigny, in substance, to "stay out of it," Eckard nonetheless provided informal advice to Kristal Adams and received information from her about the investigation.

-42-

79. On or about April 27, 2003, following a consumer complaint, Cidra filed a Field Alert reporting that Avandamet 40 mg tablets had been found in the United States mixed up with unidentified tablets stamped "MOVA" or "MBO."

80. GSK had no legitimate business with MOVA, so there was no legitimate reason for Avandamet tablets and MOVA products to be at the same site.

81. Further, a considerable quantity of Avandamet batches had been rejected because of manufacturing problems in late 2002 because of lack of content uniformity, so that some tablets were sub-potent and others were super-potent.

82. On information and belief, based on paragraphs 76, 77, and 79 through 81, rejected batches of drug product, including Avandamet, were sent from Cidra to MOVA, (which is located near Cidra) for "black market" packaging and distribution, resulting in the mix-up.

83. On information and belief, based on paragraphs 76, 77, and 79 through 82, rejected batches of drug product, including Avandamet, were distributed to the United States market.

-43-

84. Additionally, the FDA and other experts have identified the cross-border sale to the United States of drugs, some of which are diverted, counterfeit, stolen or fraudulent, as a growing threat to patient safety.  There is growing evidence of efforts by increasingly well-organized groups in other countries, backed by increasingly sophisticated technologies and criminal operations, to profit from such drugs at the expense of American patients, who increasingly are purchasing drugs at lower prices over the Internet and via other means from foreign sources. Drugs from countries along the United States border have been identified as a particular threat.

85. On information and belief, based on paragraphs 76, 77, and 84, product diverted from the Cidra plant to the "black market" in Latin America was sold to such groups and channeled back into the United States as legitimate product.

86. In or about April or May of 2003, GSK closed its internal investigation for lack of sufficient evidence.  On information and belief, based on paragraphs 76 through 81 and paragraph 84 above, GSK's investigation was inadequate.

-44-

## Eckard's Termination, Report to GSK's Compliance Department and Report to the FDA

87. In early May 2003 Eckard received a phone call from the GSK Human Resources Department advising her that she was being offered a redundancy package. Eckard stated that she was not interested in a package and was told that she had no choice. She was advised to take a couple of weeks off with pay. In late May the Human Resources Department asked her to attend a meeting at RTP, at which the Vice President of Human Resources for Global Operations formally presented the redundancy package to her, took her security badge, and escorted her from the premises.

88. Even after her termination, Eckard continued her efforts to have GSK address Cidra's quality and compliance problems. In or about July 2003, she called GSK's general counsel and Chief Executive Officer in the United Kingdom, who declined to speak with her. She then called GSK's general counsel in the United States and explained the general nature of her concerns to his secretary. She referred Eckard to the Vice President for Compliance, whom Eckard phoned on or about July 14, 2003. She detailed the serious quality assurance and compliance problems at Cidra, including the product diversion allegations.

89. On or about August 27, 2003, she participated in a

-45-

teleconference with other GSK compliance personnel, in which she again detailed her concerns. As a result of this call, she formed the view that the Compliance Department lacked authority internally and that regardless of the outcome of their investigation, if any, GSK was unlikely to take any corrective action. On the same day, she called the FDA's San Juan District Office, where she spoke with Compliance Officer Carmelo Rosa ("Rosa"). For two to three hours, she detailed all of the serious quality assurance and compliance problems at Cidra, including the alleged product diversion.

90. On or about October 3, 2003, following a phone conversation with the Compliance Department, Eckard called Rosa at the San Juan District Office of the FDA and informed him that GSK did not intend to take any corrective actions as a result of her report.

91. On or about October 22, 2003, GSK announced in an SEC filing that in October 2003 the FDA had begun an investigation of its manufacturing facility in Cidra, Puerto Rico.

## DETAILS OF QUALITY ASSURANCE FAILURES AND VIOLATIONS OF THE FDC ACT AND CFRs

92. The defendants' failure to assure quality of drug products manufactured at Cidra and violations of the FDC Act and the Code

-46-

of Federal Regulations, Title 21, include those set forth below.

## Product Comingling

93. As set forth in paragraph 58 above, Eckard learned on or about August 14, 2002, that Cidra had received a number of complaints of product comingling from patients, pharmacies and hospitals in 2002. In other words, consumers found tablets of a different drug type or different strength in the same bottle. Additional complaints were received during 2003.  To June 2003, these complaints reported the following:

    a. Avandia 8 mg mixed with Avandia 4 mg;

    b. Paxil 30 mg mixed with Paxil 10 mg;

    c. Coreg 12.5 mg mixed with Coreg 6.25 mg;

    d. Coreg 6.25 mg mixed with Coreg 3.125 mg;

    e. Paxil 40 mg mixed with Paxil 20 mg;

    f. Avandia 4 mg mixed with Avandia 8 mg; and

    g. Paxil 20 mg mixed with Benadryl 25 mg;

    h. Paxil 10 mg bottle contained unidentified pink tablets (Paxil 10 mg is yellow);

    i. Paxil 40 mg mixed with Paxil 30 mg;

    j. Paxil 10 mg bottle contained unidentified peach/brownish tablets;

    k. Avandamet 40 mg mixed with unidentified tablets stamped "MOVA" or "MBO"  (As to MOVA, see paragraphs 77, 79, 80 and 82

-47-

above);

l. Three Paxil CR 12.5 mg bottles contained unidentified pink tablets (Paxil CR 12.5 is yellow);

m. Avandia 2 mg mixed with Avandia 4 mg;

n. Paxil CR 25 mg pink mixed with Paxil CR 12.5 mg; and

o. Paxil CR 37.5 mg mixed with Paxil CR 25 mg.


94. Cidra filed Field Alert reports with the FDA with respect to these consumer complaints. Cidra told the FDA in each case that, following an investigation, it had determined that the product mix-ups were very unlikely to have occurred at the Cidra plant, for example, because of "the extensive controls in our packaging areas."


95. Between approximately January 2002 and June 2003 Cidra generated the following internal investigation reports describing product comingling that it had identified at the plant:

a. Avandia 4 mg mixed with Tagamet OTC 200 mg;

b. Avandia 8 mg mixed with Avandia 4 mg;

c. Coreg 25 mg mixed with Coreg 6.25 mg;

d. Ecotrin 81 mg mixed with Stelazine 2 mg;

e. Paxil 30 mg mixed with Avandia 4 mg;

f. Paxil 30 mg mixed with Paxil CR 12.5 mg;

g. Paxil 20 mg mixed with Paxil 25 mg;

-48-

h. Tagamet HB mixed with Avandia 4 mg;

i. Tagamet OTC mixed with Avandia 8 mg;

j. Avandia 8 mg mixed with Paxil 10 mg;

k. Coreg 6.25 mg mixed with Paxil 20 mg;

l. Coreg 25mg mixed with overweight tablets found during packaging;

m. Paxil DC 10mg mixed with two defective tablets found during packaging;

n. Tagamet OTC mixed with Coreg 6.25; and

o. Paxil DC 10mg mixed with Coreg 3.125mg.


96.   Despite these contemporaneous mix-ups discovered at the site, Cidra repeatedly represented to the FDA in Field Alert reports responding to consumer complaints referred to in paragraphs 93 and 94 above that its manufacturing and packaging processes were beyond reproach, that it was extremely unlikely that the mix-ups occurred on site and that they must have occurred outside GSK's control.  For example, in January 2003 Cidra filed a Field Alert report with the FDA following a pharmacist's complaint of finding Paxil 30 mg tablets in a Paxil 40 mg bottle.  Cidra told the FDA that "given the current process controls in place, it was highly unlikely that this situation occurred on our premises."  The above-listed mix-ups identified at the site, however, show that the similar incidents reported by

-49-

consumers were, in fact, highly likely to have occurred on Cidra's premises.

97. When Eckard learned of the mix-ups in or about August 2002, she pressed Cidra managers for additional information about the cause. She was told that they likely arose from the re-use of undedicated bulk fiber board drums in tablet suites. In other words, drums used in the processing of one type or strength of tablet had been re-used for a different type or strength of tablet. Eckard was also told that uncoated tablets of one type were being mixed with uncoated tablets of another type, so that a tablet of a different type in a final batch would only be recognizable by its size or shape, and not by its color.

98. In or about August 2002, Eckard asked Cidra management to conduct a full analysis of the problem as a matter of priority. A report was not issued until May 2003. This report concluded that "most mix-ups occurred in the compression area in Cidra II Building and were found to be related to drum cleaning and preparation." In other words, Cidra's internal investigation confirmed that the consumer-reported mix-ups likely did not occur outside the plant (as it had earlier informed the FDA) but were a result of failure to properly clean out drums that were used to prepare one type or strength of drug before the drum was reused

-50-

for another type or strength of drug.  Still, Cidra did not
inform the FDA of these findings or initiate any product recalls.

## Laboratory Investigations

99. Manufacturers are required to conduct laboratory testing of
each drug lot prior to release to determine conformance to the
final specifications of the drug product, including the identity
and strength of each active ingredient. 21 C.F.R. § 211.165(a).
When OOS results are found, i.e., products fail to meet
specifications or other quality control criteria, the batch must
be rejected.  21 C.F.R. § 211.165(f).

100. OOS results may be due to either error made in the
laboratory during testing or to a drug sample that indeed does
not conform to the specifications.  When the initial assessment
cannot document laboratory error, a full-scale failure
investigation must be conducted. 21 C.F.R. § 211.192.  This is a
crucial step in the quality assurance process: root cause must be
identified so that appropriate preventive action can be taken.
Examples of potential causes of OOS results not attributable to
laboratory error are: an improperly validated process (see
paragraph 104 below), production operator error, improperly
functioning production equipment, use of OOS components, and
improper environmental conditions.

-51-

101. As stated above, on or about January 24, 2003, Rosado,
Plating, Ramirez and senior Cidra staff members met with the FDA
to discuss Warning Letter Commitments ("the January 24, 2003
meeting").  One of the Corrective and Preventive Action items
that GSK represented to be complete was its Review of Laboratory
Investigations.  GSK represented that a review of all
investigation reports from 2000 to date had been conducted by
consultants and a summary of findings prepared; that an action
plan had been defined for corrective actions; that an evaluation
of the adequacy of current SOPs for handling OOS investigations
had been conducted; and that the adequacy of corrective actions
taken had been determined.

102. In fact, Cidra's laboratory investigation review was not
complete.  In or about August 2002, GSK had hired a consulting
firm, The Weinberg Group, Inc. ("Weinberg") to conduct a
retrospective OOS laboratory investigations audit for the period
from 2000 to August 2002, i.e., to review Cidra's findings
arising from investigations of OOS results for products that had
been released to the market still containing shelf life (i.e.,
unexpired batches) and to state whether they concurred or did not
concur with those findings and with Cidra's decision to release
the product.  This encompassed some 500 investigations.  At that
time, GSK told the FDA that in the event of any "do not concur"

-52-

findings by the consultants that could present a public health
risk, it would immediately advise the FDA. At the time of the
January 24, 2003, meeting, Weinberg had conducted its review and
prepared a summary of findings, including that it did not concur
with at least 30 of Cidra's findings. Unbeknownst to the FDA,
Cidra had agreed with Weinberg that any investigations resulting
in a "do not concur" finding would be reinvestigated by Cidra and
re-evaluated by Weinberg. Further, a March 2003 internal report
prepared by Cidra personnel ("the March 2003 Cidra report")
listed some four additional laboratory investigations during the
2000-2002 period that the relator believes had not been reviewed
by Weinberg at all at the time of the January 24, 2003, meeting.
Therefore, GSK's representation to the FDA that the laboratory
investigations review was complete was not accurate, since more
than 30 investigations were still outstanding.

103. In addition, in many cases Cidra did not conduct laboratory
investigations with adequate skill and diligence and failed to
conduct follow-up investigations required by the cGMPS. For
example:

      a. A great many of Cidra's investigations, both those that
were covered by the Weinberg review, and those that post-dated
the period of that review (August 2002), incorrectly assigned a

root cause of "determinate" laboratory error, when in fact the root cause was "indeterminate laboratory error." In other words, the investigation purported to find the cause of the OOS result as an identified laboratory error, when such cause had not been proved but was merely theoretical. As stated above, 21 C.F.R. § 211.192 requires that a full-scale failure investigation be conducted when the initial assessment cannot document laboratory error. As a result of Cidra's incorrect assignment of cause, the required follow-up investigations were never conducted and thus product released to the market was potentially suspect.

b. An unusually and unacceptably high number of laboratory investigations conducted by Cidra arose as a result of "unknown peaks" detected during routine laboratory testing. "Unknown peaks" appearing on a chromatograph during routine laboratory testing of drug samples indicate that the drug lots may be contaminated. These investigations frequently assigned the root cause of the "unknown peak" as contamination from glassware or other equipment used in the analytical process without adequate proof. As a result, Cidra limited the root cause to laboratory error and did not conduct any additional investigation. The number of reported cases of contamination from glassware was so high that any objective investigator would have considered and investigated cross-contamination in the production facility,

including contamination arising from environmental conditions, manufacturing equipment, air handling systems, and water systems. All of these areas of the production facility were classified in a June 2003 audit of the Cidra facility conducted by Global Quality Assurance ("GQA") personnel ("the June 2003 GQA audit") as areas in which there were serious deficiencies that could significantly impact product quality and required immediate corrective action, and yet Cidra ignored cross-contamination and corrective action arising from "unknown peaks" was focused on re-evaluation of its procedures for laboratory glassware washing.

## Process Validation

104. Process validation is a quality control measure for obtaining, recording and interpreting the results required to establish that a process will consistently yield product complying with predetermined specifications.  Manufacturers are required to establish written procedures for production and process control designed to assure that drug products have the identity, strength, quality, and purity they are represented to possess.  21 C.F.R. § 211.100.  The execution of the validation protocol, the test results and approvals are documented in a validation report.  Changes in process may render the process no longer valid, and manufacturers are expected to establish a system that monitors processes, equipment and personnel so that

-55-

unintended changes are identified, as well as conducting periodic
process reviews. Process validation is key to assuring that
quality, safety and effectiveness are designed and built into the
product rather than relying on quality inspection of the finished
product, and that each step in the manufacturing process is
controlled to maximize the probability that the finished product
meets all quality and design specifications.

105. Inadequate validation of Paxil OS and Thorazine were cited
by the FDA in the April 2002 FDA-483 and Warning Letter to Cidra.
In addition to correcting these specific problems, GSK promised
the FDA in or about August 2002 that it would review process
validation for all products, many of which had not been reviewed
for periods of up to ten or more years. GSK told the FDA on
January 24, 2003, that it had reviewed all process validation
reports to assure compliance with current guidelines. In fact,
many elements of this review were incomplete. For example:

    a. In the March 2003 Cidra report, Cidra documented 29
laboratory investigations, dating from 1995 through 2002, that
required review in order to determine the impact on validation
certification for the drugs in question. Those drugs included
Avandia, Paxil, Relafen, Ecotrin, Tagamet, Albenza, Compazine,
Factive, Dyrenium, Batroban and Kytril injection. While the

-56-

report marked this review as being complete on 12/30/02, the relator believes that the review was in fact still outstanding.

b. The February 2003 RTP audit identified the need for specific compliance questions concerning the validation of Kytril injection to be rectified before additional batches of the drug could be manufactured. Cidra nonetheless proceeded with the manufacture of Kytril injection. The March 2003 Cidra report identified an action item described as: "Issue a document addressing the concerns raised by Richard Kettlewell [the Director of Validation for the sterile facility at GSK's Barnard Castle plant in the United Kingdom] in the process validation assessment of Kytril." See paragraph 72 above. While this item is marked as complete at 12/30/02, it was not, in fact, complete, as evidenced by the findings of the February 2003 RTP audit.

c. Further, the June 2003 GQA Audit noted that Cidra did not have any validation review processes in place for non-sterile products and that reviews must be conducted at no less than three-yearly intervals. (Non-sterile refers to all drug products other than injectable drugs.) The auditors classified this deficiency as one that could significantly impact product quality and required immediate corrective action.

-57-