## Equipment Calibration

106. 21 C.F.R. § 211.68(a) requires that automatic, mechanical and electronic equipment be inspected or checked according to a written program to ensure proper performance, and that written records of calibration and inspection be maintained according to a written program. The FDA expects that calibration will be performed both before and after validation studies to ensure the validity of the data gathered. If equipment is found to be out of calibration, investigations should be conducted to determine whether there was any impact of product quality.

107. Inadequate instrument calibration was one of the areas of non-compliance cited by the FDA in the FDA-483 issued to Cidra in April 2002. When the Warning Letter was issued in August 2002, Cidra still had no calibration program at all for the laboratory. As part of the Warning Letter recovery process, Cidra established a calibration program for the laboratory and calibrated some 20,000 pieces of equipment in the manufacturing facility. However, Cidra did not coordinate this process with validation studies as required by the FDA, and thus the validity of data gathered could not be relied upon as accurate.

108. At the January 24, 2003, meeting, Cidra told the FDA that it had completed the task of activating the Laboratory Calibration/

Metrology Unit.  However, at the time of the February 2003 RTP audit, the timeline for the calibration corrective action plan was not on target.  For example, the auditors cited one item for which the completion date was unknown, and one item that had not even been started by the stated completion date.

109. Further, the June 2003 GQA Audit found that investigations of equipment found to be out of calibration were not being conducted in a timely manner.  The auditors noted that due to the high number of incomplete investigations it was difficult to assess the impact of out-of-calibration conditions on product quality.  The auditors classified this deficiency as one that could significantly impact product quality and required immediate corrective action.

## Overdue Process Investigations

110. Process investigations are conducted whenever a mistake or irregularity is detected during the manufacturing process.  These may arise, for example, from an OOS result that is not proven to be caused by laboratory error (see paragraph 100 above), from the discovery of mixed up product, or from a finding that purportedly cleaned equipment is dirty.  Process investigations must be completed within 30 days. See U.S. v. Barr Laboratories, Inc., et al., 812 F. Supp. 458, 468 (D.N.J. 1993)

111. As stated in paragraphs 59, 60 and 61, when Eckard learned, in August 2002, that hundreds of process investigations were overdue, she urged GSK management to shut the plant down immediately while the matters identified therein were resolved. The March 2003 Cidra report confirmed that in August 2002, there were 283 overdue process investigations. Cidra continued to manufacture and release product notwithstanding the potential impact on the quality of released batches.

112. An example of Cidra's inability to complete investigations within 30 days is its process investigation relating to Avandamet commenced in or about April 2003.

a. As stated in paragraph 65 above, Avandamet was approved by the FDA in October 2002. The process investigation should have been initiated in or about December 2002 when a number of failures and problems were observed during manufacture. These failures resulted in the rejection of several batches of the product for lack of content uniformity, assays (tests for purity) that failed to meet specification, and granulation that did not flow appropriately, so that some tablets were sub-potent and others were super-potent.

b. Finally, a process investigation was undertaken in or about April 2003 to determine root cause and any impact on batches that had been released to the market. To Eckard's

-60-

knowledge, the investigation was still outstanding in May 2003, when she was terminated. No Field Alert was filed with the FDA as required when the quality of batches or product released to the market are suspect. 21 C.F.R. § 314.81 (b)(1)(ii).

113. Further, in the February 2003 RTP audit, Eckard and the other auditors noted that while Cidra had provided computer printouts for process investigations conducted during 2002 and 2003, no clear data for process investigations conducted during 2000 and 2001 had been made available. The auditors noted that they had been provided with log books for the period 2000-2001, which appeared to show that numerous (perhaps several hundred) process investigations were still outstanding. Cidra denied that any investigations were overdue from that time period, but never provided the auditors with any definitive data.

## Understaffing in the Quality Assurance Unit

114. The cGMPs require drug manufacturers to have a distinct QA unit that is responsible for ensuring that drug products produced and released to the market meet all applicable standards. Personnel employed in the unit must be appropriately trained and must be of adequate numbers. 21 C.F.R. 211.25(c). The QA unit is responsible for ensuring that procedures are implemented during the manufacturing process to ensure drug product quality and for

-61-

conducting investigations of apparent errors, including ensuring that investigations of laboratory testing results that may impact the identity, strength, purity and/or safety of drug products are completed in a timely manner and that corrective actions are taken when necessary. 21 C.F.R. 211.22.

115. Cidra's QA unit was chronically understaffed. In or about August 2002, Cidra told the FDA that it would increase the QA Staff by 17 additional resources. At the January 24, 2003, meeting, Cidra told the FDA that it had hired 23 people. However, it did not tell the FDA that many experienced staff had resigned from the QA unit. Therefore, the actual increase in staff fell short of the promised number. This attrition rate continued in 2003.

## Poor Documentation Quality

116. Documentation is crucial to the maintenance of drug quality. Drug manufacturing operations and related quality control and quality assurance systems are required by the cGMPs to be managed and documented according to detailed written procedures covering manufacturing, testing, packaging and storing. See, e.g., 21 C.F.R. § 211.100(a); 21. C.F.R. § 211.180-198. In the April 2, 2003, report, Eckard noted that Cidra had been cited for regulatory violations related to poor documentation quality

-62-

during FDA inspections in 1991, 1992, 1993, 1994, 2001 and 2002. In that report, Eckard noted that critical documents, including validation, investigation and change control documents, were often not signed and/or dated, or were lost or missing.   She noted that Cidra had not responded to regulatory scrutiny by establishing systems to correct the problems.

117. Written procedures, commonly referred to as SOPs, are the foundation of the manufacturing plant's documentation system. The cGMPs require that there be written procedures for the preparation of master records (21 C.F.R. § 211.186(a)), and the "current good" aspect of the cGMPs requires that procedures be reviewed and updating considered on a regular basis.   Most responsible manufacturers review procedures on a one or two year cycle.   In August 2002, 366 SOPs were overdue for review and revision at Cidra.

## Contamination in Products Manufactured in the Sterile Facility

118. Injectable medications are manufactured in the sterile facility.   In the April 2, 2003, report, Eckard cited the sterile facility and Kytril injection as a high risk compliance area. Further, the June 2003 GQA Audit called for the manufacture of Kytril injection to be immediately suspended due to high levels of contamination.   The report called for capital expenditure to

improve conditions of sterile operations or else close the
sterile facility with a sense of urgency.

119. Bactroban ointment, while not a sterile product, is also
manufactured in the sterile facility at Cidra.  Bactroban is an
antibiotic ointment that is used, amongst other things, to treat
impetigo, a contagious skin infection that is common in small
children.  Release to the market of Bactroban ointment that was
contaminated with microorganisms was cited by the FDA in both the
April 2002 FDA-483 and the July 2002 Warning Letter.  At the
January 24, 2003 meeting, GSK told the FDA that it had completed
a line item entitled: "Discuss with FDA (Compliance and Division
of Anti-Infective) the microbial specification requirements for
Bactroban."  Cidra, however, failed to correct the problem.  The
June 2003 GQA Audit documented the release to the market on March
4, 2003, of a further lot of Bactroban contaminated with the same
microorganism as the one that resulted in an FDA-mandated recall
of Bactroban in February/May 2002.  This microorganism, *Ralstonia
paucula*, is associated with human infection such as bacteranemia,
urinary tract infections, meningitis, wound infection, and
peritonitis.  The June 2003 GQA Audit also found that there was
no formal validation to support the microbial cleaning of the
holding tank for Bactroban ointment.  They classified Bactroban
production as a major problem area that could significantly

-64-

impact product quality requiring immediate corrective action.

## Substandard Quality and Control of Water Systems

120.   In the April 2, 2003 report, Eckard cited quality and
control of water systems as a high risk compliance area at Cidra
due to an increase in the number of investigations related to the
isolation of objectionable organisms in the water system.   Eckard
noted that there was a project underway to upgrade the water
system.   However, this project was not progressing.   The June
2003 GQA Audit identified water systems as a major problem that
could significantly impact product quality requiring immediate
corrective action.   The auditors noted that the system design
allowed for build up of stagnant water exhibiting microbial
contamination.   They called for the critical assessment and
redesign of the water systems with swift implementation.

## OOS Events for Environmental Monitoring of Manufacturing Areas and Clean Equipment

121. In the April 2, 2003 report to GSK management, Eckard noted
that manufacturing areas and equipment that had purportedly been
cleaned to eliminate chemical and microbial contamination failed
routine environmental testing on more than a dozen occasions
during 2002.   She also noted that the microbiology laboratory
investigated 8 events of contamination in negative controls

-65-

(i.e., control swabs used in testing for microbial contamination of equipment and manufacturing areas) in 2002, as well as inadequate investigation of root cause.

122. The June 2003 GQA Audit cited continuing contamination of negative controls in 2003, and the recovery of objectionable organisms from sampling plates collected during manufacture.   The auditors noted that production continued even though two separate investigations failed to determine root cause.   The auditors classified this as a major problem that could significantly impact product quality requiring immediate corrective action.

## Destruction of Audit Reports

123. It is current good practice in the pharmacuetical industry to routinely conduct internal audits.   Further, the cGMPs require that the quality assurance unit review all production records to ensure errors are fully investigated (21 C.F.R. § 211.22(a)) and that written production and process control procedures be reviewed (21 C.F.R. § 211.100(a)). In order to promote self-auditing, it is FDA policy to obtain copies of internal audit reports only when investigating a serious health problem or upon order of the court.

124. GSK policy requires that internal audit reports be retained

for 3 years after all actions have been completed to facilitate tracking for future observations and that a 7 year log/record be maintained including the date, scope, auditor and completion of identified actions.  This is consistent with industry practice. The June 2003 GQA Audit found that Cidra's standard procedure was to destroy audit reports once the problems had been discussed with the responsible personnel and to keep no evidence of same. The auditors found that action plans were not documented.  They also found that the audit program did not include the aseptic area or the air handling system.  They classified auditing as a major problem that could significantly impact product quality requiring immediate corrective action.

### Microbiology Laboratory ("Micro Lab")

125. Testing of products and equipment for contamination by objectionable organisms is conducted in the Micro Lab.  The June 2003 RTP found a number of serious deficiencies in the functioning of the Micro Lab, including:

a. Poor controls of materials used in testing functions, including lack of assurance that media (used to test for growth of microorganisms) meets quality standards;

b. Poor document control and lack of data integrity;

c. Poor controls of water samples prior to testing for presence of microorganisms;

-67-

d. Lack of assurance that test samples and materials are maintained at the required temperatures for the duration of incubation and storage periods and no alarms on equipment for notification of out-of-range conditions;

e. No procedures for identification of trends in water and environmental monitoring; and

f. Lack of timeliness in the review and approval of test results.

126. Deficiencies in environmental monitoring (discussed in paragraphs 121 through 122 above) are further evidence of problems impacting the effective functioning of the Micro Lab. The auditors classified the Micro Lab as a major problem area that could significantly impact product quality requiring immediate corrective action.

## Substandard Air Quality

127. The cGMPS provide that air handling systems must be balanced to ensure that they are functioning correctly.  Equipment for controlling air pressure, microorganisms, dust, humidity and temperature must be provided.  21 C.F.R. § 211.46.  The June 2003 GQA Audit found that the design of Cidra's air handling did not meet cGMP standards and created the potential for cross contamination.  The auditors found that pressure differentials

were misdirected allowing improper airflow in certain areas. They classified this as a major problem that could significantly impact product quality requiring immediate corrective action. As stated above, poor air quality likely contributed to the high incidence of "unknown peaks" observed during routine laboratory testing.

### Cytotoxic Research & Development ("R&D") Manufacturing

128.  Cytotoxic substances cause the destruction or inhibit the function of cells.  Manufacture of cytotoxic substances must, for obvious reasons, be strictly quarantined from manufacture of other products.  The June 2003 GQA Audit found that Cidra was engaged in the R&D manufacture of Topotecan, a chemotherapy drug that is associated with serious side-effects, in a contained area in the midst of commercial manufacturing.  The auditors found that air pressure differentials that are crucial to containment of the cytotoxic substance were not properly monitored and documented: the most recent data was dated April 2002.  Further, they found that there was no baseline monitoring in surrounding areas to ensure that toxic substances were contained to the R&D area and had not been tracked into other areas where prescription and over-the-counter drugs were made.  The auditors also found that an area formerly used for Topotecan trials had not been properly decontaminated and decommissioned.  They classified this

-69-

as a major problem that could significantly impact product
quality requiring immediate corrective action.

## Other cGMP Issues

129. The June 2003 GQA Audit identified the following
miscellaneous cGMP issues, and collectively classified this as a
major problem that could significantly impact product quality
requiring immediate corrective action:

    a. Raw materials with no identification or status control;

    b. Product waste inappropriately stored;

    c. Equipment allowing product leakage creating the potential
for cross-contamination;

    d. Containers of drug product open in unprotected areas;

    e. Poor controls of lubricants and cleaning agents creating
the potential for misuse leading to product contamination;

    f. H&K encapsulator for Dyazide (a machine that fills and
seals capsules) was not cleaned after use;

    g. Poor controls of disinfectants to ensure that they are
free of contamination and within expiry date;

    h. No studies to demonstrate effectiveness of disinfection
procedures on surfaces in controlled areas;

    i. Improper storage and inventory tracking of materials used
in process validation; and

    j. 9 of 28 packaging lines not equipped to carry out the

-70-

required 100% electronic verification of printed materials.

## CONCLUSION

130. During the times relevant to this Complaint, the defendants released to the market and made claims to government health programs for drugs manufactured at Cidra that were defective, misidentified as a result of product mix-ups, not manufactured in accordance with FDA approved processes, and/or did not come with the assurance of identity, strength, quality and purity required for distribution to patients; and/or the approvals for which were obtained through false representations to the FDA.

131. These false claims arose out of chronic, serious deficiencies in the quality assurance function at the Cidra plant and the defendants' ongoing serious violations of the laws and regulations designed to ensure the fitness of drug products for use, including the Federal Food, Drug and Cosmetics Act, 21 U.S.C. §§ 301 *et seq.*, and the Code of Federal Regulations, Title 21. GSK lied to the FDA in the process of Warning Letter recovery and beyond in order to conceal its inability and/or unwillingness to correct these quality failures and legal and regulatory violations.

132. Further, on information and belief, GSK employees diverted

-71-

reject drug product from the Cidra plant to black markets in Latin America. On information and belief, this resulted in the distribution of reject drug product to the United States market and the submission of false claims for drug product that was defective.

133. On information and belief, as set forth in paragraphs 45 through 46 above, after its purchase of the global rights to Kytril in or about January 2001, Roche filed and caused to be filed false claims under the FCA and state and city equivalents by failing to discharge its responsibility under 21 C.F.R. § 211.22(a) to ensure that Kytril was fit for use.

CAUSES OF ACTION

FIRST CAUSE OF ACTION
(Federal False Claims Act
31 U.S.C. § 3729(a)(1))

134. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 133 above as though fully set forth herein again at length.

135. This is a claim for penalties and treble damages under the Federal False Claims Act.

-72-

136. By virtue of the acts described above, Defendants, for the purpose of defrauding the Government, knowingly presented and/or caused to be presented false or fraudulent claims for payment or approval under the Medicare, Medicaid and other Government health programs to officers, employees or agents of the United States Government, within the meaning of 31 U.S.C. § 3729(a)(1).

137. As a result, federal monies were lost through payments made in respect of the claims and other costs were sustained by the Government.

138. Therefore, the Federal Government has been damaged in an amount to be proven at trial.

139. Additionally, the Federal Government is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendants and arising from their fraudulent conduct as described herein.

SECOND CAUSE OF ACTION
(Federal False Claims Act
31 U.S.C. § 3729(a)(2))

140. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 133 above as though fully set forth herein again at length.

-73-

141. This is a claim for penalties and treble damages under the Federal False Claims Act.

142. By virtue of the acts described above, the Defendants, for the purpose of defrauding the Government, knowingly made, used and/or caused to be made or used, false or fraudulent records or statements to get false and fraudulent claims paid or approved under Medicare, Medicaid and other Government health programs, within the meaning of 31 U.S.C. § 3729(a)(2).

143. As a result, federal monies were lost through payments made in respect of the claims and other costs were sustained by the Government.

144. Therefore, the Federal Government has been damaged in an amount to be proven at trial.

145. Additionally, the Federal Government is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

### THIRD CAUSE OF ACTION
(Federal False Claims Act
31 U.S.C. § 3730 (h))

146. Plaintiff/relator repeats and realleges each and every

allegation contained in paragraphs 1 through 133 above as though fully set forth herein again at length.

147. This is a claim for damages and other relief under the Federal False Claims Act.

148. By virtue of the acts described above, Defendant GSK discharged the plaintiff/relator and discriminated against her in the terms and conditions of her employment because of lawful acts done by her in furtherance of this action, in violation of 31 U.S.C. § 3730 (h).

149. As a result, the plaintiff/relator been damaged in an amount to be proven at trial.

150. Additionally, the plaintiff/relator is entitled to reinstatement with the same seniority status that she would have had but for the discrimination.

<u>FOURTH CAUSE OF ACTION</u>
(California False Claims Act
Cal. Gov't Code § 12651(a)(1))

151. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 133 above as though fully set forth herein.

152. This is a claim for penalties and treble damages under the California False Claims Act.

153. By virtue of the acts described above, Defendants, for the purpose of defrauding the California State Government, knowingly presented and/or caused to be presented false claims for payment or approval under Medicaid and other California State funded programs to officers or employees of the state within the meaning of Cal. Gov't Code § 12651(a)(1).

154. As a result, California State monies were lost through payments made in respect of the claims and other costs were sustained by the California State Government.

155. Therefore, the California State Government has been damaged in an amount to be proven at trial.

156. Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

FIFTH CAUSE OF ACTION
(California False Claims Act
Cal. Gov't Code § 12651(a)(2))

157. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 133 above as though fully set forth herein.

158. This is a claim for penalties and treble damages under the California False Claims Act.

159. By virtue of the acts described above, Defendants, for the purpose of defrauding the California State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other California State funded programs within the meaning of Cal. Gov't Code § 12651(a)(2).

160. As a result, California State monies were lost through payments made in respect of the claims and other costs were sustained by the California State Government.

161. Therefore, the California State Government has been damaged in an amount to be proven at trial.

162. Additionally, the California State Government is entitled to

-77-

the maximum penalty of $10,000 for each and every false claim **paid or approved** arising from the Defendants' fraudulent conduct as described herein.

## SIXTH CAUSE OF ACTION
(Delaware False Claims and Reporting Act
6 Del. C. § 1201(a)(1))

163.  Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 133 above as though fully set forth herein.

164. This is a claim for penalties and treble damages under the Delaware False Claims and Reporting Act.

165. By virtue of the acts described above, Defendants, for the purpose of defrauding the Delaware State Government, knowingly presented and/or caused to be presented, directly or indirectly, false or fraudulent claims for payment or approval under Medicaid and other Delaware State funded programs to officers or employees of the state within the meaning of 6 Del. C. § 1201(a)(1).

166. As a result, Delaware State monies were lost through payments made in respect of the claims and other costs were sustained by the Delaware State Government.

167. Therefore, the Delaware State Government has been damaged in an amount to be proven at trial.

168. Additionally, the Delaware State Government is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

### SEVENTH CAUSE OF ACTION
(Delaware False Claims and Reporting Act
6 Del. C. § 1201(a)(2))

169. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 133 above as though fully set forth herein.

170. This is a claim for penalties and treble damages under the Delaware False Claims and Reporting Act.

171. By virtue of the acts described above, Defendants, for the purpose of defrauding the Delaware State Government, knowingly made, used, and/or caused to be made or used, directly or indirectly, false records or statements to get false or fraudulent claims paid or approved under Medicaid and other Delaware State funded programs within the meaning of 6 Del. C. § 1201(a)(2).

-79-

172. As a result, Delaware State monies were lost through payments made in respect of the claims and other costs were sustained by the Delaware State Government.

173. Therefore, the Delaware State Government has been damaged in an amount to be proven at trial.

174. Additionally, the Delaware State Government is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim **paid or approved** arising from the Defendants' fraudulent conduct as described herein.

## EIGHTH CAUSE OF ACTION
(District of Columbia Procurement Reform Amendment Act
D.C. Code § 2-308.14(a)(1))

175. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 133 above as though fully set forth herein.

176. This is a claim for penalties and treble damages under the District of Columbia Procurement Reform Amendment Act.

177. By virtue of the acts described above, Defendants, for the purpose of defrauding the District of Columbia Government, knowingly presented and/or caused to be presented, false claims for

-80-

payment or approval under Medicaid and other District of Columbia funded programs to officers or employees of the District within the meaning of D.C. Code § 2-308.14(a)(1).

178. As a result, District of Columbia monies were lost through payments made in respect of the claims and other costs were sustained by the District of Columbia Government.

179. Therefore, the District of Columbia Government has been damaged in an amount to be proven at trial.

180. Additionally, the District of Columbia Government is entitled to the maximum penalty of $10,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

NINTH CAUSE OF ACTION
(District of Columbia Procurement Reform Amendment Act
D.C. Code § 2-308.14(a)(2))

181. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 133 above as though fully set forth herein.

182. This is a claim for penalties and treble damages under the District of Columbia Procurement Reform Amendment Act.

-81-

183. By virtue of the acts described above, Defendants, for the purpose of defrauding the District of Columbia Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other District of Columbia funded programs within the meaning of D.C. Code § 2-308.14(a)(2).

184. As a result, District of Columbia monies were lost through payments made in respect of the claims and other costs were sustained by the District of Columbia Government.

185. Therefore, the District of Columbia Government has been damaged in an amount to be proven at trial.

186. Additionally, the District of Columbia Government is entitled to the maximum penalty of $10,000 for each and every false claim **paid or approved** arising from the Defendants' fraudulent conduct as described herein.

TENTH CAUSE OF ACTION
(Florida False Claims Act
Fla. Stat. § 68.082(2)(a))

187. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 133 above as though fully set forth herein.

-82-

188. This is a claim for penalties and treble damages under the Florida False Claims Act.

189. By virtue of the acts described above, Defendants, for the purpose of defrauding the Florida State Government, knowingly presented and/or caused to be presented false claims for payment or approval under Medicaid and other Florida State funded programs to officers or employees of the state within the meaning of Fla. Stat. § 68.082(2)(a).

190. As a result, Florida State monies were lost through payments made in respect of the claims and other costs were sustained by the Florida State Government.

191. Therefore, the Florida State Government has been damaged in an amount to be proven at trial.

192. Additionally, the Florida State Government is entitled to the maximum penalty of $10,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

ELEVENTH CAUSE OF ACTION
(Florida False Claims Act
Fla. Stat. § 68.082(2)(b))

193. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 133 above as though fully set forth herein.

194. This is a claim for penalties and treble damages under the Florida False Claims Act.

195. By virtue of the acts described above, Defendants, for the purpose of defrauding the Florida State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved under Medicaid and other Florida State funded programs within the meaning of Fla. Stat. § 68.082(2)(b).

196. As a result, Florida State monies were lost through payments made in respect of the claims and other costs were sustained by the Florida State Government.

197. Therefore, the Florida State Government has been damaged in an amount to be proven at trial.

198. Additionally, the Florida State Government is entitled to the

-84-

maximum penalty of $10,000 for each and every false or fraudulent claim **paid or approved** arising from the Defendants' fraudulent conduct as described herein.

TWELFTH CAUSE OF ACTION
(Georgia State False Medicaid Claims Act
Ga. Code Ann. § 49-4-168.1(a)(1))

199. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 133 above as though fully set forth herein.

200. This is a claim for penalties and treble damages under the Georgia State False Medicaid Claims Act.

201. By virtue of the acts described above, Defendants, for the purpose of defrauding the Georgia State Government, knowingly presented and/or caused to be presented to the Georgia Medicaid program false or fraudulent claims for payment or approval within the meaning of Ga. Code Ann. § 49-4-168.1(a)(1).

202. As a result, Georgia State monies were lost through payments made in respect of the claims and other costs were sustained by the Georgia State Government.

203. Therefore, the Georgia State Government has been damaged in an

amount to be proven at trial.

204. Additionally, the Georgia State Government is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim presented or caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

THIRTEENTH CAUSE OF ACTION
(Georgia State False Medicaid Claims Act
Ga. Code Ann. § 49-4-168.1(a)(2))

205. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 133 above as though fully set forth herein.

206. This is a claim for penalties and treble damages under the Georgia State False Medicaid Claims Act.

207. By virtue of the acts described above, Defendants, for the purpose of defrauding the Georgia State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program within the meaning of Ga. Code Ann. § 49-4-168.1(a)(2).

208. As a result, Georgia State monies were lost through payments

made in respect of the claims and other costs were sustained by the Georgia State Government.

209. Therefore, the Georgian State Government has been damaged in an amount to be proven at trial.

210. Additionally, the Georgia State Government is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim **paid or approved** arising from the Defendants' fraudulent conduct as described herein.

FOURTEENTH CAUSE OF ACTION
(Hawaii False Claims Act
Haw. Rev. Stat. § 661-21(a)(1))

211. Plaintiff/relator repeats and realleges each and every allegation contained in paragraphs 1 through 133 above as though fully set forth herein.

212. This is a claim for penalties and treble damages under the Hawaii False Claims Act.

213. By virtue of the acts described above, Defendants, for the purpose of defrauding the Hawaii State Government, knowingly presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other Hawaii State

-87-